## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OPERATING ENGINEERS CONSTRUCTION INDUSTRY AND MISCELLANEOUS PENSION FUND, <br><br> Plaintiff, <br><br> v. <br><br> JAMES DIMON, ASHLEY BACON, LINDA B. BAMMANN, JAMES A. BELL, JOHN H. BIGGS, CRANDALL C. BOWLES, STEPHEN B. BURKE, TODD A. COMBS, DAVID M. COTE, JAMES S. CROWN, MARY C. ERDOES, TIMOTHY P. FLYNN, ELLEN V. FUTTER, MELLODY HOBSON, JOHN J. HOGAN, LABAN P. JACKSON, JR., JOHN W. KESSLER, ROBERT I. LIPP, RICHARD A. MANOOGIAN, MICHAEL A. NEAL, DAVID C. NOVAK, LEE R. RAYMOND, JAMES E. STALEY, WILLIAM C. WELDON, and BARRY L. ZUBROW, <br><br><br> Defendants, <br> and <br><br> JPMORGAN CHASE & CO., <br><br> Nominal Defendant. | Case Number: |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Operating Engineers Construction Industry and Miscellaneous Pension Fund ("Operating Engineers" or "Plaintiff"), for the benefit of nominal defendant JPMorgan Chase & Co. ("JP Morgan," the "Bank," or the "Company"), brings the following Verified Stockholder Derivative Complaint against Defendants James Dimon, Ashley Bacon, Linda B. Bammann, James A. Bell, John H. Biggs, Crandall C. Bowles, Stephen B. Burke, Todd A. Combs, David M. Cote, James S.

Crown, Mary C. Erdoes, Timothy P. Flynn, Ellen V. Futter, Mellody Hobson, John J. Hogan, Laban P. Jackson, Jr., John W. Kessler, Robert I. Lipp, Richard A. Manoogian, Michael A. Neal, David C. Novak, Lee R. Raymond, James E. Staley, William C. Weldon, and Barry L. Zubrow. The allegations of this Complaint are based on the knowledge of Plaintiff as to itself and the investigation of counsel, including the review of publicly available information and documents.

## NATURE AND SUMMARY OF THE ACTION

1.　　Most of the world learned of Jeffrey Epstein's horrific abuses of women and children in 2019, when Epstein was arrested for orchestrating a wide-ranging human trafficking enterprise. Others, however—including those that facilitated Epstein's enterprise—knew of his abusive behavior for more than a decade earlier. JP Morgan was one such facilitator. JP Morgan served as Epstein's primary bank from at least 1998 to 2013, during which time he operated as many as 55 accounts: some in his own name, some in the name of shell companies and sham non-profits, and some in the names of his victims, associates, and recruiters.

2.　　For nearly fifteen years, Epstein relied on these accounts to abuse women and children. Epstein used his JP Morgan accounts to transfer money to recruiters that trafficked new victims and to withdraw vast amounts of cash to pay off his victims. During certain periods, Epstein reportedly withdrew up to $80,000 in cash multiple times a month; he once withdrew more than $750,000 in cash in a single year. Epstein is now infamous for using cash to pay his victims, and his extraordinary cash withdrawals were obviously suspicious even without knowledge of his abusive conduct.

3.　　But JP Morgan knew of Epstein's abusive conduct many years before his arrest, and internally held deep concerns about precisely why Epstein was withdrawing vast amounts of cash and transferring hundreds of thousands of dollars to "modeling" agencies. As early as 2006, when Epstein was arrested for solicitation of a minor, JP Morgan knew not only that Epstein was

abusing young women and children, but that he paid his victims in cash—something that one of JP Morgan's top executives has admitted. In 2008, in 2010, and multiple times in 2011, JP Morgan's employees internally shared reports about Epstein's abuses and expressed concern about the Bank's ongoing relationship with him. In 2011, JP Morgan employees explicitly questioned whether a previous payment to a "model management" agency was "payment for services as a procurer."

4.     Knowledge of Epstein's abusive conduct extended to the very top of the Company's C-suite. Most notoriously, Jes Staley (who, until 2013, served as the chief executive officer ("CEO") of JP Morgan's Investment Bank) shared a deep personal friendship with Epstein. Although JP Morgan is now attempting to lay all blame for its institutional failures on Staley alone in an attempt to escape legal and reputational harm, it is clear that Staley could not have sustained and concealed a 15+ year banking relationship involving tens of millions of dollars without the knowledge and assistance of others within JP Morgan. Mary Erdoes (who has served as CEO of JP Morgan's Asset & Wealth Management division) paid numerous visits to Epstein's home and has admitted that she and JP Morgan knew of Epstein's abuses by 2006. Erdoes is known as a top lieutenant to the Bank's longtime CEO, Jamie Dimon. And Dimon himself appears to have been personally involved in sanctioning the Bank's relationship with Epstein: one August 2008 document references Epstein's $120 million with JP Morgan being in question "pending Dimon review."

5.     Despite this top-to-bottom knowledge, JP Morgan's Board did nothing. JP Morgan knew that Epstein was a serial abuser that relied heavily on cash payments, and that Epstein regularly withdrew vast sums of cash from his JP Morgan accounts. But upon information and belief, JP Morgan consistently failed to file suspicious activity reports ("SARs") that it was

required to file when it suspected potential criminal activity—as it clearly did.  This failure persisted through Epstein's entire 15+ year history with the Bank, and persisted for years even after JP Morgan terminated Epstein's accounts in 2013.  This failure persisted, in fact, through the time of Epstein's final arrest in 2019, until which time Epstein continued to commit his prolific abuses.

6.     This failure to file SARs and otherwise comply with similar anti-money laundering ("AML") and know-your-customer ("KYC") regulations is nothing new for JP Morgan.  Rather, it is a symptom of a broader, years-long failure of governance and oversight by JP Morgan's board of directors—a failure for which JP Morgan was previously cited and penalized by regulators, in 2013 and 2014.  In 2013, both the OCC and the Federal Reserve accused JP Morgan of failing to comply with federal AML laws and regulations, including because the Bank failed to file timely SARs.  JM Morgan was hit with a $350 million sanction in 2014 due to its continuing AML compliance failures.  Not only did the Company face civil penalties, it was faced criminal liability as well:  the Bank pleaded guilty in 2014 to two felony counts relating to failures to comply with AML rules, including the failure to file SARs.

7.     Now, JP Morgan is exposed to substantial legal risk due its role in helping conceal Epstein's crimes.  One of Epstein's victims, identified only as "Jane Doe 1", has brought several claims (on behalf of herself and other victims) against the Bank for its role in Epstein's abuse of her.  The government of the U.S. Virgin Islands has also initiated litigation against the Bank for similar reasons, and is seeking significant monetary damages, including punitive and treble damages.

8.     All told, JP Morgan has suffered and will continue to suffer substantial monetary and reputational harm for its longstanding role in assisting the most egregious sex trafficker in

modern history.  Had JP Morgan's Board and senior officers taken their oversight responsibilities seriously, JP Morgan would have consistently reported Epstein's suspicious practices and would have terminated its relationship with him much sooner than it actually did.  Plaintiff brings this action on behalf of JP Morgan to hold these directors and officers to account for their longstanding governance failures.

## THE PARTIES

9.      Plaintiff is a stockholder of JP Morgan, and has held JP Morgan stock since 2010.

10.     Nominal Defendant JPMorgan Chase & Co. is a Delaware corporation with its principal place of business in New York City, New York.  JP Morgan's principal bank subsidiary is JPMorgan Chase Bank, National Association.

11.     Defendant James Dimon ("Dimon") has been a director of JP Morgan since 2004. Dimon has been JP Morgan's CEO since 2005 and Chairman of the Board since 2006.  Dimon is an individual and is believed to be a resident of New York, New York.

12.     Defendant Ashley Bacon ("Bacon") has been JP Morgan's Chief Risk Officer since 2013.  Bacon is an individual and is believed to be a resident of Greenwich, Connecticut.

13.     Defendant Linda B. Bammann ("Bammann") has been a director of JP Morgan since 2013.  Bammann has been Chair of the Risk Committee since 2017, and a member of the Risk Committee from 2014-2017.  Bammann is an individual and is believed to be a resident of Ocala, Florida.

14.     Defendant James A. Bell ("Bell") was a JP Morgan director from 2011-2020. During that time, Bell was a member of the Audit Committee from 2012-2016, and Chair of the Audit Committee from 2017-2020.  Bell is an individual and is believed to be a resident of Beverly Hills, California.

15.     Defendant John H. Biggs ("Biggs") was a director of JP Morgan from 2003-2008. During that time, Biggs was a member of the Audit Committee from at least 2006-2008.  Biggs is an individual and is believed to be a resident of St. Louis, Missouri.

16.     Defendant Crandall C. Bowles ("Bowles") was a JP Morgan director from 2006-2018.  Bowles was a member of the Audit Committee from 2007-2018.  Bowles is an individual and is believed to be a resident of Fort Mill, South Carolina.

17.     Defendant Stephen B. Burke ("Burke") has been a director of JP Morgan since 2004.  Burke is an individual and is believed to be a resident of Dillon, Montana.

18.     Defendant Todd A. Combs ("Combs") has been a director of JP Morgan since 2016. Combs was a member of the Risk Policy Committee from 2017-2019.  Combs is an individual and is believed to be a resident of Omaha, Nebraska.

19.     Defendant David M. Cote ("Cote") was a director of JP Morgan from 2007-2013. During that time, Cote was a member of the Risk Policy Committee from 2008-2013.  Cote is an individual and is believed to be a resident of Pine Plains, New York.

20.     Defendant James S. Crown ("Crown") has been as a director of JP Morgan since 2004.  Crown was a member of the Risk Committee from at least 2006-2007 and since 2017, and Chair of the Risk Committee from 2007-2017.  Crown is an individual and is believed to be a resident of Chicago, Illinois

21.     Defendant Mary Callahan Erdoes ("Erdoes") joined JP Morgan in 1996 as head of fixed income for high-net-worth accounts.  She became CEO of JP Morgan Private Bank in 2005. In September 2009, Erodes obtained her current role as CEO of JP Morgan's Asset & Wealth Management division.  Erodes is an individual and is believed to be a resident of Miami, Florida.

22.     Defendant Timothy P. Flynn ("Flynn") has been a director of JP Morgan since 2012.  Flynn has been Chair of the Audit Committee since 2021, was a member of the Audit Committee from 2017-2021, and was a member of the Risk Policy Committee from 2013-2017.  Flynn is an individual and is believed to be a resident of Marana, Arizona.

23.     Defendant Ellen V. Futter ("Futter") was a director of JP Morgan from 2001-2013.  Futter was a member of the Risk Policy Committee from at least 2006-2013.  Futter is an individual and is believed to be a resident of New York, New York.

24.     Defendant Mellody Hobson ("Hobson") has been a director of JP Morgan since 2018.  Hobson was a member of the Audit Committee in 2019, and has been a member of the Risk Committee since 2020.  Hobson is an individual and is believed to be a resident of Chicago, Illinois.

25.     Defendant John J. Hogan ("Hogan") was JP Morgan's Chief Risk Officer from 2012-2013.  Hogan is an individual and is believed to be a resident of Naples, Florida.

26.     Defendant Laban P. Jackson, Jr. ("Jackson") was a director of JP Morgan from 2004-2020.  During that time, Jackson was Chair of the Audit Committee from at least 2006-2016, and a member of the Audit Committee from 2017-2020.  Jackson is an individual and is believed to be a resident of Harbor Springs, Missouri.

27.     Defendant John W. Kessler ("Kessler") was a director of JP Morgan from 1995-2007.  Kessler is an individual and is believed to be a resident of New Albany, Ohio.

28.     Defendant Robert I. Lipp ("Lipp") was a director of JP Morgan from 2003-2009.  During that time, Lipp was a member of the Risk Committee from at least 2006-2009.  Lipp is an individual and is believed to be a resident of New York, New York.

29.     Defendant Richard A. Manoogian ("Manoogian") was a director of JP Morgan from 1978-2007.  During that time, Manoogian was a member of the Audit Committee from at least 2006-2007.  Manoogian is an individual and is believed to be a resident of Grosse Pointe Park, Michigan.

30.     Defendant Michael A. Neal ("Neal") has been a director of JP Morgan since 2014. Neal has been a member of the Audit Committee since 2021, and was a member of the Risk Policy Committee from 2014-2020.  Neal is an individual and is believed to be a resident of Naples, Florida.

31.     Defendant David C. Novak ("Novak") was a JP Morgan director from 2004-2012. During that time, Novak was a member of the Compensation and Management Development Committee from 2006-2012, and was Chair of the Corporate Governance and Nominating Committee from 2006-2012.  Novak is an individual and is believed to be a resident of Southampton, New York.

32.     Defendant Lee R. Raymond ("Raymond") was a director of JP Morgan from 2001-2020.  Raymond is an individual and is believed to be a resident of Westlake, Texas.

33.     Defendant James E. Staley ("Staley") was the CEO of JP Morgan's Investment Bank from September 2009 through January 2013.  Previously, Staley was the CEO of JP Morgan's Asset Management division from 2001-2009, and was the head of JP Morgan's Private Banking division from 1999-2001.  Staley is an individual and is believed to be a resident of Manhattan, New York.

34.     Defendant William C. Weldon ("Weldon") was a director of JP Morgan from 2005-2019.  Weldon is an individual and is believed to be a resident of North Palm Beach, Florida.

35.     Defendant Barry L. Zubrow ("Zubrow") was JP Morgan's Chief Risk Officer from 2007-2012.  Zubrow is an individual and is believed to be a resident of West Palm Beach, Florida.

36.     Defendants Bammann, Bell, Biggs, Bowles, Burke, Combs, Cote, Crown, Dimon, Flynn, Futter, Hobson, Jackson, Kessler, Lipp, Neal, Novak, Manoogian, Raymond, and Weldon are referred to collectively herein as the "Director Defendants."

37.     Defendants Bacon, Dimon, Erdoes, Hogan, Staley, and Zubrow are referred to collectively herein as the "Officer Defendants."

38.     The Director Defendants and Officer Defendants are collectively referred to herein as "Defendants."

## RELEVANT NON-PARTIES

39.     Alicia Boler Davis ("Davis") has been a director of JP Morgan since March 2023.

40.     Alex Gorsky ("Gorsky") has been a director of JP Morgan since July 2022.

41.     Phebe N. Novakovic ("Novakovic") has been a director of JP Morgan since 2020.

42.     Virginia M. Rometty ("Rometty") has been a director of JP Morgan since 2020.

## JURISDICTION AND VENUE

43.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.  The Court has supplemental jurisdiction over the state law claims asserted herein pursuant 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

44.     Venue is proper in this Court because JP Morgan has its principal place of business in this district, Plaintiff's claims arose in this district, and JP Morgan has suffered and will continue to suffer harm in this district.  Venue is further proper in this Court because various actions related to the allegations asserted herein, including *Doe v. JP Morgan* and *USVI v. JP Morgan* (defined below), are currently pending before this Court.

## PROCEDURAL BACKGROUND

45.     JP Morgan is currently defending allegations from two distinct lawsuits stemming from its facilitation and concealment of Epstein's abuse.  First, a plaintiff identified as "Jane Doe 1", on behalf of herself and other victims of Epstein's abuse, asserted several claims against the Company's primary banking subsidiary, JP Morgan Chase Bank, N.A., in the litigation styled *Jane Doe 1 v. JP Morgan Chase Bank, N.A.*, 22-cv-10019 (JSR) ("*Doe v. JP Morgan*").  Second, the government of the U.S. Virgin Islands also asserted several claims against JP Morgan Chase Bank, N.A. in the litigation styled *Government of the United States Virgin Islands v. JP Morgan Chase Bank, N.A.*, 22-cv-10904 (CSR) ("*USVI v. JP Morgan*").

46.     In both actions, the plaintiffs broadly allege that for several years, JP Morgan knew about Epstein's abusive conduct and knew about Epstein's suspicious use of his many accounts at the Bank, yet failed to comply with federal regulations to report his suspicious activity.  This failure and concealment, in turn, helped Epstein's systematic abuse to continue unchecked.  Plaintiffs in both actions seek monetary damages, including punitive and treble damages in the *USVI v. JP Morgan* action.  JP Morgan therefore faces a material risk of substantial monetary liability, above and beyond the significant reputational harm that JP Morgan has already suffered and will continue to suffer as a result of its longstanding facilitation and concealment of Epstein's crimes.  JP Morgan also faces the risk of fines or monetary damages as the result of potential governmental investigations into its conduct.

## SUBSTANTIVE ALLEGATIONS

## I.     EPSTEIN'S DECADES OF ABUSIVE CONDUCT

47.     The shocking extent and gravity of Epstein's abuses are now well known.  For more than two decades, Epstein operated a vast network of shell companies, intermediaries, and enablers

for the sole purpose of trafficking and abusing young women at his properties, including in the U.S. Virgin Islands.

48.     Epstein is reported to have begun his systematic exploitation of young women as early as the 1990s.  But since at least 2001, Epstein trafficked young girls and women to the U.S. Virgin Islands, where he then had them transported to his private island, Little St. James.[1]  He also trafficked women to New York and to other properties he owned.  Epstein and his associates often deceived these girls and young women into traveling with promises of modeling contracts, employment, or educational opportunities.  Other times, Epstein's abuse began as a demand for a massage, which rapidly evolved into abuse.  Once trafficked to the U.S. Virgin Islands, Epstein and others in his network exploited and abused these women, and then ensured their silence with both threats and payoffs.  Epstein was infamous for paying his victims in cash, although he on occasion also wired money directly to both victims and allies.[2]

49.     The full scale of Epstein's abuses is hard to comprehend.  Epstein is accused of trafficking and abusing girls as young as 11 years old, reflecting his repulsive preference of the "younger the better."[3]  Air traffic controllers and other airport personnel in the U.S. Virgin Islands reported seeing Epstein disembark from his plane with girls that appeared to be between 11 and 18 years old.  In one harrowing instance, a 15 year old victim that Epstein abused on Little St.

---

[1] *Government of the United States Virgin Islands v. Indyke*, et al. ST-20-CV-14, Second Am. Compl. (Nov. 30, 2022) at ¶49 (hereinafter "USVI State Complaint").

[2] *Government of the United States Virgin Islands v. JP Morgan Chase Bank, N.A.*, 22-cv-10904 (CSR), Second Am. Compl. (Apr. 12, 2023) at ¶42 (hereinafter "USVI Complaint").

[3] *Jane Doe 1 v. JP Morgan Chase Bank, N.A.*, 22-cv-10019 (JSR), First Am. Compl. (Jan. 13, 2023) at ¶126 (hereinafter "Doe Complaint").

James attempted to escape by swimming off the island.  Epstein organized a search party, found the victim, confiscated her passport, and threatened her with physical harm if she did not submit.[4]

50.      Epstein trafficked many of his victims from Eastern Europe and sometimes kept the same girls and women in servitude for several years.  For example, Epstein is accused of having flown one victim to his island dozens of times between 2004 and 2017; and another more than 50 times between 2000 and 2002.  This meant that Epstein eventually had to grapple with immigration concerns.  To address this problem, Epstein forced some of his victims to marry his American citizen associates (or even other victims), and then helped finalize arrangements with immigration authorities.[5]  Epstein is accused of having forced at least three victims into marriages, and then threatening them with harm if they attempted to leave.

51.      Epstein's appetite for abuse was seemingly insatiable.  Epstein is reported to have regularly abused up to 3-4 victims each day—a demand that even Epstein's extensive network struggled to supply.  Epstein therefore demanded that his victims themselves help deceive and recruit other victims.  To this end, Epstein often instructed his victims to go to night clubs or on shopping trips to help identify other unsuspecting women and girls that they might be able to entrap.  Epstein paid an additional fee for each new victim that an existing victim lured in.

52.      The frequency and duration of his crimes make clear that Epstein could not have orchestrated his abuse without both an extensive network of allies and enablers, and steady, unquestioned access to large amounts of cash.  In JP Morgan, Epstein had both.

---

[4] USVI State Complaint, ¶60.

[5] USVI State Complaint, ¶63.

## II.      JP MORGAN ENABLED EPSTEIN'S CRIMES FOR YEARS

53.      Epstein was a JP Morgan client from at least 1998 through 2013.  Over this time, JP Morgan serviced roughly 55 accounts that belonged or were related to Epstein, collectively worth hundreds of millions of dollars.  In addition to accounts in his own name, Epstein also operated many JP Morgan accounts in the names of other companies and non-profit entities that often had no legitimate business purpose.  These entities included 2013 Butterfly Trust, Coatue Enterprises, LLC, C.O.U.Q. Foundation, Enhanced Education, Financial Trust Company, Inc., HBRK Associates, Inc., Hyperion Air, Inc, JEGE, Inc., JEGE, LLC, NES, LLC, Plan D, LLC, Southern Financial, LLC, and Southern Trust Company, each of which had accounts with JP Morgan.  Epstein used many of these entities to make and conceal payments to his victims and his associates or, as the U.S. Virgin Islands alleges, to help shield his assets from judgment.

54.      Over the many years that Epstein served as a star JP Morgan client, he used his 55+ accounts with the Bank extensively to facilitate his abuse.  According to the U.S. Virgin Islands government, Epstein paid at least 20 of his victims through JP Morgan accounts, and these victims collectively received in excess of $1 million.  Epstein also used his JP Morgan accounts to pay his associates and enablers: the U.S. Virgin Islands government alleges that Epstein paid nearly $1.5 million to known recruiters.

55.      The details of these enormous payments are deeply troubling.  Epstein paid the plaintiff identified as Jane Doe 1, for example, more than $600,000 through his JP Morgan accounts between 2003 and 2013.  Epstein's abuse of Doe 1 began when she was only 14 years old.[6]  In an obvious sign that something was amiss, Doe 1 listed Epstein's New York City townhouse as her address for purposes of the many payments she received from Epstein.

---

[6] USVI Complaint, ¶66.

56.     More troublingly, Epstein also regularly withdrew millions of dollars from his JP Morgan accounts—in *cash*.  As early as 2006, a JP Morgan Rapid Response Team noted that Epstein routinely withdrew $40,000 to $80,000 in cash from his accounts several times each month, and more than $750,000 per year.  In each of 2004 and 2005, Epstein withdrew more than $800,000 in cash.  Epstein also used his JP Morgan accounts to make at least 95 foreign remittances to unknown payees—another blatantly suspicious pattern of conduct.

57.     Some of Epstein's use of cash is so obviously illegitimate that it almost defies belief.  For example, the company that owned and operated Epstein's private plane (Hyperion Air, Inc.) issued more than $547,000 in checks—payable to cash—for "fuel expenses when traveling to foreign countries."[7]  Apart from the absurdity of paying for hundreds of thousands of dollars' worth of jet fuel in cash, some of these checks were issued when Epstein was under house arrest,[8] and plainly unable to travel anywhere.

58.     Similarly, between January 2012 and June 2013, Hyperion converted more than $120,000 into foreign currency, with the constituent cash withdrawals either exceeding the typical $10,000 reporting threshold, or being structured in a way to avoid meeting this threshold.  Epstein also used other entities under his control to funnel payments to his victims and associates.  For example, Epstein used a charitable organization he controlled (and which had an account with JP Morgan) to pay $29,464 to three young women, and used another organization to pay $124,232 to Leslie Wexner, who is now known to have been a vital part of Epstein's network.

---

[7] USVI Complaint, ¶67.

[8] As discussed further below, Epstein was arrested in Florida in 2006 on charges of soliciting a minor for prostitution, and entered into a plea agreement in 2008.

### III.    JP MORGAN WILLFULLY IGNORED AND FAILED TO REPORT EPSTEIN'S HIGHLY SUSPICIOUS PRACTICES

59.     JP Morgan knew of Epstein's true nature at least as early as 2006.  The previous year, press reports emerged that claimed that Epstein paid a 14-year old girl in Palm Beach, Florida for a massage and then proceeded to abuse her.  These press reports prompted other Epstein victims to come forward with similar allegations.  In 2006, Epstein was arrested and indicted in Florida for solicitation of a minor, amidst additional extensive press reports about his crimes.

60.     JP Morgan was immediately aware of Epstein's arrest.  In 2006, the same year Epstein was arrested, JP Morgan's Global Corporate Security Division found "[s]everal newspaper articles … that detail the indictment of Jeffrey Epstein in Florida on felony charges of soliciting underage prostitutes"[9] (*i.e.* raping children).  Despite these reports and Epstein's indictment, JP Morgan decided to retain Epstein as a client—while concluding that his account "should be classified as high risk" and require special approval.[10]

61.     JP Morgan's knowledge of Epstein's crimes at this time was not limited to lower-level employees, but extended all the way to the top.  At her deposition in the *USVI v. JP Morgan* action, Mary Erdoes (who was CEO of JP Morgan Private Bank from 2005 until she became CEO of the Asset & Wealth Management Division in 2009) admitted that JP Morgan was aware in 2006 not only that Epstein was abusing women and underage girls, but that Epstein paid these victims in cash.  Crucially, this was the same year that a team at JP Morgan made an internal report that Epstein was withdrawing up to $80,000 in cash at a time, *multiple times a month.*

---

[9] USVI Complaint, ¶44.

[10] USVI Complaint, ¶44.

62.     In 2008, Epstein pled guilty to several of the charges that he faced in Florida, including solicitation of a minor for prostitution.  As part of his plea arrangement, Epstein was sentenced to serve 18 months in jail and was required to register as a sex offender.[11]  To the extent JP Morgan had any doubts about the allegations against Epstein in 2006, Epstein's guilty plea in 2008 erased them.

63.     Internally, Epstein's guilty plea led some of JP Morgan's employees to assume that the Bank would immediately terminate its sprawling relationship with the now-convicted sex trafficker.  But they would be mistaken, as JP Morgan's senior-most executives decided to maintain this lucrative, if problematic, relationship.  In August 2008, a JP Morgan employee wrote that she "would count Epstein's assets as a probable outflow for '08 ($120mm or so?) as I can't imagine it will stay (pending [Jamie] Dimon review)."[12]

64.     Given that JP Morgan continued to service Epstein's accounts for at least five more years, the "Dimon review" evidently resulted in a decision not to take any action against Epstein following his guilty plea but, rather, to retain the lucrative relationship.  The same year, in a reflection of JP Morgan's decision to brush off Epstein's known crimes, Erdoes received an email asking her whether Epstein was at an event "with miley cyrus"—who was only 16 years old at the time.[13]

65.     Press reports about Epstein's abusive conduct continued to emerge in subsequent years, and JP Morgan compliance employees continued to express concerns about the Bank's

---

[11] Epstein's full non-prosecution agreement with Florida became public in 2009.  This agreement alleged that Epstein trafficked and engaged in illicit sexual conduct with minors, including across state lines.

[12] USVI Complaint, ¶51.

[13] USVI Complaint, ¶95.

continued patronage of someone with Epstein's history.  In 2010, JP Morgan learned of even more allegations in the press against Epstein, detailing his trafficking of women and minors for abuse. In an internal email, an employee in JP Morgan's risk management division referred to "new allegations of an investigation related to child trafficking," and asked whether the Bank was "still comfortable with this client who is now a registered sex offender."[14]  Other JP Morgan compliance employees decided that Epstein "should go."[15]  But reflecting the Bank's fundamental attitude to Epstein's crimes, a different JP Morgan risk management employee dismissed these disturbing reports as routine: "In my short tenure working on the account these stories pop up including these from the summer."[16]

66.     The next year, in January 2011, JP Morgan once again was made keenly aware of yet more allegations of human trafficking against Epstein.  And yet again, JP Morgan brushed off the allegations.  That month, JP Morgan conducted a review of Epstein's accounts because a "few news stories during 2010 connect[ed] Jeffrey Epstein to human trafficking."[17]  The U.S. Virgin Islands alleges that JP Morgan's coverage team "met to discuss the situation and agreed to enhance monitoring and document a discussion with the client."[18]  Unsurprisingly, Defendant Jes Staley— the CEO of JP Morgan's Investment Bank who seemingly participated in Epstein's crimes, as discussed in Section IV below—was the JP Morgan executive that the Bank entrusted to hold this "discussion" with Epstein.  Also unsurprisingly, Epstein claimed "there was no truth to the

---

[14] USVI Complaint, ¶45.

[15] USVI Complaint, ¶98.

[16] USVI Complaint, ¶45.

[17] USVI Complaint, ¶46.

[18] USVI Complaint, ¶47.

allegations" against him and "no evidence."[19]   JP Morgan internally concluded that it would "continue to monitor the accounts and cash usage closely going forward."[20]

67.     In other words, JP Morgan knew that Epstein was a convicted sexual offender who heavily relied on his cash to pay his victims and his associates.  JP Morgan also knew that Epstein regularly withdrew huge amounts of cash from his many accounts with the Bank.  Yet JP Morgan's response was to simply "monitor" Epstein's already-extraordinary "cash usage," rather than take any measures to report his blatantly suspicious transactions to the authorities.  In a hint that Epstein was too large of a client for JP Morgan to take action against, the Bank had granted Epstein a new $50 million line of credit only weeks earlier, in December 2010.

68.     Only two months later, JP Morgan's Global Corporate Security Division internally circulated even more devastating reports about Epstein's abuses.  In March 2011, this division reported that "[n]umerous articles detail various law enforcement agencies investigating Jeffrey Epstein for allegedly participating, directly or indirectly, in child trafficking and molesting underage girls."[21]   Even more damningly, this report also noted that Epstein had "settled a dozen civil lawsuits out of court from his victims regarding solicitation."[22]   This made it abundantly clear to JP Morgan that Epstein was not a one-off offender—he was a prolific, serial abuser of women and girls that he paid through his many JP Morgan bank accounts.

69.     This same March 2011 report also noted that a company named "MC2 Model Management and Jeffrey Epstein engaged in racketeering that involved luring in minor children

---

[19] USVI Complaint, ¶47.

[20] USVI Complaint, ¶47.

[21] USVI Complaint, ¶48.

[22] USVI Complaint, ¶48.

for sexual play for money," and that MC2's owner was a "frequent passenger on Epstein's private jet and often visited Epstein in jail."[23]  Worse, the report noted that Epstein paid MC2 $1 million in 2005, and that it was "unknown if the money was given as a secret investment or payment for services as a procurer."[24]

70.     JP Morgan was plainly concerned that Epstein was using his accounts with the Bank to "procure" ever more victims.  This concern within the Bank soon also spread to others within Epstein's orbit.  Although most of the public learned of Ghislaine Maxwell's key role in Epstein's abuses only after her arrest in 2019, JP Morgan suspected her involvement years earlier.  In August 2011, Maxwell applied to open a new account with JP Morgan for a "personal recruitment consulting business."[25]  Internally, JP Morgan's AML director asked: "What does she mean by personal recruitment?? Are you sure this will have nothing to do with Jeffrey? If you want to proceed, I suggest that we flag this as a High Risk Client."[26]  While it is unclear how JP Morgan may have treated Maxwell internally, the Bank plainly did not ever report Maxwell's suspicious "recruitment" activities to regulators.

71.     Also in 2011, a senior JP Morgan compliance official who reviewed the Bank's relationship with Epstein warned that there was "[l]ots of smoke" and "[l]ots of questions" surrounding Epstein's criminal behavior.[27]  According to the U.S. Virgin Islands' complaint against JP Morgan, these included that:

---

[23] USVI Complaint, ¶48.

[24] USVI Complaint, ¶48.

[25] USVI Complaint, ¶49.

[26] USVI Complaint, ¶49.

[27] USVI Complaint, ¶98.

- Epstein "is alleged to be involved in the human trafficking of young girls and law enforcement is also allegedly investigating his involvement in this activity."

- "He is also an alleged personal associate of the CEO of the Investment Bank (Jes Staley)."

- "AML Operations went to a [Private Bank] risk meeting late last week requesting that we exit this relationship."

- "[W]hether Epstein if further exposed could have a potential serious impact."

- "The one new concerning thing is the one article about the DOJ investigation is saying they brought under age girls to the US via a modeling agency M2 that is owned by a guy named Brunel. Turns out the banker said today we extended Epstein a loan in relation to this modeling agency." The writer claims that the agency is "legit" and that "it would be hard for us to tell" if "girls were exploited via their contract or arrangement." The loan was a letter of credit provided by JP Morgan to MC2 Model Management.

- In 2004, Epstein sponsored private bank accounts and credit cards for two 18 year olds "that appear to be part of his inner entourage. One is mentioned in many of the recaps of the escapades as a willing participant and assistant when hosting visitors. She has received about 450,000 since opening from Epstein . . . . Both can be put in Palm Beach during 2004, by way of debit charges, which was when most allegations were from . . . . He did pay other girls, many models no huge amounts. Sugar Daddy!"

- "His foundation account did pay donations to the Palm Beach Police Dept as reported just before the case started. The same foundation account did pay monies direct to models and payments direct to specialty schools (massage, culinary) and university's on behalf of models/aspiring actresses. Nothing was astronomical."

- "His business accounts Fiduciary we saw no client activity. I know his biggest client, Wexner parted ways when he was convicted. His [Due Diligence Reports] say he manages a few private clients money but never says who. I would like to know if in fact he is managing anyone's money at this point or is it all his money. We saw no evidence of disbursements even in the rocky years 08-09. When the well to do were running to their mattresses, he did not have any distributions from his accounts at Bear or JP. He does have money at other institutions so maybe it happened there."

*USVI v. JP Morgan* Complaint, ¶98.

72.     Despite unequivocally knowing that Epstein was a serial sex offender, and despite the obviously suspicious nature of Epstein's activity with the Bank, JP Morgan took no corrective action against Epstein for years.  Finally, in 2013, JP Morgan terminated its relationship with Epstein; it continued to do business with him for several years afterward (as detailed below).  The year that JP Morgan terminated Epstein's accounts, the Bank noted that "[p]er bank policy, felons are considered high risk and require additional approval."[28]  Epstein had been a convicted felon for almost a decade before his banking accounts were terminated.  That the Company left the accounts in place for so long, despite such deeply troubling, public accounts of his crimes, suggests either that the Bank's senior-most executives reviewed and approved Epstein's ongoing relationship with the Bank despite knowing about his crimes; or the Bank's oversight system failed, allowing Epstein's abusive conduct to continue unchecked.

## IV.     JP MORGAN'S SENIOR-MOST EXECUTIVES SUPERVISED THE BANK'S RELATIONSHIP WITH EPSTEIN, EVEN YEARS AFTER JP MORGAN TERMINATED EPSTEIN'S ACCOUNTS

73.     JP Morgan was clearly fully aware of Epstein's abusive conduct, and its lower-level employees held deep concerns about the Bank's ever-deeper relationship with Epstein.  But JP Morgan's senior-most executives did not share this concern—and this extends far beyond just Defendant Staley, Epstein's close friend and apparent fellow abuser (as discussed *infra*), whom JP Morgan is now attempting to hold solely responsible for its longstanding failures.  Mary Erdoes—who currently serves as the CEO of JP Morgan's Asset and Wealth Management division—visited Epstein at his New York home in both 2011 and 2013.  Erdoes is also reported to have exchanged

---

[28] USVI Complaint, ¶50.

"dozens of emails" with Epstein, including with regard to a charitable fund that JP Morgan considered launching together with Epstein.[29]   Similarly, John Duffy—who served as Vice Chairman of JP Morgan and as the CEO of JP Morgan's private bank for ultrawealthy clients—also visited Epstein at his New York home in April 2013.   Just one month later, the private bank that Duffy ran re-authorized Epstein to borrow money against his accounts, despite JP Morgan's compliance officials' repeated warnings about Epstein's suspicious practices and criminal behavior.   Another senior JP Morgan executive who worked at the private bank, Justin Nelson, visited Epstein's New York home around six times between 2014-2017—*after* the bank supposedly terminated Epstein's accounts.   Nelson also visited Epstein at his ranch in New Mexico in 2016.   Defendant Kessler—who was a member of the Board from 1995 to 2007—was former college classmates, close friends and business partners with Epstein's main benefactor, Leslie Wexner ("Wexner"), with whom Kessler co-founded a real estate development business.   Wexner, a multibillionaire, has been called Epstein's "biggest client" and likely helped provide Epstein with a substantial part of the wealth that enabled his scheme of sexual abuse and predation.

74.     These ties pale in comparison, however, to Defendant Staley's intimate—and potentially criminal—relationship with Epstein.   Staley led JP Morgan's Private Banking division (which was later run by Duffy) from 1999-2001, during which time he formed a close relationship with Epstein.   Staley later served as the CEO of JP Morgan's Asset Management division from 2001 until 2009, and was then promoted in 2009 to serve as the CEO of JP Morgan's Investment Bank.   Staley left JP Morgan in 2013: the same year that the bank terminated Epstein's accounts.

75.     Between 2008 and 2013, Staley used his JP Morgan email account to exchange some 1,200 emails with Epstein, reflecting the deep bond the two men shared.   Some of these

---

[29] WSJ Article.

emails suggest that Staley may have participated in or taken advantage of Epstein's criminal trafficking operation.  In December 2008, for example, Epstein and Staley discussed Staley visiting Epstein at his residence in Palm Beach.  Although Epstein was not going to be in Palm Beach at the time, Epstein invited Staley to use his house.  In early January 2009, around the time that Staley was staying at Epstein's house in Palm Beach, Epstein wired $2,000 from his JP Morgan account to a woman with an Eastern European surname.  (Many of the women that Epstein trafficked were from Eastern Europe).

76.     Later that same year, Epstein and Staley again discussed getting together, this time in London.[30]  In late August 2009, Epstein asked Staley whether he would need anything while he was in London; Staley said yes.  Just two days later, Epstein again used his JP Morgan account to wire $3,000 to the same woman he had paid while Staley was in Palm Beach.  This, of course, was after Epstein's 2008 plea agreement related to his charges for solicitation of a minor in Florida.

77.     Just months later, in November 2009, while Epstein was in jail, Staley again took advantage of Epstein's hospitality—but this time at Epstein's now-infamous private island, Little St. James.  While there, Staley wrote Epstein via email: "So when all hell breaks lo[o]se, and the world is crumbling, I will come here, and be at peace.  Presently, I'm in the hot tub with a glass of white wine.  This is an amazing place.  Truly amazing.  Next time, we're here together.  I owe you much.  And I deeply appreciate our friendship.  I have few so profound."[31]

78.     The following month, Staley made clear that he was fully aware of Epstein's crimes and the risk that his ongoing relationship with Epstein posed to him.  On December 4, 2009, Staley seemingly met with Epstein in New York, and then wrote to him via email: "I realize the danger

---

[30] USVI Complaint, ¶55.

[31] USVI Complaint, ¶56.

in sending this email.  But it was great to be able, today, to give you, in New York City, a long heartfelt, hug."[32]

79.     The next day and later that same month, Epstein sent pictures of young women to Staley, to which Staley responded with cryptic commentary.  Staley again visited Little St. James the following month, in January 2010.  Later that year, in July, Staley had the following exchange with Epstein via email, strongly suggesting that Epstein was procuring victims for Staley:

**Staley**: "Maybe they're tracking u? That was fun. Say hi to Snow White."

**Epstein**: "[w]hat character would you like next?"

**Staley**: "Beauty and the Beast"

**Epstein**: "[W]ell one side is available."[33]

80.     After the government of the U.S. Virgin Islands sued JP Morgan in this Court, JP Morgan filed its own complaint against Staley, effectively alleging that Staley was solely responsible for the Bank's longstanding relationship with Epstein, and that Staley concealed Epstein's criminal activity from JP Morgan.  But the allegations detailed above, and those brought by Doe 1 and the U.S. Virgin Islands government, make clear that employees and senior executive officers across JP Morgan were fully aware of Epstein's abusive conduct, and fully aware that Epstein was using his many JP Morgan accounts in a manner that was highly suspicious, if not obviously illegitimate.  JP Morgan's effort to paint Staley as the sole wrongdoer is little more than an attempt to evade legal and reputational responsibility for knowingly failingly to report—and thereby enabling—Epstein's criminal conduct for more than a decade.

---

[32] USVI Complaint, ¶57.

[33] USVI Complaint, ¶61.

## V.   BY FAILING TO TAKE ACTION IN RESPONSE TO NUMEROUS RED FLAGS CONCERNING EPSTEIN'S CONDUCT, THE DIRECTOR DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

81.     The Board's most fundamental responsibility is to ensure that the Company is operating within the law.  JP Morgan, which operates a national bank, is subject to stringent requirements with respect to detecting and reporting potentially criminal activity.  But instead of conducting effective oversight of JP Morgan's operations, the Board sat idly by while the Company was used to facilitate a massive sex trafficking enterprise.  Instead of ensuring that the appropriate reports of suspicious activity were filed with federal authorities, for years the Board allowed the Bank to continue to rake in fees from Epstein's dozens of accounts.  Even after the Company closed Epstein's accounts, the Board continued to abdicate its responsibility to file SARs.  Finally, the Board failed to act with respect to its own executive, Staley, who knew about and participated in Epstein's pernicious sex-trafficking ring.

### A.   COMPLYING WITH FEDERAL BANKING LAWS AND REGULATIONS IS MISSION CRITICAL FOR JP MORGAN

82.     JP Morgan and its commercial bank subsidiaries are regulated and supervised by numerous regulatory agencies, both domestically and internationally, including the U.S. Federal Reserve Board and the Office of the Comptroller of the Currency ("OCC"), as well as other federal agencies, state banking and insurance departments, and international financial services authorities.

83.     JP Morgan acknowledges that the Company is "highly regulated" and represents in its Code of Conduct that legal compliance with those laws and regulations "is not just *a critical part* of our business, but *fundamental* to who we are."  It advises its employees and directors that they must "comply with the *letter, spirit, and intent* of laws, regulations and Firm policies," and that any violations "may weaken customer confidence, put our reputation at risk, impact market integrity, or result in regulator criticism, legal actions, fines or penalties, or other negative

repercussions."  JP Morgan employees and directors are prohibited from engaging in outside activities that "reflect adversely on JP Morgan or give rise to a real or apparent conflict of interest with [their] duties to the firm."  Dimon himself has asserted that the Company has "zero tolerance" for improper behavior and that the bank complies with "the letter and spirit of the laws and regulations everywhere we do business."[34]

84.     Financial institutions, like JP Morgan, are susceptible to serving as conduits for significant financial crimes, including money laundering.  The federal government has therefore established a series of clear AML laws and regulations meant to safeguard the economy by ensuring that banks do not engage in, or facilitate, illegitimate activities.

85.     The primary laws governing banks with respect to AML are the Bank Secrecy Act of 1970 ("BSA") and certain provisions of the USA Patriot Act.[35]

86.     Congress enacted the BSA to address an increase in money laundering making its way through financial institutions.  Together, the BSA and the Patriot Act create mandatory reporting and record-keeping requirements to track currency transactions and detect and prevent money laundering and the facilitation of other crimes.  The law requires banks to maintain compliance programs to prevent, identify, and report suspicious and potentially criminal activity. The BSA and its implementing regulations mandate that banks institute policies, procedures, and controls to protect against money laundering, oversee monitoring with respect to BSA requirements, and test their compliance programs.  Each regulated bank "must have a BSA/AML

---

[34] JP Morgan Code of Conduct (2022) at ii.,
 available at https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/documents/code-of-conduct.pdf.

[35] United Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001(USA-PATRIOT), Pub. L. 107-56.

compliance program commensurate with its respective BSA/AML risk profile."[36]  And it is the **board of directors**, "acting through senior management," that is "ultimately responsible for ensuring that the bank maintains an effective BSA/AML internal control structure, including suspicious activity monitoring and reporting."[37]  Yet policies are not enough; as explained by the Federal Financial Institutions Examinations Counsel—an interagency group of bank regulators—"**practices must coincide with the bank's written policies, procedures, and processes**."[38]

> 87.    Internal controls should (among other requirements):
>
> • Identify banking operations . . . more vulnerable to abuse by money launderers and criminals; provide for periodic updates to the bank's risk profile; and provide for a BSA/AML compliance program tailored to manage risks.
>
> • Inform the board of directors, or a committee thereof, and senior management, of compliance initiatives, identified compliance deficiencies, and corrective action taken, and notify directors and senior management of [SARs] filed.
>
> • Implement risk-based [customer due diligence] policies, procedures, and processes.
>
> • Identify reportable transactions and accurately file all required reports including [SARs], Currency Transaction Reports ("CTRs"), and CTR exemptions . . . [and]
>
> • Provide sufficient controls and monitoring systems for timely detection and reporting of suspicious activity.[39]

---

[36] FFIEC *Bank Secrecy Act / Anti-Money Laundering Examination Manual* (2006) ("FFIEC Manual"), at 28, available at https://www.ffiec.gov/pdf/bsa_aml_examination_manual2006.pdf.

[37] *Id.* at 29.

[38] *Id.*

[39] *Id*.

88.     In addition to the broad requirement for effective, meaningful internal controls, federal law also requires that banks promptly notify authorities upon discovering any suspicious activity.  These SARs are "the cornerstone of the BSA reporting system" and are "critical to the United States' ability to utilize financial information to combat terrorist financing, money laundering, and other financial crimes."[40]   The failure to timely file SARs deprives law enforcement of essential information it needs to combat serious crimes.

89.     BSA's implementing regulations, 12 CFR § 21.11 and 12 CFR § 163.180, specify the circumstances under which banks must file a SAR.  Section 21.11 provides that banks must file SARs whenever they "detect a known or suspected violation of Federal law."[41]   More specifically, SARs are required whenever a bank:

> detects any known or suspected Federal criminal violation, or pattern of criminal violations . . . involving a transaction or transactions conducted through the bank and involving or aggregating $5,000 or more in funds or other assets where the bank believes . . . that it was used to facilitate a criminal transaction, and the bank has a substantial basis for identifying a possible suspect . . .[42]

Similarly, the bank must file a SAR for any transaction conducted through the bank:

> aggregating $5,000 or more in funds or other assets, if the bank **knows, suspects, or has reason to suspect** that:  . . . (ii) The transaction is designed to evade any regulations promulgated under the Bank Secrecy Act; or (iii) the transaction has no business or apparently lawful purpose or is not the sort in which the particular customer would normally be expected to engage, and the institution knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction.[43]

---

[40] *Id.* at 60.

[41] 12 C.F.R. § 21.11(a).

[42] 12 C.F.R. § 21.11(c)(2).

[43] 12 C.F.R. § 21.11(c)(4).

90.    Notably, SARs must be submitted the finding of *suspicious* activity.  Banks may not avoid filing a SAR simply because they are not *certain* the activity at issue constitutes a crime.

91.    Banks must file any SARs within 30 days "of the initial detection of facts that may constitute a basis for filing a SAR."[44]  After filing the SAR, management must "promptly notify" the bank's board or a relevant board committee.[45]  When the suspicious or criminal conduct is ongoing, banks are expected to file a new SAR every 90 days.[46]

## B.    JP Morgan's Board Is Obligated to Ensure and Oversee a Robust AML Program

92.    JP Morgan's directors owe fiduciary duties to the Company to conduct adequate oversight to ensure JP Morgan and its subsidiaries are not flouting federal laws and regulations. These duties include the duty to develop, implement, and enforce effective internal controls throughout the Company, including with respect to compliance with federal anti-money-laundering laws and regulations.  Federal agencies that supervise the banking industry have repeatedly emphasized the importance of board oversight with respect to BSA/AML compliance.

93.    JP Morgan's primary banking subsidiary, JPMorgan Chase Bank, N.A., is regulated by the OCC.[47]  OCC-regulated banks are required to "establish and implement a risk governance framework to manage and control the covered bank's risk-taking activities."[48]  For this purpose,

---

[44] 12 C.F.R. § 21.11(d).

[45] 12 C.F.R. §21.11(h)(1).

[46]  FinCen, The SAR Activity Review (October 2000), at 27, available at https://www.fincen.gov/sites/default/files/shared/sar_tti_01.pdf.

[47] 12 U.S.C. § 1 *et seq.*

[48] 12 C.F.R. § Pt. 30, App. D– *OCC Guidelines Establishing Heightened Standards for Certain Large Insured National Banks, Insured Federal Savings Associations, and Insured Federal Branches.*

the OCC has established a set of "minimum standards," both for the bank's compliance systems

and for its board of directors' oversight.  The standards require, among other things, that the board

of the bank establish an effective risk governance framework and "***actively oversee*** the [] bank's

risk-taking activities and ***hold management accountable*** for adhering to the risk governance

framework."[49]

94.     The OCC's Handbook on Corporate and Risk Governance explains that it is the

bank's board that is responsible, *inter alia*, for "providing effective oversight" and for confirming:

(i)     "that the bank has a risk management system, including audit, suitable for the
        bank's size and activities, and understanding the bank's material risks,"

(ii)    "that the bank has an effective system of internal controls," and

(iii)   "that management's actions to correct material weaknesses, including those
        identified by the bank, its auditors and regulators, ***are timely and effective***."[50]

95.     The Handbook also provides that the bank's board must "oversee the bank's

compliance management programs."[51]  As such, the "OCC expects the board to be responsible for

confirming that a system of internal controls is in place."[52]  Accordingly, the board must "receive

information about the effectiveness of the bank's internal controls and information systems" and

"demonstrate that it has an adequate understanding of the bank's IT infrastructure, inherent risks,

---

[49] 12 C.F.R. § Pt. 30, App. D. § III(B) (emphasis added).

[50] Comptroller's Handbook:  Corporate and Risk Governance (v2.0, 2019), at 14, available at
https://www.occ.gov/publications-and-resources/publications/comptrollers-
handbook/files/corporate-risk-governance/index-corporate-and-risk-governance.html.

[51] *Id.* at 56.

[52] *Id.*

and existing controls."[53]   Significantly, the OCC's Handbook confirms that "the sophistication of [a bank's] risk management system should reflect the bank's size, complexity, and risk profile."[54]

96.     JP Morgan itself—the parent entity—is regulated by, among others, the Federal Reserve.  Federal Reserve regulations require, among other things, that holding companies like JP Morgan, which have banking subsidiaries, maintain an enterprise-wide risk management program that identifies and manages risk throughout the organization, and that the company's board ensure that the banking subsidiaries have the proper internal controls and risk management systems in place:

> One of the primary areas of focus for consolidated supervision of large complex [bank holding companies] is the adequacy of governance provided by the board and senior management.  The culture, expectations, and incentives established by the highest levels of corporate leadership set the tone for the entire organization and are essential determinants of whether a banking organization is capable of maintaining fully effective risk management and internal control processes.

97.     Further, Regulation YY of the Federal Reserve (12 C.F.R. § 252.33) requires the Board's risk committee approve and review the bank's risk-management policies and oversee the global risk-management framework.  The framework "must be commensurate with [the bank's] structure, risk profile, complexity, activities, and size and must include":

(i)     Policies and procedures establishing risk-management governance, risk management procedures, risk-control infrastructure for its global operations; and

(ii)    Processes and systems for implementing and monitoring compliance with such policies and processes, including:

(A)    Processes and systems for identifying and reporting risks and risk-management deficiencies, including regarding emerging risks, and ensuring effective and timely implementation of actions to address

---

[53] *Id.*

[54] *Id.* at 35.

emerging risks and risk-management deficiencies for its global operations [and]

(B)     Processes and systems for establishing managerial and employee responsibility for risk management . . .[55]

98.     Board oversight of those systems is imperative, according to the Federal Reserve, because "the board serves a critical role in maintaining the firm's safety and soundness and continued financial and operational resilience of its consolidated operations."[56]

99.     Two standing committees of the Board—the Risk Committee and the Audit Committee—impose *additional oversight obligations* related to the Company's risk management systems, along with its internal controls.

100.    The Risk Committee's purpose, according to its Charter, is "to assist the Board in its oversight of management's responsibility to implement an effective global risk management framework reasonable designed to identify, assess and manage the Firm's strategic, credit and investment, market, and operational risks."  The Risk Committee "oversees reputational risks and conduct risks within its scope of responsibility."  It is required to receive and review reports from management concerning significant risks, set qualitative and quantitative limits for risk, and approve certain risk policies.  The Risk Committee is required to report periodically to the Board concerning any "significant matters" reviewed by the committee.

101.    The Risk Committee is also responsible for appointing and replacing the Chief Risk Officer ("CRO"), and setting the Chief Risk Officer's compensation.  The Risk Committee must also review the CRO's "proposed priorities, budget and staffing plans annually."

---

[55] 12 C.F.R. § 252.33 (a)(2).

[56] SR 21-3/CA21-1: *Supervisory Guidance on Board of Directors' Effectiveness*, Board of Governors of the Federal Reserve System, available at: https://www.federalreserve.gov/supervisionreg/srletters/SR2103.htm

102.    The Audit Committee's purpose, in relevant part, is to "assist the Board in its oversight of . . . [m]anagement's responsibilities to ensure that there is an effective system of controls reasonably designed to:  . . . [m]aintain compliance with the corporation's ethical standards, policies, plans and procedures, and with laws and regulations."  The Audit Committee "oversees reputational risks and conduct risks within its scope of responsibility . . ."

103.    The Charter of the Audit Committee provides that the committee must receive from management—including the Risk and Compliance functions—"communications and presentations," including concerning "significant control issues" and "material weaknesses in the internal control environment."  The Audit Committee must also "receive communications and presentations from management summarizing the suspicious activity report filing activity of the Firm and/or its subsidiaries with the appropriate regulatory and law enforcement agencies."

104.    By law, regulation, and the Company's own policies, directors had a non-delegable obligation to conduct sufficient, effective oversight to ensure that the bank was operating in compliance with the law.  Instead, the Board ignored a series of glaringly obvious indications that Jeffrey Epstein used the bank for years to facilitate a sex trafficking operation and to abuse young women and girls.

### C.    THE DIRECTORS FAILED TO RESPOND TO BRIGHT RED FLAGS CONCERNING EPSTEIN'S USE OF THE BANK'S SERVICES TO CONDUCT A CRIMINAL ENTERPRISE

105.    Despite the clear obligations of the Company's Board—set forth in federal regulation and in the Company's own policies and committee charters—to ensure that JP Morgan was conducting its business in compliance with the law, for years the Board sat on its hands as the Bank continued to provide services to disgraced sexual offender Epstein.

106.    Since 2006, the directors serving on the Board had knowledge that Epstein was a serial abuser of young women and girls.  Even so, the Bank declined to turned him away, choosing instead to rake in fees year after year from servicing the accounts through which he operated the most notorious sex trafficking ring in recent history.  The Board also failed to ensure that the Company was meeting its obligations under federal anti-money-laundering laws.  Upon information and belief, at *no point* from 2006 onward did JP Morgan submit any SARs concerning Epstein, despite the mounds of evidence available to the Bank that Epstein was using his cash to fund a criminal enterprise and that he was often attempting to structure his transactions to avoid government oversight.

107.    As discussed above, from 1998 to 2013, the Company serviced more than 4 dozen accounts for Epstein worth hundreds of millions of dollars, which he used to facilitate his sexual abuse of young girls and women.

108.    The Board knew about Epstein's predation no later than 2006.  That year, Epstein was arrested and indicted for solicitation of a minor, and the press extensively reported about his abuse of that, and other, victims.  The Company's Global Corporate Security Division flagged these press reports, but JP Morgan maintained Epstein's account, despite concluding that it should be "classified as high risk" and require special approval.

109.    Mary Erdoes, a high-level executive at the Company, admitted in a deposition that the Company knew in 2006 that Epstein abused young girls *and* paid them in cash.  At the same time, JP Morgan employees were reporting that Epstein was withdrawing $80,000 at a time multiple times a month.  The Bank was also aware that Epstein pleaded guilty in 2008, was sentenced to serve 18 months in jail, and registered as a sex offender.

110.    Despite being aware of Epstein's arrest and guilty plea, and press reports concerning his pedophilia, sexual abuse, and engagement in prostitution, the Bank *continued* to provide Epstein with banking services for *seven more years following his arrest*, facilitating his criminal trafficking enterprise.   The Bank continued doing business with the disgraced, but wealthy, Epstein, even after Defendant Dimon's purported review of Epstein's account.

111.    As discussed further above, revelations continued even after Epstein's guilty plea. In 2011, the Company was made aware of more allegations of human trafficking involving Epstein.   But while employees discussed "the situation," they did little more than encourage Staley—Epstein's buddy and co-conspirator—to "discuss" the allegations with him.   When Epstein denied the allegations, the Bank continued to do business with him.   Later in 2011, the Bank was aware of reports that law enforcement was investigating Epstein for participating in trafficking and molestation of children and that Epstein had settled "a dozen" claims regarding solicitation.   Even a senior compliance official warned that there were "[l]ots of questions" concerning Epstein's behavior.   But the Bank refused to cut Epstein off until 2013.

112.    The Board was no doubt aware of the mountain of press reports concerning Epstein's conduct, particularly following his very public arrest in 2006.   Yet the Board did not take action to terminate the accounts of the ultrawealthy Epstein or cause management to file timely SARs.   In failing to ensure that the Bank ceased doing business with the sexual predator, the directors engaged in bad faith, risking liability for the Company and causing untold reputational harm.

113.    The obligation to file SARs concerning Epstein's conduct did not cease when the Company finally, and belatedly, terminated Epstein's account in 2013.   Yet it appears that the Bank continued to fail to submit such reports to authorities from 2013 until at least 2019.   Directors

on the Board during this period continued to be responsible for ensuring that the Bank met its legal obligations, including the obligation to file reports concerning the criminal activity in which Epstein engaged while he maintained a banking relationship with JP Morgan.  By failing to ensure that the Bank complied with federal laws concerning suspicious transactions and transactions potentially implicating criminal activity, Defendants acted in bad faith and breached their fiduciary duties to the Company.[57]

### D. THE COMPANY HAD A TROUBLING HISTORY OF FAILING TO COMPLY WITH BSA/AML REGULATIONS AND THE BOARD SHOULD HAVE EXERCISED HEIGHTENED DILIGENCE

114.    Furthermore, no later than January 2013, the Board was fully aware of weaknesses in JP Morgan's AML program and should have exercised heightened diligence conducting oversight.  On January 14, 2013, the Company's main banking subsidiary, JP Morgan Chase, N.A., entered into a consent order with the OCC (the "2013 OCC Consent Order") because the regulator had "identified deficiencies in the Bank's overall program for Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') compliance . . . "  More specifically, JP Morgan had failed to correct a previously identified problem and BSA/AML compliance violation, and had also violated regulations concerning suspicious activity reports.

115.    According to the OCC, "[t]he Bank has failed to adopt and implement a compliance program that adequately covers the required BSA/AML program elements due to an inadequate

---

[57] Indeed, it was just this type of failure with respect to Epstein—i.e., a failure to investigate Epstein's banking activities and to report Epstein's suspicious transactions—that led Deutsche Bank to being hit with a $150 million penalty by the N.Y. State Department of Financial Services. The regulator noted that the fact that Epstein's cash withdraws "were suspicious should have been obvious to Bank personnel at various levels.  [Deutsche Bank's] failure to recognize this risk constitutes a **_major compliance failure_**."

system of internal controls, and ineffective independent testing."  Notably, the bank[58] had failed to "develop adequate due diligence on customers, particularly in the Commercial and Business Banking Unit, a repeat problem, and ***failed to file all necessary Suspicious Activity Reports ('SARs') related to suspicious customer activity.***"  The bank had also failed to remedy weaknesses in "the effectiveness of monitoring in light of the customers' cash activity and business type…"

116.    According to the OCC, JP Morgan had "an inadequate system of internal controls and independent testing, "systemic deficiencies in its transaction monitoring systems [and] due diligence processes . . ."  The regulator also noted that the bank had "significant shortcomings in SAR decision-making protocols and an ineffective method for ensuring that referrals and alerts are properly documented, tracked, and resolved."  In violation of federal regulations, the bank "failed to identify significant volumes of suspicious activity and filed the required SARs concerning suspicious customer activities . . ."  As a result of the 2013 OCC Consent Order, the bank was required to take a series of remedial steps, including evaluating its systems for monitoring transactions and filing suspicious activity reports.  It was also required to refresh its risk assessments, at least every year.  In addition, the bank was required to conduct a SAR look-back to determine "whether additional SARs should be filed on additional subjects or for continuing suspicious activity."

117.    The 2013 OCC Consent Order was approved by the bank's board and executed by both Defendants Crown and Dimon, on behalf of JPMorgan Chase Bank, N.A.

118.    Just as the OCC had done with respect to the Company's banking subsidiary, JPMorgan Case, N.A., the Federal Reserve issued a Consent Order against the Company itself in

---

[58] Because the OCC orders discussed in this section deal specifically with JP Morgan Chase, N.A., references to the "bank" in this section are to this subsidiary, rather than to the parent entity, JP Morgan (as defined above).

January 2013 (the "2013 Federal Reserve Order"). The 2013 Federal Reserve Order required the Board to submit a plan to improve the Company's "firmwide compliance risk management program with regard to compliance with BSA/AML Requirements." In the plan, the Board was required to address funding for a sufficient compliance program, policies to ensure risks are timely identified and managed, and measures to improve the Company's policies, procedures and standards. The Company was also required to review and address the "policies, procedures, and processes" for "identifying and investigating suspicious activity, and for filing suspicious activity reports" and "customer due diligence that consolidates information" on each customer.

119. Because JP Morgan's BSA/AML systems continued to be deficient, in January 2014 the OCC issued a Consent Order of the Assessment of a Civil Money Penalty (the "2014 OCC Penalty Order"). The 2014 OCC Penalty Order indicated that the regulator had discovered "additional deficiencies in the Bank's BSA/AML compliance program." In particular, the OCC determined that the bank *continued* to fail to remedy previously identified problems with its BSA/AML compliance program and continued to violate regulations concerning SARs.

120. The OCC determined that, as in 2013, the bank's BSA/AML program remained deficient and the Bank had failed to "develop adequate due diligence on customers" and to "file all necessary SARs related to suspicious customer activity." The bank "failed to correct previously identified systemic weaknesses" concerning customer due diligence and transaction monitoring. More specifically, the bank continued to have "*significant shortcomings* in SAR decision-making protocols and an ineffective method for ensuring that referrals and alerts [were] properly documented, tracked, and resolved," and "failed to identify *significant volumes* of suspicious activity and file the required SARs . . ."

121.    As a result of these failures, the OCC ordered JP Morgan to pay $*350 million* in a civil money penalty.

122.    The 2014 Penalty Order was approved by the bank's board and was executed by Defendants Crown, Jackson, and Weldon.

123.    On January 7, 2014, the bank entered into a Deferred Prosecution Agreement (the "DPA") with the U.S. Attorney's Office for the Southern District of New York.  In the DPA, the bank admitted that it had failed to file SARs concerning the activities of another extraordinarily wealthy banking client, Bernie Madoff.  In the DPA, the bank pleaded guilty to two felony counts of failing to maintain an effective anti-money laundering program and failing to file a suspicious activity report.

124.    The 2013 OCC Consent Order remained in effect until May 2019, and the 2013 Federal Reserve order remained in effect until December 2019.

125.    Because the bank had pleaded guilty to *two felonies* and paid *$350 million* in penalties relating to its failures to file suspicious activity reports and other BSA/AML deficiencies, the Board was no doubt aware that the Company's risk management systems—particularly with respect to SARs—required additional oversight and diligence.  Even so, in the years following the consent orders, upon information and belief, the Company continued to fail to file SAR reports concerning the transactions Epstein had conducted with the bank while his account was open.

### E.    THE BOARD FAILED TO PURSUE CLAIMS AGAINST STALEY

126.    The Board also failed to pursue claims against Staley until March 8, 2023.  Staley was the CEO of JP Morgan's Asset Management line of business from 2001 to 2009, and then became the CEO of the Corporate and Investment Banking line of business in 2009 until he left the Company in 2013.

127.    The evidence of Staley's involvement with Epstein was clear. *See* ¶¶74-80, *supra*. Staley was close friends with Epstein and knew about his sexual predation of young women and girls. According to Doe, Staley "personally observed Doe as a sex trafficking and abuse victim at times including through his departure from JP Morgan in 2013."[59]  He also met with young girls while visiting with Epstein. Staley is also credibly accused of using "aggressive force in his sexual assault" of plaintiff Doe.[60]

128.    Despite the clear evidence of Staley advocating on behalf of Epstein to maintain his Company accounts, despite having access to over 1,200 emails sent from Staley's JP Morgan company account to Epstein which raised questions about Staley's possible involvement in Epstein's criminal enterprise, and despite press reports making clear the close relationship between Epstein and Staley, the Director Defendants failed to pursue claims against Staley until March 2023. At that time, the Company filed claims against him, including for breaching his fiduciary duty and violating the "faithless servant doctrine." By failing to act in a timely fashion, the Board has risked the viability of the claim by subjecting it to a potential statute of limitations defense. Indeed, in his April 24, 2023 Motion to Dismiss in the lawsuit JP Morgan belatedly brought against Staley, Staley has argued that those claims are time-barred.[61]

## VI.    THE OFFICER DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES

129.    Officers of Delaware corporations, like directors, have fiduciary duties to the companies, including the duties of good faith and due care. Officers' duty of good faith includes

---

[59] Doe Complaint, ¶115.

[60] Doe Complaint, ¶107.

[61] *Jane Doe 1 v. JP Morgan Chase Bank, N.A.*, 22-cv-10019 (JSR) Third-Party Def. James Staley's Mem. of Law in Supp. of Mot. to Dismiss, at 18-20, DKT 91.

an obligation to conduct adequate oversight.  Officers are required to "make a good faith effort to ensure that information systems are in place" so that "officers receive relevant and timely information that they can provide to the directors."[62]  Officers must also act on red flags of which they are aware, as they are "optimally positioned to identify red flags and either address them or report upward to more senior officers or to the board."[63]

130.    Officers of banking entities have specific obligations when it comes to protecting the companies from risk, including BSA/AML risk. The OCC's Comptroller's Handbook explains that the "OCC expects senior management to be responsible for developing and maintaining the risk governance framework and system of internal controls, which enables management to effectively identify, measure, monitor, control, and report risk exposures consistent with the board-established risk appetite."[64]  Moreover, the "CEO and his or her senior management team should be responsible for," among other things, "complying with laws, regulations, and internal bank policies, including policies governing ethics and insider activities," developing and administering a risk governance framework that enables management to effectively identify, measure, monitor, and control risk," and "establishing and maintaining an effective system of internal controls."

131.    JP Morgan's policies spell out in particular the obligations of the Chief Risk Officer ("CRO") of the Company.  The CRO is required to attend meetings of the Board's Risk Committee and to discuss with the committee "any concerns that they reasonably believe could be material to the Firm or to a line of business," including any "actions that have been or are planned to be taken

---

[62] *In re McDonald's Corp. S'holder Derivative Litig.*, 289 A.3d 343, 361 (Del. Ch. 2023).

[63] *Id.* at 362.

[64] OCC Comptroller's Handbook:  Corporate and Risk Governance (v2, July 2019), at 56, available at                         https://www.occ.gov/publications-and-resources/publications/comptrollers-handbook/files/corporate-risk-governance/index-corporate-and-risk-governance.html.

to address such concerns."  Between meetings, the CRO must "promptly report" any such issues

to the Risk Committee's Chair.  The CRO also has full access to communications with and report

to the Audit Committee "on any matter relevant to risk and compliance."

132.    Despite their obligations under federal banking laws and regulations, and the

Company's own policies, the Officer Defendants failed to fulfill their fiduciary obligations of due

care and oversight.  Like the Director Defendants, the Officer Defendants ignored the glaring red

flags concerning the Company's complicity in a criminal sex trafficking scheme, including

repeated news reports concerning Epstein's involvement in the abuse of girls and young women.

133.    The Officer Defendants—including Defendants Bacon, Hogan, and Zubrow (JP

Morgan's CROs)—failed to ensure that the Company was following the law and its own policies

with respect to the AML compliance.  According to an investigation by the U.S. Virgin Islands

government, "it does not appear . . . that JP Morgan engaged in any investigation of the source of

Epstein's funds."[65]  Likewise, the Company also "seemingly did no due diligence on the nature of

the various business entities for which it held accounts for Epstein, which appear to have no

legitimate business purpose and, upon information and belief, were part of Epstein's criminal

enterprise in the Virgin Islands."[66]

134.    The Officer Defendants also failed to ensure that SARs were timely filed

concerning Epstein's banking activities.  A convicted felon and sex offender was able to continue

withdraw tens of thousands of dollars in cash every month from the Bank for years, using those

funds to abuse young women and girls.  When Company employees finally did start to raise

alarms—given repeated press reports about Epstein's activities—management did nothing.

---

[65] USVI Complaint, ¶76.

[66] USVI Complaint, ¶77.

Internal discussions resulted in nothing more than Staley—Epstein's buddy—feeling Epstein out and reporting back to other employees that all was well. And a review of Epstein's account that was to be conducted by CEO Dimon either never took place or, if it did, Dimon must have sanctioned the bank's relationship with Epstein, as it was not until 2013—some seven years after Epstein was arrested—that the Bank closed his accounts. Because of the Officer Defendants' failure to act in good faith and with due care, the bank thus helped Epstein prey on vulnerable girls for almost a decade.

## DERIVATIVE ALLEGATIONS AND DEMAND FUTILITY

135.    Plaintiff brings this action derivatively on behalf of and for the benefit of JP Morgan to redress injuries suffered by the Company as a direct and proximate result of the breaches of fiduciary duty and other legal violations alleged herein. JP Morgan is named as defendant solely in its derivative capacity.

136.    Plaintiff has owned JP Morgan stock continuously during the time of the wrongful course of conduct constituting the basis for the claims asserted herein.

137.    Plaintiff will retain its shares in the Company throughout the duration of this litigation.

138.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in this litigation and has retained counsel competent and experienced in stockholder derivative actions.

139.    The wrongful acts complained of herein subject, and will persist in subjecting, the Company to continuing harm because the adverse consequences of the injurious actions are still in effect and ongoing.

140.   Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

141.   Plaintiff has not made a demand on the Board to pursue the claims set forth herein because any pre-suit demand would be futile and is therefore excused as a matter of law.

142.   The Demand Board consists of twelve directors: Defendants Dimon, Bammann, Burke, Combs, Crown, Flynn, Hobson, and Neal, as well as non-Defendants Davis, Gorsky, Novakovic, and Rometty.

143.   A demand on the current Board would be futile because eight of the Demand Board Members—Defendants Dimon, Bammann, Burke, Combs, Crown, Flynn, Hobson, and Neal—face a substantial risk of liability for acting in bad faith by knowingly or recklessly permitting the Company to continue to serve as a banker for Epstein's criminal enterprise and for failing to ensure that JP Morgan operated in compliance with federal law and Company policy concerning the timely filing of SARs.

144.   Each of the Defendant Demand Board members either served on the Board during the time that Epstein maintained his accounts at JP Morgan used them to conduct his sex trafficking scheme (i.e., Defendants Dimon, Burke, Crown, and Flynn) and/or served on the Board during the time in which JP Morgan was obligated, but failed, to submit SARs regarding Epstein's transactions with the bank (i.e., Defendants Dimon, Burke, Combs, Crown, Flynn, Hobson, and Neal).

145.   Defendants on the Board at the time of the OCC orders face additional risk because they were not only aware of Epstein's conduct, but they were also serving at the time the Company was sanctioned because of its history of failing to comply with AML rules, including rules concerning SARs.  Defendants Dimon, Bammann, Burke, Crown, and Flynn were each on the

Board at the time one or more of the regulators' orders were issued.  Moreover, Defendants Dimon and Crown both executed the 2013 OCC Consent Order, which established that the Company had deficiencies in its BSA/AML compliance program in violation of federal law and regulations. Despite being fully cognizant of the weakness in the Company's AML program, Defendants failed to act to ensure that timely reports were filed concerning Epstein's conduct.

146.    Defendant Dimon, in particular, faces a substantial risk of liability.  He has been the Company's CEO since 2006 and Chairman since 2007, even before Epstein was arrested.  He also either failed to review the Epstein accounts over which Company employees had raised concerns or, having reviewed them, failed to act to close the predator off from his funds.  He also failed to ensure that his management team effectively supervised the Company's BSA/AML compliance system.

147.    Defendant Bammann also has an increased risk of liability as she, in particular, should have been alert to federal requirements concerning an effective BSA/AML program and to the Company's deficiencies in meeting those standards.  When public reports emerged about Epstein's criminal conduct, Bammann should have taken action to ascertain the Company's involvement with Epstein, close his accounts, and file timely SARs.  After all, before joining the Board, and during the time that Epstein maintained his accounts at the bank, Bammann served as Deputy Head of Risk Management for JP Morgan Chase, N.A., and before that, as Chief Risk Management Officer at Bank One.  Indeed, in encouraging shareholders to support her Board nomination, the Company touted her "extensive expertise in risk management and regulatory issues."[67]

---

[67] JPMorgan Chase & Co., Schedule 14A (2015) at 11.

148.     Thus, any lawsuit initiated to remedy the wrongs complained of herein would expose *at least* eight of the twelve current Board members to significant personal liability for their bad faith breaches of fiduciary duties and other misconduct.

149.     The Demand Board members also suffer from a lack of independence from Defendant Dimon.  The Demand Board directors have demonstrated their lack of independence by choosing to pursue its belated claims *only* against Staley, choosing to pin all of the Defendants' failures on him and to avoid implicating Dimon in JP Morgan's misconduct concerning Epstein. In contrast, an independent Board would have promptly pursued claims against all of those individuals—including directors and former directors—who failed to implement and oversee an effective BSA/AML system and ignored waving red flags.  Rather that aggressively pursuing claims against all involved officers, the Demand Board "circled the wagons" by seeking to tag only an executive that conveniently *no longer works for JP Morgan*.

150.     In addition, Defendant Bammann is conflicted because she is a former Company executive and worked closely with and for Defendant Dimon.  She served under, and reported to, Defendant Dimon at Bank One from 2000-2004, where he publicly praised her contributions; she followed Dimon to the Company when it acquired Bank One, and worked for him until the end of 2005, later returning to the Company to join the Board in 2013.  As a spokesman for institutional investor CtW Investment Group noted, Bammann was too close to Dimon, and "[b]ringing in someone who is a former deputy of Jamie Dimon's is absolutely the wrong move."  With her close ties to the man under whom she served for half a decade, Bammann could not reasonably be expected to pursue litigation against Defendant Dimon.

151.    For the foregoing reasons, at least eight of the twelve members of the Demand Board are incapable of impartially considering a litigation demand against the Defendants, and demand is therefore excused as futile.

## CLAIMS FOR RELIEF

### COUNT I

**Breach Of Fiduciary Duty**
**(Against The Director Defendants)**

152.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

153.    The Director Defendants, as current and former directors of JP Morgan, all owed and owe and owe fiduciary duties to JP Morgan and its stockholders.  By reason of their fiduciary relationships, the Director Defendants specifically owed and owe JP Morgan the highest obligation of good faith and loyalty in the administration of the affairs of the Company, including, without limitation, the oversight of JP Morgan's compliance with the BSA and regulations promulgated thereunder, and laws and regulations governing AML requirements.

154.    In addition, the Director Defendants owed and owe specific fiduciary duties as defined by the Company's corporate governance documents, including the charters of various Board committees (including, but not limited to, those of the Audit and Risk Policy Committees) that, had they been discharged in accordance with the Director Defendants' obligations, would have necessarily prevented the misconduct and the consequent harm to the Company alleged herein.

155.    The Director Defendants consciously breached their fiduciary duties and violated their corporate responsibilities by affirmatively and repeatedly ignoring red flags related to Epstein's criminal activity and Epstein's criminal use of his accounts and funds at JP Morgan.

156.    As a direct and proximate result of the Director Defendants' conscious failure to perform their fiduciary duties and exercise their oversight responsibility, JP Morgan has sustained, and will continue to sustain, significant damages—both financially and to its corporate image and goodwill.  Such damages to JP Morgan caused by the Director Defendants include and will include, substantial penalties, fines, damages awards, settlements, expenses, increased regulatory scrutiny, reputational harm, and other liabilities described herein.

157.    As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

## COUNT II

### Breach Of Fiduciary Duty of Loyalty
### (Against The Officer Defendants)

158.    Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

159.    The Officer Defendants, as current and former officers of JP Morgan, all owed and owe fiduciary duties to JP Morgan and its stockholders.  By reason of their fiduciary relationships, the Officer Defendants specifically owed and owe JP Morgan the highest obligation of good faith and loyalty in the administration of the affairs of the Company, including, without limitation, the oversight of JP Morgan's compliance with the BSA and regulations promulgated thereunder, and laws and regulations governing AML requirements.

160.    In addition, the Officer Defendants owed and owe specific fiduciary duties as defined by the Company's corporate governance documents that, had they been discharged in accordance with the Officer Defendants' obligations, would have necessarily prevented the misconduct and the consequent harm to the Company alleged herein.

161.     The Officer Defendants consciously breached their fiduciary duties and violated their corporate responsibilities by affirmatively and repeatedly ignoring red flags related to Epstein's criminal activity and Epstein's criminal use of his accounts and funds at JP Morgan.

162.     As a direct and proximate result of the Officer Defendants' conscious failure to perform their fiduciary duties and exercise their oversight responsibility, JP Morgan has sustained, and will continue to sustain, significant damages—both financially and to its corporate image and goodwill.  Such damages to JP Morgan caused by the Officer Defendants include and will include, substantial penalties, fines, damages awards, settlements, expenses, increased regulatory scrutiny, reputational harm, and other liabilities described herein.

163.     As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

**COUNT III**

**Breach Of Fiduciary Duty of Care**
**(Against The Officer Defendants)**

164.     Plaintiff repeats and realleges each and every allegation above as if set forth in full herein.

165.     The Officer Defendants, as current and former officers of JP Morgan, all owed and owe fiduciary duties to JP Morgan and its stockholders.  By reason of their fiduciary relationships, the Officer Defendants specifically owed and owe JP Morgan the highest obligation of due care in the administration of the affairs of the Company, including, without limitation, ensuring JP Morgan's compliance with the BSA and regulations promulgated thereunder, and laws and regulations governing AML requirements.

166.     In addition, the Officer Defendants owed and owe specific fiduciary duties as defined by the Company's corporate governance documents that, had they been discharged in

accordance with the Officer Defendants' obligations, would have necessarily prevented the misconduct and the consequent harm to the Company alleged herein.

167.    The Officer Defendants consciously breached their fiduciary duties and violated their corporate responsibilities by consistently and repeatedly permitting JP Morgan to breach or fail to comply with its legal and regulatory reporting and compliance requirements related to Epstein's criminal activity and Epstein's criminal use of his accounts and funds at JP Morgan.

168.    As a direct and proximate result of the Officer Defendants' failure to perform their fiduciary duties, JP Morgan has sustained, and will continue to sustain, significant damages—both financially and to its corporate image and goodwill.  Such damages to JP Morgan caused by the Officer Defendants include and will include, substantial penalties, fines, damages awards, settlements, expenses, increased regulatory scrutiny, reputational harm, and other liabilities described herein.

169.    As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff, on behalf of JP Morgan, requests judgment as follows:

A.      Determining that this action is a proper derivative action maintainable under the law and that demand on the JP Morgan Board is excused as futile;

B.      Finding the Director Defendants liable for breaching their fiduciary duties by consciously allowing JP Morgan to not comply with its reporting obligations under various laws and regulations related to Epstein's criminal conduct and Epstein's use of JP Morgan accounts and funds to further his criminal conduct;

C.      Finding the Officer Defendants liable for breaching their fiduciary duty by consciously allowing JP Morgan to not comply with its reporting obligations under various laws and regulations related to Epstein's criminal conduct and Epstein's use of JP Morgan accounts and funds to further his criminal conduct;

D.      Finding the Officer Defendants liable for breaching their fiduciary duty by allowing JP Morgan to not comply with its reporting obligations under various laws and regulations related to Epstein's criminal conduct and Epstein's use of JP Morgan accounts and funds to further his criminal conduct;

E.      Directing JP Morgan to take all necessary actions to reform and improve its compliance procedures and governance policies to comply with applicable laws and to protect JP Morgan and its stockholders from a repeat of the damaging events described herein;

F.      Awarding to JP Morgan restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

G.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' consultants' and experts' fees, costs, and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

Dated: May 9, 2023                                  **GRANT & EISENHOFER P.A.**

*s/ Rebecca Musarra*
Rebecca A. Musarra
485 Lexington Ave., 29th Floor
New York, NY 10017
rmusarra@gelaw.com
(646) 722-8500

Michael J. Barry (*pro hac forthcoming*)
Christine M. Mackintosh (*pro hac forthcoming*)
Vivek Upadhya (*pro hac forthcoming*)
123 Justison St.
Wilmington DE 19801
mbarry@gelaw.com
cmackintosh@gelaw.com
vupadhya@gelaw.com
(302) 622-7000

*Counsel for Plaintiff*

## VERIFICATION

I, M. Scott Anderson, Trustee for the Operating Engineers Construction Industry and Miscellaneous Pension Fund (the "Operating Engineers"), hereby verify that the Operating Engineers have held stock in JPMorgan Chase & Co. ("JP Morgan" or the "Company"), at all relevant times herein. The Operating Engineers are ready, willing, and able to pursue this stockholder derivative action on behalf of and for the benefit of JP Morgan. I have reviewed the allegations in the attached Verified Stockholder Derivative Complaint, and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate, and complete. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason I believe them to be true. Having received a copy of the Verified Stockholder Derivative Complaint, and having reviewed it with my counsel, I hereby authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:

May 8 , 2023

M. Scott Anderson, Administrator
Operating Engineers Construction Industry
and Miscellaneous Pension Fund