**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

CITY OF MIAMI GENERAL
EMPLOYEES & SANITATION
EMPLOYEES RETIREMENT TRUST

and

OPERATING ENGINEERS
CONSTRUCTION INDUSTRY AND
MISCELLANEOUS PENSION FUND

                       Plaintiffs,

   v.

JAMES DIMON, STEPHEN B. BURKE,
TODD A. COMBS, JAMES S. CROWN,
TIMOTHY P. FLYNN, MELLODY
HOBSON, JOHN W. KESSLER, PHEBE
N. NOVAKOVIC, and JAMES E.
STALEY,

                       Defendants,

   and

JPMORGAN CHASE & CO.,

                       Nominal Defendant.

**Civil Case No: 1:23-cv-03903**

**JURY TRIAL DEMANDED**

---

**VERIFIED AMENDED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiff City of Miami General Employees & Sanitation Employees Retirement Trust and Plaintiff Operating Engineers Construction Industry and Miscellaneous Pension Fund ("Plaintiffs"), for the benefit of nominal defendant JPMorgan Chase & Co. ("JPM" or the "Company"), bring the following Verified Amended Stockholder Derivative Complaint (the "Complaint") against Defendants James Dimon, Stephen B. Burke, Todd A. Combs, James S.

Crown, Timothy P. Flynn, Mellody Hobson, John W. Kessler, Phebe N. Novakovic, and James E. Staley. The allegations of this Complaint are based on the knowledge of Plaintiffs as to themselves and the investigation of counsel, including the review of publicly available information and documents.

## INTRODUCTION

1.     When an otherwise reputable financial institution learns that a client is using bank facilities to further a criminal scheme, the ensuing appropriate steps are clear: the bank terminates its relationship with the client, immediately reports the incident to regulators, and informs the board of directors of the problem. But what should this Court infer when those commonsensical – and legally required – actions do not occur?

2.     The bank at issue in this stockholder derivative action (the "Action") is JPM, one of the world's largest financial institutions. Based on Plaintiffs' investigation, it appears that the Company **did** have appropriate internal controls in place to identify suspicious activity, such as massive cash withdrawals and wires by Jeffrey Epstein ("Epstein"), a **known** felon convicted for soliciting a minor for prostitution and clouded by allegations of rampant sexual abuse. Indeed, beginning in 2006, JPM's compliance staff repeatedly flagged the need to end the bank's ties to Epstein, sending distress calls all the way up to the Company's second most-powerful decision-maker, Defendant James "Jes" Staley ("Staley").

3.     For instance, in 2011, ***JPM's own General Counsel,*** Stephen Cutler ("Cutler"), documented his unambiguous recommendation about Epstein, emailing Staley and CEO of JPM's Asset and Wealth Management business, Mary Erdoes ("Erdoes"), among others: "***This is not an honorable person in any way. He should not be a client***." Despite these calls to cut ties with Epstein making it to the Company's C-suite – and, some of these cries coming from the C-suite itself – Epstein remained a client until 2013, JPM did not report Epstein's suspicious activity to

regulators, and there is no evidence that JPM's board of directors (the "Board") ever discussed Epstein prior to his death by apparent suicide in 2019.

4.    The fundamental question that this Action presents is, why?  Why didn't Staley, his boss, Defendant Chief Executive Officer ("CEO") and Chairman Jamie Dimon ("Dimon"), and the JPM Board fire Epstein and his affiliates after the imperative of terminating the relationship was recognized throughout the organization?  JPM has proffered one answer, although it is both implausible and unsatisfying.  In recent litigation, the Company has tried to lay all of the blame on Staley for the Company's ongoing relationship with Epstein, which facilitated Epstein's payments to victims and network of enablers.  In particular, JPM faults Staley for not reporting his alleged knowledge of – and personal participation in – Epstein's crimes to the Company.

5.    Even assuming that Staley obscured his relationship with Epstein, Staley's misconduct does not tell the whole story.  JPM executives – who presumably attended Board meetings and reported to directors – plainly were aware of the Company's compliance department's urges to fire Epstein.  And, the Board – comprised of intelligent people at the forefront of the business world – very likely were aware of rampant allegations of sexual misconduct levied against a purported billionaire deeply integrated into the highest reaches of the financial and political communities.

6.    So, again, why did none of the JPM fiduciaries take action?  As detailed below, Epstein was anything but a "regular" counterparty and client.  Independent of the child sex rings that made him one of the world's most notorious criminals, he had a uniquely diverse set of connections to the people who shaped the JPM of today and who still control its operations.  These connections may explain why these fiduciaries proverbially "put their heads in the sand" and hoped

the Company's (and their own) ties to Epstein would go unnoticed—a far more plausible story than JPM's tale making Staley the lone scapegoat.

7.      At bottom, the failure by the individuals at the very top of JPM to do the obvious thing their fiduciary duties required, *i.e.*, to cut Epstein off at the very latest by his 2008 guilty plea for soliciting a minor for prostitution, likely reflects something worse than a "mere" failure of internal controls or poor oversight.  Instead, it reflects, at a minimum, a bad faith disregard for their duties.

*-*-*-*-*-*

8.      Epstein was anything but a "run of the mill" JPM client.  After a young Jeffrey Epstein suddenly left Bear Stearns in 1980, he audaciously opened a financial advisory firm, J. Epstein & Co., premised on only representing billionaires.  Somewhat inexplicably, he succeeded in not only advising, but often gaining the full power of attorney over the fortunes of some of the world's richest and most powerful people.  Those (presumably legitimate) connections and the banking services needed to cater to that clientele would make him a marquee client that should get the attention of any bank CEO and board.

9.      Beyond the profits his advisory firm could generate, Epstein also had alleged ties to some of the darker corners of the geo-political community, including personal entanglement in some of the most notorious financial and political schemes of the 1980s and 1990s.  It is almost inconceivable that a person whose entire career implicates so many widely reported scandals (such as infamous hedge fund Ponzi schemes, stealing software with national security implications, and even financing weapons and drug trade in the Iran-Contra affair) can go through any respectable Know Your Customer ("KYC") bank vetting process without being tagged from the outset as a high-risk client.

10.    But Epstein's reach also extended to the events and people who made JPM the institution it is today.  In fact, by using his close friendship with apparel giant Leslie "Les" Wexner ("Wexner") as an entryway into the business and social elite circles of Columbus, Ohio, Epstein developed direct or one-step-removed financial or personal ties to a range of individuals who served or currently serve on the JPM Board.

11.    These entanglements start no later than the 1980s, when Epstein salvaged a major financing and real estate transaction in which a number of power players in the Columbus, Ohio business community participated.  During that period, Wexner worked with prominent local executives, including future JPM directors James S. Crown ("Crown") and John W. Kessler ("Kessler") and the McCoy family (which founded and controlled Bank One Corporation ("Bank One"), the largest bank in Ohio), to develop an idyllic community called New Albany, Ohio, which sought to house some of the most influential names in American business.

12.    The Crown family had inherited via merger General Dynamics Corporation ("General Dynamics"), a weapons manufacturer with deep governmental ties, and enjoyed seats on the board of First Chicago, another prominent Midwestern bank, before it was acquired by Bank One and Crown joined the Bank One board.  Kessler was a well-connected and prominent corporate lawyer in Columbus, Ohio, who advised on a wide range of deals for Wexner, the McCoys, and the Crowns alike, and enjoyed a seat on the Bank One board.

13.    Despite being backed by a marquee lineup of Columbus citizens, the New Albany project struggled initially.  Its early development was exceedingly expensive and complex, and was mishandled by its original financial leadership.  That changed after Epstein came along. Epstein was given a partnership interest in the New Albany project for a nominal investment.

Epstein promptly re-organized and restructured the New Albany development project so it could take hold, be completed, and ultimately flourish.

14.     Until 2000, Dimon had established his Wall Street reputation by serving as second-in-command in helping Sanford "Sandy" Weill ("Weill") transform his purchase of several financial institutions with links to both Epstein and British financier Robert Maxwell (whose daughter Ghislaine remains in jail for her critical role in Epstein's sex trafficking ring) into the current-day global banking behemoth Citigroup.  After Dimon and Weill split up in 1998, Dimon re-emerged as Bank One's CEO, replacing a member of the McCoy family.  Crown and Kessler both sat on the Bank One board and, as detailed below, had glowing things to say about Dimon. Thereafter, Dimon ingratiated himself in and publicly praised the Columbus business community, to which Epstein was described as "ubiquitous."  While Dimon denies ever meeting Epstein, his professed ignorance of the man's existence strains credibility.

15.     After JPM's 2003 acquisition of Bank One, several former Bank One directors and officers joined the highest ranks of the Company, including Dimon, Crown, Kessler, Stephen B. Burke ("Burke"), and Linda B. Bammann ("Bammann").  It also appears that even before the merger, JPM knew that Epstein was not a "typical" client, be it his line to banking services for billionaire clients or more controversial issues.  Staley, the head of JPM's private bank at the time, claims that he was told in 2000 to "get to know" his new (and presumably important) client.

16.     Put simply, Defendants may not have known that Epstein catered to the worst proclivities of some of the world's most powerful people.  But it appears that numerous people at the apex of Bank One's, and later JPM's, decision-making structure not only knew of Epstein, but also either had direct dealings with him or understood that they were engaged in significant business with no more than a single degree of separation from Epstein.  Epstein got attention from

the outset, and any functioning KYC onboarding process would make him a high-risk client garnering extra monitoring and attention from the outset.

17.     Whether or not he was so designated from the outset, it did not take long for JPM employees to begin openly questioning the Company's ongoing relationship with Epstein.  A September 2006 *New York Times* article about Epstein's arrest for soliciting a minor for prostitution triggered emails among JPM executives, including Erdoes, where she observed (sarcastically) that Epstein was "a lovely guy to work with."

18.     By the time of Epstein's 2008 guilty plea to the solicitation charge, JPM labeled Epstein a "high-risk" client, and many employees expressed the obvious need to terminate the relationship.  In fact, a mid-July 2008 internal risk function memorandum documented that "Catherine [Keating, the CEO of the Company's Private Bank] will go back to Jes [Staley, then the CEO of JPM's Asset Management Division] to ***tell him we are uncomfortable with Epstein***…"

19.     Even more striking, in August 2008, a JPM employee wrote that she "would count Epstein's assets as a probable outflow for '08 ($120mm or so?) ***as I can't imagine it will stay (pending [Jamie] Dimon review)***."  Whether Staley blocked the expected "Dimon review" or someone with authority (such as Dimon or a Board member) provided informal and tacit support to Epstein and thus obviated the formal "Dimon review" process, Epstein remained with JPM.

20.     Despite Epstein's 2008 guilty plea and ongoing sex crime allegations, neither JPM nor Staley ended their relationship with Epstein.  Between 2008 and 2013, Staley and Epstein exchanged 1,200 emails (including pictures of young girls in seductive poses).  Inexplicably, the bank's risk reviews of Epstein's accounts uncovered precisely zero of his grossly improper communications with Staley.

21.    By mid-2010, a risk management division employee referred to "new allegations of an investigation related to child trafficking," and asked whether JPM was "still comfortable with this client who is now a registered sex offender."  Other JPM compliance employees decided that Epstein "should go."

22.    Far from breaking off relations with the man who served as power of attorney for Wexner (a known JPM billionaire client) and unknown other billionaires and who played a role in bringing the New Albany, Ohio business elite to the heights of Wall Street and global finance, in December 2010, JPM granted Epstein a new $50 million line of credit.

23.    As Epstein's notoriety as an international criminal became more obvious, internal efforts to distance the Company from the criminal client only grew louder.  Yet no amount of risk management could overcome the failure (or refusal) of senior management and the Board to intervene to protect the Company.

24.    An internal March 2011 report explained that a company named "MC2 Model Management and Jeffrey Epstein engaged in racketeering that involved luring in minor children for sexual play for money," and that MC2 Model Management's owner was a "frequent passenger on Epstein's private jet and often visited Epstein in jail."

25.    On July 20, 2011, JPM's General Counsel Cutler emailed Staley and Erdoes, among others, writing of Epstein:  "***This is not an honorable person in any way.  He should not be a client***."  The next day, Cutler emailed Erdoes again, describing Epstein as:  "***Not a person we should do business with, period***."  Nevertheless, Epstein's accounts with the bank remained open and functional.

26.    JPM continued doing business with Epstein personally until 2013, and potentially continued to engage with Epstein related entities until his death in jail in 2019.  In fact, the

Company actively concealed Epstein's crimes by failing to file ***any*** legally required Suspicious Activity Reports ("SARs"), which are mandated for large cash withdrawals and other suspicious transactions.

27.     The Company's refusal to timely cut off its relationship with Epstein has harmed the Bank already and is continuing to do so.  JPM recently agreed to pay $290 million to settle a class action lawsuit brought by Epstein's victims.  JPM faces an ongoing lawsuit by the government of the U.S. Virgin Islands in connection with harm it suffered due to the Company financing Epstein's use of a home base in the U.S. Virgin Islands until his arrest in 2019.

28.     In sum, the story of Epstein using Company bank accounts and resources to support his child sex trafficking ring was not a single client slipping through the cracks in the system. Company fiduciaries knew about Epstein and his admitted and alleged crimes, but Epstein was not "just" a client.  He was a business partner and colleague to various members of JPM management and the Board.  The bank's delay and refusal to address (and end) its unacceptable relationship with Epstein thus likely reflects a "head in the sand" attitude, with JPM officers and directors hoping the world would not discovery the Company's facilitation of Epstein's crimes. Unfortunately for them, the Company's ties to Epstein have come to light and caused significant damage to JPM.  Demand is excused, and the defendant fiduciaries should be accountable.

## PARTIES AND RELEVANT NON-PARTIES

### I.   PARTIES

#### A.  Plaintiffs

29.     Plaintiff City of Miami General Employees' & Sanitation Employees' Retirement Trust  is a pension fund providing retirement benefits to active and retired employees of the City of Miami, Florida.

30.     City of Miami General Employees' & Sanitation Employees' Retirement Trust owns 27,950 shares of JPM common stock, has continuously held JPM common since December 2016, and is currently a stockholder of the Company.  City of Miami General Employees' & Sanitation Employees' Retirement Trust brings this Action derivatively on behalf of JPM and its stockholders to redress injuries that the Company suffered and will suffer as a direct result of Defendants' breaches of fiduciary duty.  City of Miami General Employees' & Sanitation Employees' Retirement Trust intends to retain JPM shares throughout the duration of this litigation.

31.     Plaintiff Operating Engineers Construction Industry and Miscellaneous Pension Fund is a stockholder of JPM, and has held JPM stock since 2010.

#### B.  Nominal Defendant

32.     Nominal defendant JP Morgan Chase & Co. (as previously defined, "JPM" or the "Company") is a Delaware corporation headquartered in New York, New York, that operates as a global investment bank, providing financial services in the United States and across the globe. JPM's principal bank subsidiary is JP Morgan Chase Bank, N.A.  The Company is publicly traded on the New York Stock Exchange under the ticker "JPM."

### C. Director Defendants

33.    Defendant James S. Crown (as previously defined, "Crown") was a director of JPM from 2004 until June 2023.  He served as a member of both the Public Responsibility Committee and the Risk Committee of the Board.  Prior to its merger with JPM, Crown served as a director of Bank One from 1991 to 2004.  Crown was one of the key people who selected Dimon as the CEO of Bank One in 2000 and advocated for his ascent at JPM.  From 1987 to June 2023, Crown served as a director for General Dynamics, an aerospace defense giant inherited by the Crown family following its merger with MSC in 1959.  He joined General Dynamics as lead director in 2010.  Crown was a resident of Chicago, Illinois.

34.    Defendant John W. Kessler (as previously defined, "Kessler") was a director of JPM from 2004 to 2007.  Prior to joining JPM's board, Kessler served as a director of Bank One from 1995 to 2004.  From 1998 to present, he has been the chairman of the New Albany Company.  Kessler also served on the board of Wexner's company, Abercrombie & Fitch.   Kessler is an individual and is believed to be a resident of New Albany, Ohio.

35.    Defendant Stephen B. Burke (as previously defined, "Burke") has been a director of JPM since 2004.  Prior to its merger with JPM, Burke served as a director of Bank One while Dimon was Bank One's CEO.  From 2011 until his retirement in 2020, Burke was the Chairman and COO of NBCUniversal, LLC and NBCUniversal Media, LLC.  Burke made headlines at NBCUniversal during the Harvey Weinstein scandal after Ronan Farrow alleged that Burke was warned in 2015 about a culture of sexual harassment at NBC's news division.  Burke is an individual and is believed to be a resident of Dillon, Montana.

36.    Defendant Phebe N. Novakovic ("Novakovic") has been a director of JPM since 2020.  From 2013 to present, Novakovic has served as the Chairman and CEO of General Dynamics, the aerospace defense company affiliated with the Crown family.  As previously noted,

Crown had been a member of General Dynamics board since 1987.  Novakovic has served in a variety of leadership roles at General Dynamics since her start in 2002.  Before joining General Dynamics, Novakovic worked for the United States Department of Defense from 1997 to 2001 and prior to that she served as an officer for the Central Intelligence Agency.  Novakovic is an individual and is believed to be a resident of Annapolis, Maryland.

37.    Defendant Timothy P. Flynn ("Flynn") has been a director of JPM since 2012.  He is also a member of the Audit Committee of the Board.  In his professional career, Flynn held various leadership roles at KPMG LLC in the US and finished his career as the Chairman of KPMG International in 2011.  Flynn has been a director of United Health Group since 2017 and of Wal-Mart Stores, Inc since 2012.  He was previously a director of the Alcoa Corporation and Chubb Corporation, and a member of the World Economic Forum's International Business Council. Flynn is an individual and is believed to be a resident of Marana, Arizona.

38.    Defendant Todd A. Combs ("Combs") has been a director of JPM since 2016. Combs was a member of the Risk Policy Committee of the Board from 2017 to 2019.  Combs is an individual and is believed to be a resident of Omaha, Nebraska.

39.    Defendant Mellody Hobson ("Hobson") has been a director of JPM since 2018. She serves a member of both the Public Responsibility Committee and the Risk Committee of the Board.  Hobson was a member of the Audit Committee of the Board in 2019.  Hobson is presently the Co-CEO of Ariel Investments, LLC ("Ariel Investments") where she has served as President and director since 2000.  Ariel Investments was founded by John Rogers, a former Bank One director who served with Defendant Crown, among others, and was on the Bank One board at the same time Dimon served as Bank One's CEO and one of its directors.  Hobson is an individual and is believed to be a resident of Chicago, Illinois.

40.     As used herein, "Director Defendants" refers to Dimon, Crown, Kessler, Burke, Novakovic, Flynn, Combs, and Hobson.

**D.  Officer Defendants**

41.     Defendant James "Jamie" Dimon (as previously defined, "Dimon") has been a director of JPM since 2004.  Dimon has been JPM's CEO since 2005 and Chairman of the Board since 2006.  Until 1998, Dimon served as the President of Citigroup, under the leadership of his long-term mentor, Weill.  Amidst growing tensions between the two, Dimon was fired by Weill that year.  In 2000, Dimon was selected to become the new CEO of Bank One.  In 2003, JPM purchased Bank One, launching Dimon into his role as JPM's CEO, which he assumed in 2005.  Dimon is an individual and is believed to be a resident of New York, New York.

42.     Defendant James E. Staley (as previously defined, "Staley") was the CEO of JPM's Investment Bank from September 2009 through January 2013.  Previously, Staley was the CEO of JPM's Asset Management division from 2001 to 2009 and was the head of JPM's Private Banking division from 1999 to 2001.  Staley is an individual and is believed to be a resident of Manhattan, New York.

43.     As used herein, "Officer Defendants" refers to Dimon and Staley.

44.     As used herein, "Individual Defendants" refers to the Directors Defendants and the Officer Defendants.

## II.    RELEVANT NON-PARTIES

45.     Mary C. Erdoes (as previously defined, "Erdoes") joined JPM in 1996 as head of fixed income for high-net-worth accounts.  She became CEO of JPM's Private Bank in 2005.  In September 2009, Erdoes obtained her current role as CEO of JPM's Asset & Wealth Management division.  Besides Dimon, Erdoes is the longest serving member of the JPM operating committee, which is comprised of the Company's most senior executives.

## JURISDICTION AND VENUE

46.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.  The Court has supplemental jurisdiction over the state law claims asserted herein pursuant 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

47.    Venue is proper in this Court because JPM has its principal place of business in this District, Plaintiffs' claims arose in this District, and JPM has suffered and will continue to suffer harm in this District.

48.    Pursuant to Local Civil Rule 1.6(a), the undersigned believe that this action is related to *Jane Doe 1 Doe v. JP Morgan Chase Bank, N.A.*, 22-cv-10019 (JSR) (the "*Jane Doe* Action") and *Government of the United States Virgin Islands v. JP Morgan Chase Bank, N.A.*, 22-cv-10904 (CSR) (the "*USVI* Action"), which are currently pending before this Court.  This Action and those actions arise from a common nucleus of operative fact involving JPM's participation, directly or indirectly, in Epstein's sex-trafficking venture by facilitating payments to women and girls, channeling funds to Epstein to fund the operation, and concealing Epstein's criminal conduct by violating federal banking regulations.

## SUBSTANTIVE ALLEGATIONS

## I.    COMPLIANCE WITH BANKING LAWS AND REGULATIONS IS MISSION-CRITICAL TO JPM'S BUSINESS

49.    As a global financial institution, compliance with banking laws and regulations is mission-critical to JPM's business.  The Company acknowledges that it "is subject to extensive

and comprehensive regulation under U.S. federal and state laws, as well as the applicable laws of the jurisdictions outside the U.S. in which the Firm does business."[1]

50.    JPM's national bank subsidiary, JP Morgan Chase Bank, N.A., "is supervised and regulated by the Office of the Comptroller of the Currency ('OCC') and, with respect to certain matters, by the Federal Deposit Insurance Corporation (the 'FDIC')."[2]

51.    Failure to comply with this "extensive and comprehensive regulation" could have severe consequences on JPM's business.   Indeed, the ***first*** "Risk Factor" that the Company identifies in its annual report is "Regulatory,"[3] and JPM proceeds to warn that "[r]esolving regulatory investigations can subject JP Morgan Chase to ***significant penalties and collateral consequences***," including "greater exposure to litigation" and damage to JP Morgan Chase's reputation."[4]   Accordingly, JPM – and each of the Defendants – knew that regulatory compliance (including with the laws and rules discussed herein) was "mission-critical" to the Company.

52.    Because financial institutions like JPM are susceptible to serving as conduits for significant financial crimes, the federal government has established a series of anti-money laundering ("AML") laws and regulations.   The primary federal laws governing banks with respect

---

[1] JPMorgan Chase & Co., Annual Report (Form 10-K), at 4 (Feb. 21, 2023).  Since at least 2006, the Company has made similar disclosures.  *See, e.g.*, JP Morgan Chase & Co., Annual Report (Form 10-K), at 6 (Mar. 9, 2006) ("JPMorgan Chase operates within a highly regulated industry and its business and results are significantly affected by the regulations to which it is subject.").

[2] JPMorgan Chase & Co., Annual Report (Form 10-K), at 4 (Feb. 21, 2023).

[3] *Id*. at 9.

[4] *Id*. at 11.  Since at least 2006, the Company has made similar disclosures.  *See, e.g.*, JP Morgan Chase & Co., Annual Report (Form 10-K), at 6 (Mar. 9, 2006) ("JPMorgan Chase faces significant legal risks, both from regulatory investigations and proceedings and from private actions brought against the firm. . . .   These or other future actions brought against the Firm may result in judgments, settlements, fines, penalties or other results adverse to the Firm which could materially adversely affect the Firm's business, financial condition or results of operation, or cause it serious reputational harm.").

to AML are the Federal Bank Secrecy Act ("BSA") and certain provisions of the USA Patriot Act (the "Patriot Act").[5]

53.     The BSA and Patriot Act require financial institutions to implement adequate risk-based AML policies and systems to detect and prevent money laundering and other uses of a bank's services and resources to facilitate criminal activities.  Such requirements include maintaining a due diligence program, filing SARs after detecting suspicious behavior, filing currency transaction reports ("CTRs") for currency transactions or series of currency transactions that exceed $10,000 in a 24-hour period, preventing structuring or assistance with structuring of transactions undertaken for the purpose of evading federal reporting requirements, and maintaining systems to prevent money laundering.

54.     The Federal Financial Institutions Examination Council ("FFIEC") – a formal U.S. government interagency body of banking regulators that is empowered to prescribe uniform principles, standards, and report forms to promote uniformity in the supervision of financial institutions – has published a Bank Secrecy Act / Anti-Money Laundering Examination Manual (the "FFEIC Manual") to provide further guidance to financial institutions on BSA / AML compliance.[6]  FFIEC is comprised of the Board of Governors of the Federal Reserve System, the FDIC, the National Credit Union Administration, the OCC, and the Consumer Financial Protection Bureau.

55.     The FFEIC Manual makes clear that ultimate responsibility for regulatory compliance lies with the financial institution's ***board of directors***:  "The board of directors, acting

---

[5] United Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272.

[6] FFIEC regularly updates the FFEIC Manual.  Given the relevant period for this Complaint, cites herein are to the 2006 edition of the FFEIC Manual.

through senior management, is ultimately responsible for ensuring that the bank maintains an effective BSA/AML internal control structure, including suspicious activity monitoring and reporting."[7]  Such controls should include:[8]

- "Identify[ing] banking operations . . . more vulnerable to abuse by money launderers and criminals; provid[ing] for periodic updates to the bank's risk profile; and provid[ing] for a BSA / AML compliance program to manage risks."

- "***Inform[ing] the board of directors***, or a committee thereof, and senior management, of compliance initiatives, identified compliance deficiencies, and corrective action taken, and notify directors and senior management of [SARs] filed."

- "***Implement[ing] risk-based customer due diligence (CDD)*** policies, procedures, and processes."

- "***Identify[ing] reportable transactions and accurately file all required reports including SARs***, [CTRs], and CTR exceptions."

- "Provid[ing] sufficient controls and monitoring systems for timely detection and reporting of suspicious activity."

56.    The FFEIC Manual explains that effective CDD policies are "critical" because they are needed for: (a) "[d]etecting and reporting unusual or suspicious transactions that potentially expose the bank to financial loss, increased expenses, or reputational risk"; (b) "[a]voiding criminal exposure from persons who use or attempt to use the bank's products and services for illicit purposes"; and (c) "[a]dhering to safe and sound banking practices."[9]

57.    With respect to "high-risk customers," the FFEIC Manual instructs that "[e]nhanced due diligence . . . is especially critical in understanding their anticipated transactions

---

[7] Bank Secrecy Act / Anti-Money Laundering Examination Manual, Federal Financial Institutions Examination Council, at 29 (2006), available at https://www.ffiec.gov/pdf/bsa_aml_examination_manual2006.pdf.

[8] *Id*. at 29-30.

[9] *Id*. at 56.

and implementing a suspicious activity monitoring system that reduces the bank's reputation, complaint, and transaction risks."[10]  Moreover, "due diligence is an ongoing process" and risk profiles should be adjusted as necessary.[11]

58.    Closely related to a bank's CDD policies is its suspicious activity reporting, which the FFEIC Manual calls "the cornerstone of the BSA reporting system."[12]  Banks are **required** to file a SAR with respect to, among other things:[13]

- "Criminal violations aggregating $5,000 or more when a suspect can be identified."

- "Criminal violations aggregating $25,000 or more regardless of a potential suspect."

- "Transactions conducted or attempted by, at, or through the bank . . . ***aggregating $5,000 or more***, if the bank . . . ***knows, suspects, or has reason to suspect*** that the transaction": (a) "***[m]ay involve potential*** money laundering or ***other illegal activity***; (b) "[i]s designed to evade the BSA or its implementing regulations"; or (c) "***[h]as no business or apparent lawful purpose*** or is not the type of transaction that the particular customer would normally be expected to engage in, and ***the bank knows of no reasonable explanation for the transaction*** after examining the available facts, including the background and possible purpose of the transaction.

59.    The FFEIC Manual continues: "Appropriate policies, procedures, and processes should be in place to monitor and identify unusual activity."[14]  When a bank detects suspicious activity, it ***must*** file a SAR within 30 days to the U.S. Department of the Treasury's Financial Crimes Enforcement Network.[15]  Moreover, where there is continuing suspicious activity, a bank should file a SAR at least every 90 days.[16]

---

[10] *Id*. at 57.

[11] *Id*. at 58.

[12] *Id*. at 60.

[13] *Id*. at 60-61.

[14] *Id*. at 61.

[15] *Id*. at 66, 68.

[16] *Id*. at 69.

60.    Banks are ***required*** to notify their boards of directors when SARs have been filed,[17] and the FFEIC Manual advises that "management should provide sufficient information on its SAR filings to the board of directors or an appropriate committee in order to fulfill its fiduciary duties."[18]   Under the laws of Delaware – JPM's state of incorporation – the Board's fiduciary duties require them to implement adequate oversight systems to ensure compliance with laws and regulations, including the BSA and the Patriot Act.

## II.    EPSTEIN'S PRE-JPM PROFESSIONAL BACKGROUND MADE HIM A "HIGH RISK-HIGH REWARD" CLIENT FROM THE OUTSET

61.    Historical context is necessary to appreciate why and how Epstein could thrive within JPM even though a person without links to the bank's power centers would surely have been reported to authorities and terminated as a client when his status as a child sex trafficker became known within the Company.

62.    Epstein's history and notoriety at the time of his earliest interactions with JPM supports the inference that, from the outset, he would have been recognized as a high-risk, but high-reward, client, and would likely have been reported to the highest levels within the Company. What already was known around the time Epstein was onboarded at JPM in 1998 – not to mention what came to light in 2002 to 2003 – begs the question of whether plentiful red flags were intentionally ignored by those in positions of power to retain Epstein as a client, overriding the many concerns that his history should have raised.

63.    Based solely on the sheer volume of money for an exceedingly high-profile clientele that Epstein purported to handle, it is probable that his seeking to open an account would have been brought to the attention of any bank CEO.  Even when the JPM onboarding process for

---

[17] *Id*. at 67.

[18] *Id*. at 68.

Epstein was taking place around 1998, there were already an array of reasons that his desire to bank with JPM would have garnered attention from the highest levels of the Company, and should have triggered KYC measures.

64.    Among these red flags were a trail of financial irregularities and crimes left in Epstein's wake among those he was known to be close to, including an SEC investigation into insider trading during his time at Bear Stearns, his proximity to the Tower Financial Ponzi scheme, and his incredibly close ties to Robert Maxwell, whose theft of over $1.2 billion of his clients' money had recently come to light.  Epstein's history even at this time also included early red flags of his horrific sexual abuses, still being unearthed and litigated to this day.

**A.  The Founding and Expansive Reach of J Epstein & Co**

65.    In the summer of 1974, Epstein found himself within the halls of the prestigious Dalton School on Manhattan's Upper East Side, teaching physics and calculus, despite the fact that he was 21 years old and had no college degree.  Epstein's foray into education, however, proved short-lived.  In 1976, he traded his classroom for the financial sphere, securing a position at Bear Stearns – an institution that would later be subsumed by JPM.

66.    Working under the direct tutelage of Wall Street legends Alan "Ace" Greenberg and James "Jimmy" Cayne, Epstein rapidly ascended the Bear Sterns ranks, attaining the title of senior partner by 1980.  However, shortly thereafter, the Securities and Exchange Commission ("SEC") initiated a formal investigation into Bear Stearns about insider trading around a tender offer placed on March 11, 1981, by the Seagram Company Ltd. for St. Joe Minerals Corp.  Epstein left Bear Stearns the next day, March 12, 1982.  This investigation included at least one personal interview with Epstein by the SEC on April 1, 1981, regarding potential charges, and it has been reported that Epstein left behind a string of financial irregularities at Bearn Stearns, which perhaps explains his swift exit from the company.

67.    In fact, according to his SEC interview and a contemporaneous Bear Stearns memorandum from the Executive Committee, Epstein left the company because he had illicitly lent money to clients.  The transcript of this interview and its exhibits (including the memorandum from the Executive Committee) are publicly available.  After being fined and suspended by the Executive Committee, Epstein resigned.

68.    Epstein opened his own financial advisory firm, named J Epstein & Co., in 1982. The company did not employ any analysts or portfolio managers, operating instead with approximately twenty accountants.  Despite lacking any marketing efforts, grand opening announcements, or even simple promotional flyers, J Epstein & Co. mysteriously thrived a mere year after its establishment, boasting a client base consisting of a large number of ultra-high net worth individuals.  The firm purported to cater exclusively to clients with a net worth of $1 billion or more – a striking anomaly in the financial industry at the time when billionaires were considerably rarer.[19]  In fact, a 2002 article in *New York Magazine* reported that Epstein was known to scoff at offers to manage accounts of less than $1 billion, flatly – and often rudely – turning down requests to manage accounts of $500 million or $700 million as "too small."[20]

69.    While some have questioned his veracity, Epstein consistently claimed that the world's wealthiest and most influential people flocked to give Epstein control over their finances.

70.    Importantly, according to those acquainted with him or under his employment, Epstein's business model hinged on maintaining absolute control over his clients' assets.  He went so far as to assume power of attorney over his clients' assets, providing him with total control over these immense pools of wealth, and unfettered authority over the finances of some of the world's

---

[19] Landon Thomas Jr., *Jeffrey Epstein:  International Moneyman of Mystery*, N.Y. MAG. (Oct. 28, 2002), https://nymag.com/nymetro/news/people/n_7912/.

[20] *Id.*

wealthiest individuals.[21]  At the time, Epstein's most significant confirmed client was Wexner, the billionaire behind Limited Brands and Victoria's Secret – and a director of Columbus-based Bank One.  As discussed below, Epstein's close connection with Wexner paved the way for his entanglement with the Bank One and later JPM boards.

### B. Epstein's Known Ties to the Maxwells Should Have Made Him a "High Risk" Client From the Time of His Onboarding at JPM

71.    In the early 1980s, Epstein spent his days traveling between England and the United States where he integrated into social circles comprised of socialites, arms-dealers, spies, billionaires, politicians, gangsters, and various other influential figures.  While in England, Epstein first encountered British media baron Robert Maxwell, the father of Ghislaine Maxwell (with whom Epstein would later partner in running his sex trafficking rings).

72.    Throughout his life, Robert Maxwell was renowned as a media proprietor, a member of the British Parliament, a suspected spy, and, later on, a notorious fraudster.  Most importantly, he was eye-poppingly rich and offered Epstein the connections and money that helped to turn J Epstein & Co into a massive financial advisory business.  As explained in more detail below, some of these connections included General Dynamics and the Crown family, a member of which sat on the Bank One board and currently sits on the JPM Board, *i.e.*, Defendant Crown.

73.    Prior to his mysterious death on his yacht in the middle of the Atlantic Ocean in 1991, Robert Maxwell faced allegations of espionage for the Israeli Intelligence Directorate ("IID").  Following his death, these accusations were corroborated by former IID employees and an unnamed U.S. intelligence official.[22]

---

[21] *Id.*

[22] Whitney Webb, *Former Israeli Intel Official Claims Jeffrey Epstein, Ghislaine Maxwell Worked for Israel*, MINTPRESS NEWS (Oct. 2, 2019), https://www.mintpressnews.com/ari-ben-menashe-jeffrey-epstein-ghislaine-maxwell-israel-intelligence/262162/.

74.     Whether or not he had links to intelligence agencies, Robert Maxwell served as a mentor to Epstein, even hoping that Epstein would become his son-in-law.  As Ari Ben Menashe, the former IID employee who claimed to be Maxwell's "handler," put it, "Robert Maxwell saw in Jeffrey Epstein a potential husband for his daughter and a potential business partner for himself."[23] It appears that Ghislaine Maxwell's father introduced her to Epstein in the 1980s.[24]

75.     Epstein presented himself to Ghislaine Maxwell as a financial expert who could help her family finance its business.  During that time period, Robert Maxwell allegedly needed a $50 million bridge loan, which Epstein secured.[25]

76.     According to reporting by, among others, Seymour Hersh, under Robert Maxwell's guidance, both Ghislaine Maxwell and Epstein participated in a clandestine operation involving arms dealing, blackmail, and financial fraud, which ultimately played a role in the Iran-Contra scandal.  But that connection also provided the basis for a more strengthened Epstein-Ghislaine Maxwell link.

77.     Robert Maxwell's involvement with Israeli intelligence became evident following his meeting with Epstein in London in the 1980s.  Maxwell was allegedly involved in the PROMIS scandal, also known as the "Inslaw Affair."[26]  PROMIS, short for "Prosecutors Management Information System," was a software developed by U.S.-based Inslaw Inc. and designed to help

---

[23] Michael McKinley & Barbara Shearer, *Ghislaine Maxwell: Privilege, Power, Perversion*, INKSHARES,                       https://www.inkshares.com/books/ghislaine-maxwell-privilege-power-perversion/book_segments/meeting-jeffrey.

[24] *Id*.

[25] *Id*.

[26] Emma North-Best, *Sir Robert Maxwell's FBI File is Getting More Classified By the Minute*, MUDROCK (June 28, 2017), https://www.muckrock.com/news/archives/2017/jun/28/sir-robert-maxwells-fbi-PROMIS/.

federal and state prosecutors track and flag potential money laundering operations and suspicious wire transfers.[27]

78.    According to investigative journalist covering the Inslaw Affair, Earl Brian, an associate of President Ronald Reagan, and his Attorney General Edwin Meese ("Meese"), sought to acquire access to this software.  Meese and members of the Department of Justice covertly obtained the PROMIS software intending to use it to help U.S. intelligence organizations indirectly facilitate the very crimes that the program was supposed to prevent.

79.    The software also landed in the hands of Israeli agents, who installed a backdoor into the program and attempted to sell it to U.S. military-industrial companies, including General Dynamics (affiliated with the Crown family that later enjoyed seats on the Bank One and JPM boards of directors).  The alleged intermediary for this operation was Robert Maxwell.

80.    Given the high volume of publicity surrounding Ghislaine Maxwell and Epstein's relationship in the 1990s, Epstein's ongoing dealings with the Maxwell family would inevitably have come up in any adequate bank onboarding or KYC due diligence process.

### C. Epstein's Role in the Tower Financial Ponzi Scheme and Affiliation With Founder Steve Hoffenberg Should Have Raised Major Red Flags During his JPM Onboarding

81.    In 1993, Steven Hoffenberg ("Hoffenberg"), one of Epstein's early mentors, was convicted for perpetrating one of the largest Ponzi schemes prior to Bernie Madoff.

82.    Tower Financial Corporation ("Towers") came into existence in the early 1970s as a debt collection agency stationed in Manhattan, New York.  Hoffenberg was the driving force behind its creation, taking on the roles of Chairman, CEO, and President.  In 1987, shortly after

---

[27]  Richard L. Fricker, *The INSLAW Octopus*, WIRED (JAN. 1, 1993, 12:00 PM), https://www.wired.com/1993/01/inslaw/.

Epstein's departure from Bear Stearns, Hoffenberg was introduced to Epstein by Sir Douglass Leese, who had ties to Robert Maxwell.

83.     Regarding Epstein, Leese told Hoffenberg: "He's great at selling securities. And he has no moral compass."[28] Hoffenberg thereafter welcomed Epstein into the fold as a consultant, providing him with a monthly salary of $25,000 (roughly $67,000 in today's dollars). When prompted about his association with Epstein years later, Hoffenberg stated, "He was my best friend for years. My closest friend for years."[29]

84.     In February 1993, the SEC lodged charges against Towers, Hoffenberg, and the remaining executive committee for perpetrating a $460 million Ponzi scheme that defrauded nearly 200,000 Americans. Hoffenberg pleaded guilty to fraud, obstruction of justice, and tax evasion in 1995, and was sentenced to a 20-year prison term. Hoffenberg's co-conspirators received sentences ranging from seven to nine years.

85.     While Epstein escaped charges, numerous press articles and court documents suggest Epstein was initially implicated in the scheme, with some witnesses even naming him as the true architect. Yet, his name mysteriously disappeared from the court records.[30] In any event,

---

[28] Marc Fisher & Jonathan O'Connell, *Jeffery Epstein:  The Trail of Ruined Lives, Misery and Bankruptcy Arch-Swindler and Paedophile Left in His Wake*, INDEPENDENT (Aug. 11, 2019, 2:23 PM), https://www.independent.co.uk/news/world/americas/jeffrey-epstein-death-sex-trafficking-minors-victims-justice-us-courts-fbi-investigation-a9051911.html.

[29] Brian Pascus & Mola Lenghi, *Jeffrey Epstein Worked at Financial Firm That Engaged in Massive Ponzi Scheme in 1980s and 1990s*, CBS (August 13, 2019 9:12 AM), https://www.cbsnews.com/news/jeffrey-epstein-worked-at-towers-financial-with-stephen-hoffenberg-who-committed-ponzi-scheme-crimes/.

[30] Marc Fisher & Jonathan O'Connell, *Final Evasion:  For 30 Years, Prosecutors and Victims Tried to Hold Jeffrey Epstein to Account.  At Every Turn, He Slipped Away.*, WASH. POST (Aug. 10, 2019, 8:53 PM), https://archive.is/20200705194823/https://www.washingtonpost.com/politics/final-evasion-for-30-years-prosecutors-and-victims-tried-to-hold-jeffrey-epstein-to-account-at-every-turn-he-slipped-away/2019/08/10/30bc947a-bb8a-11e9-a091-6a96e67d9cce_story.html.

Epstein's role as a consultant to Towers should have been red flags to a bank with proper AML systems in place and conducting adequate KYC due diligence.

86.     Following Epstein's arrest and subsequent incarceration in 2019, Hoffenberg, having served 18 years in prison, alleged that Epstein had in fact been the true mastermind behind the entire scheme.  When questioned about his silence on Epstein's involvement, Hoffenberg claimed that Epstein had significant sway within the United States Department of Justice, further emphasizing, "You cannot grasp the magnitude of [Epstein's] controlling effect."[31]  Given the sheer scale of the scheme and the extensive media coverage it attracted, it is hard to believe that major players in the financial world who worked with Epstein remained ignorant of Epstein's identity by 1995.

## III.  EPSTEIN'S "UBIQUITOUS" BUSINESS TIES TO THE COLUMBUS, OHIO BUSINESS ELITE THAT CREATED AND COMPRISE JPM'S CURRENT BOARD AND LEADERSHIP MAY EXPLAIN HIS SPECIAL TREATMENT AT JPM

### A.  Epstein Salvages and Successfully Turns Around the "New Albany" Project Created by Wexner and Kessler

87.     Sometime in the early 1980s, Epstein was introduced to Wexner, the billionaire behind Limited Brands and Victoria's Secret.  Wexner was one of Epstein's earliest confidants and wealthiest clients, and close associates of Wexner found it perplexing that he would so quickly entrust his fortune to a relative newcomer like Epstein. However, Epstein soon demonstrated his worth, providing timely assistance to Wexner's business venture in New Albany, Ohio.

88.     The New Albany project was the redevelopment of thousands of acres of farmland outside of Columbus, Ohio into a town modeled after an 18th-century Georgian village.  The

---

[31] Gina Tron, *Jeffrey Epstein Allegedly Took Part In Ponzi Scheme Before Creating 'Molestation Pyramid Scheme,'* OXYGEN (June 3, 2020, 6:30 PM), https://www.oxygen.com/true-crime-buzz/steven-hoffenberg-says-jeffrey-epstein-helped-him-with-ponzi-scheme.

development includes multi-million dollar homes built around a Jack Nicklaus-designed golf course. Wexner and his business partner Kessler invested significant capital into the project.

89.    By 1988, Wexner and Kessler's ambitious real estate project had become a financial debacle. To salvage the venture, Wexner enlisted Epstein's help. A Columbus-based investigative journalist has stated that "Before Epstein came along in 1988, the financial preparations and groundwork for the New Albany development were a total mess" and that "Epstein cleaned everything up."[32]

90.    The New Albany venture marked the first interaction between Kessler and Epstein, establishing a link to Epstein's future relationship with JPM. Kessler was a future supporter of Dimon who helped him reach the highest echelons of Bank One and JPM, placing Epstein at just one degree of separation from Dimon (at most).

91.    Kessler was a co-founder of New Albany and was a director on the Bank One board during its merger with JPM and stayed on as a director of JPM. He was also on the search committee that appointed Dimon as CEO of Bank One in 2000. He has described Dimon as the "best banker in the country" and stated that Dimon loves Columbus and that "he'd move everybody" at JPM to Columbus if he could.[33] Kessler, of course, knew Epstein and owed the success of the New Albany project to Epstein.

92.    Additionally, John G. McCoy, the father of John B. McCoy, was an early buyer of real estate in the New Albany development. John G. McCoy had appointed Kessler to the Bank One board and they had a close relationship, with Kessler calling the senior John G. McCoy his

---

[32] Landon Thomas Jr., *Jeffrey Epstein: International Moneyman of Mystery*, N.Y. MAG (Oct. 28, 2002), nymag.com/nymetro/news/people/n_7912.

[33] CEO Jack Kessler: Local Visionary: It's How You Treat People, COLUMBUS DISPATCH (Aug. 24, 2014, 12:01 AM), https://www.dispatch.com/story/business/2014/08/24/ceo-jack-kessler-local-visionary/23336557007/.

mentor.[34]  John G. McCoy, as a former executive of Bank One, close friend of Kessler, and early investor in New Albany, on information and belief interacted with Epstein.

### B.  Epstein's Success Ingratiated Him to Bank One, the Columbus Elite, and Future Decision Makers at JPM

93.     Epstein's connections to Bank One, the Columbus elite, and JPM goes even further. As a gesture of gratitude for saving the New Albany project, Wexner and Kessler welcomed Epstein as a general partner in New Albany Co.'s holding company.  This move came at a nominal cost to Epstein, despite both Wexner and Kessler having already invested billions into the project.

94.     Wexner even let Epstein build a 10,000 square foot home on Wexner's personal estate within the New Albany development.  Epstein, Kessler, Wexner, and John G. McCoy were all property owners (and neighbors) in this new and exclusive community.

95.     Epstein's connections to Columbus continued to develop – in fact, one article notes:

> ***Mr. Epstein became ubiquitous in Ohio***.  His black book of contacts filled up with phone numbers with Columbus's 614 area code.  That included dozens of numbers for Mr. Wexner, his personal staff and L Brands executives — even a couple of local doctors.  Mr. Epstein, who would fly in and out of Columbus on his private plane, became a fixture at Mr. Wexner's parties and an annual fund-raiser for the Wexner Center for the Arts, which included a luncheon at the billionaire's home.
>
> Mr. Epstein became deeply involved in Mr. Wexner's upscale real-estate development in New Albany, about 15 miles outside Columbus.  He set up shop in the same downtown Columbus skyscraper as Jack Kessler.

96.     This same group of the Columbus elite helped Dimon become CEO of Bank One in 2000.  The Bank One board of directors that appointed Dimon included Kessler, who knew Epstein from the New Albany project.  Former Bank One board members and executives including

---

[34] *Id*.

Wexner and John G. McCoy had New Albany property neighboring Epstein.  And the Columbus elite that did business with Bank One ran in the same social circles as Epstein.

### C.  Bank One Merges with First USA and First Chicago

97.    In 1997, John B. McCoy, a native of Columbus, Ohio and the son of John G. McCoy, the founder of Banc One Corporation (which later became Bank One), served as Bank One's Chairman and CEO.  As the 1990s drew to a close, Bank One undertook a sequence of significant, high-profile mergers that redefined its corporate identity.

98.    In January 1997, Bank One agreed to merge with Texas-based First USA Bank. Following the closing of this transaction, in 1998, Bank One embarked on another significant merger, this time with First Chicago Bank.  While completing the First Chicago deal, John B. McCoy was secretly meeting with Dimon in an attempt to bring him to Bank One as his number two.

99.    At the time, John B. McCoy was fully aware of Epstein's dealings in Ohio and with Wexner and Kessler, his Bank One colleagues who had worked with Epstein on creating the New Albany development.[35]  Additionally, his father owned property in the New Albany development along with Wexner, Kessler, and Epstein.

100.    Unfortunately for John B. McCoy, Bank One suffered a series of adverse financial results, leading to his resignation as CEO and Chairman in December 1999.  This void in leadership lead to speculation that Dimon would step in to lead Bank One, having recently been fired from Citigroup.

---

[35]The Real McCoy, COLUMBUS MONTHLY (Feb. 9, 2014, 11:01 PM) https://www.columbusmonthly.com/story/lifestyle/2014/02/10/the-real-mccoy/22772229007/.

101.    Indeed, the *New York Post* wrote: "John McCoy stepped down as CEO of Banc One, the Ohio based superregional bank.  Dimon's name leapt to the top of the list of possible successors.  But as one bank analyst pointed out to Bull's Eye, 'Why would Jamie want to move to Ohio? He's a New York boy.'"

### D.  Dimon's Move to New York and Into the Midwest Power Circle

102.    The *New York Post*'s skepticism proved misguided.  In early 2000, Dimon was vying for the CEO position at Bank One.  Dimon's fate rested in the hands of a group of individuals like Kessler, who would not only shape his forthcoming leadership trajectory but also, as discussed above, were already quite familiar with the comings and goings of Epstein, who had become "ubiquitous in Ohio."

103.    Following Dimon's interview for the role of CEO at Bank One, Kessler was in favor of hiring Dimon, stating, "He's just a fabulous leader.  He's the best banker in the country, there's no question."[36]  Crown, one of the new Bank One directors with ties back to Robert Maxwell through his family link to General Dynamics, stated that the CEO Search Committee narrowed the search to two candidates, and that:  "Jamie met with the board and made a very convincing presentation about where he would focus his energy in the beginning.  It was clear he had seen this movie before.  He had the experience of cutting costs and bringing organizations together, something we clearly needed."[37]

---

[36] *CEO Jack Kessler:  Local Visionary:  It's How You Treat People,* COLUMBUS DISPATCH (Aug. 24, 2014, 12:01 AM), https://www.dispatch.com/story/business/2014/08/24/ceo-jack-kessler-local-visionary/23336557007/.

[37] Whitney Webb, *Crowning the King of Wall Street*, UNLIMITED HANGOUT (April 27, 2023), https://unlimitedhangout.com/2023/04/investigative-series/crowning-the-king-of-wall-street/; Paul W. Marshall & Todd H. Thedinga, *Jamie Dimon and Bank One (A),* Harvard Business School Case 804-107, (Dec. 2003, rev. July 2012).

104.    Crown would go on to serve as head of JPM's risk committee during the Epstein saga.  Despite a massive failure in his role, Crown continued to serve on the Board, with his directorship spanning nearly two decades.

105.    Wexner was no longer on the board of Bank One when Dimon arrived, and it is unclear if Dimon ever personally knew of or interacted with Epstein during that time.  However, it is clear that Wexner, Kessler, Crown, and the McCoys were very much connected to Epstein's dealings in Ohio (including, of course, the New Albany project).  Considering Epstein's consistent involvement with the Columbus business elite, it is fair to infer that Dimon, as the CEO of Bank One, with a board populated with Columbus's business elite, was aware of Epstein and likely crossed paths with him, at the least.  Indeed, in a 2014 interview, Kessler referred to Dimon's affinity for Columbus, Ohio, stating, "Jamie loves it here because he said the work ethic is so good. He said he'd move everybody here if he could."[38]

106.    In January 2004, Bank One announced its acquisition by JPM for $58 billion.  The initial announcement did not envisage Dimon assuming the top position.  According to the initial deal press release:  [T]he newly merged entity was to be led by William B. Harrison, 60, the existing chairman and chief executive of J.P. Morgan Chase.  James Dimon, 47, then the chairman and chief executive of Bank One, was slated to become president and chief operating officer of the combined company.[39] Fortunately for Dimon, his colleagues from Bank One had no plans to operate under Harrison's leadership for long.

---

[38] *CEO Jack Kessler:  Local Visionary:  It's How You Treat People,* COLUMBUS DISPATCH (Aug. 24, 2014, 12:01 AM), https://www.dispatch.com/story/business/2014/08/24/ceo-jack-kessler-local-visionary/23336557007/.

[39] Andrew R. Sorkin & Landon Thomas Jr., *J.P. Morgan Chase to Acquire Bank One in $58 Billion Deal*, N.Y. TIMES (Jan. 14, 2004), https://archive.is/20210502192034/https://www.nytimes.com/2004/01/14/business/jp-morgan-chase-to-acquire-bank-one-in-58-billion-deal.html#selection-613.22-613.379.

107.    Only six months after closing the merger, Dimon was invited by the Board to take over as CEO of the combined company, and a short time thereafter he took on the role of Chairman. The directors who moved from the Bank One board to the JPM Board – Kessler, Crown, Stephen Burke, Robert Lipp, Richard Manoogian, and David Novak – helped Dimon rise to the Company's CEO role.

108.    Dimon's tenure as CEO of JPM has been rife with management failures.  A 2020 article raised a troubling question: "Why hasn't JPMorgan Chase's Board sacked Jamie Dimon as the bank accumulated five felony counts?"  The piece recognizes that Dimon has not forgotten who afforded him the opportunity to become CEO, and the connection with Bank One continues to exert a significant influence on JPM's current board.  The author responds to this question with: "Turns out Jamie Dimon has been taking very good care of the Directors on his Board and they have been taking very good care of Dimon – turning him into a billionaire, notwithstanding the worst criminal record of any major bank in the history of the United States."[40]

## IV.    JPM PURSUES EPSTEIN

### A.    Onboarding Epstein As A Client

109.    Epstein's association with JPM began in 1998.  In 2000, the Company entrusted the task of managing Epstein as a client to Staley, the then-new head of JPM's private banking division.  Staley has explained that, when he was told to work with Epstein, he was specifically advised to "get to know him."  The head of a global bank's private banking division presumably is not tasked with "getting to know" all of the bank's private bank clients.

---

[40] Pam Martens & Russ Martens, *If You're Baffled As To Why JPMorgan Chase's Board Hasn't Sacked Jamie Dimon as the Bank Racked Up 5 Felony Counts – Here's Your Answer,* WALL ST. ON PARADE: A CITIZEN GUIDE TO WALL ST. (Oct. 12, 2020), https://wallstreetonparade.com/2020/10/if-youre-baffled-as-to-why-jpmorgan-chases-board-hasnt-sacked-jamie-dimon-as-the-bank-racked-up-5-felony-counts-heres-your-answer/.

110.    What began as Staley's professional endeavor to build a relationship with Epstein transitioned into a personal one, as discussed below in more detail.  By 2003, it would become very quickly apparent to Staley that doing business with Epstein would include a level of reputational and legal risk unlike anything JPM had ever or should ever accept.

111.    As previously noted, JPM, like any major financial institution, has a duty to perform a high degree of due diligence on the individuals it does business with.  Indeed, that duty should hold even greater importance when a new client like Epstein, who claims to managing billions of dollars for world elite, has little to no digital or public footprint.  Moreover, Epstein's onboarding should have revealed his involvement with a slew of shady characters and financial dealings.

112.    For instance, if JPM even conducted this most rudimentary due diligence prior to onboarding Epstein as a client they would have learned that he departed Bearns Sterns under a shadow of financial inpropriety and was connected to Hoffenberg and the Towers Ponzi scheme.  Those two connections alone should have warranted escalating Epstein to senior management or the JPM risk committee.

**B.  2003 Vanity Fair Article Raises Major Concerns About Epstein**

113.    In March 2003, Vicky Ward of *Vanity Fair* published an article entitled "The Talented Mr. Epstein."[41]  The piece initially spotlights Epstein's roster of high-profile admirers and clients, including Wexner, Bill Clinton, Prince Andrew, and Alan Dershowitz.  However, the article simultaneously carries a more sinister undertone, which should have raised alarm bells for anyone conducting business with Epstein.  The following are several points from the article that should have set off significant concerns across JPM about its client:

---

[41]    Vicky Ward, *The Talented Mr. Epstein*, VANITY FAIR (Mar. 1, 2003), https://www.vanityfair.com/news/2003/03/jeffrey-epstein-200303.

- "He's reckless," says a former business associate, "and he's gotten more so.  Money does that to you.  He's breaking the oath he made to himself – that he would never do anything that would expose him in the media."

- According to S.E.C. and other legal documents unearthed by VANITY FAIR, Epstein may have good reason to keep his past cloaked in secrecy: his real mentor, it might seem, was not Leslie Wexner but Steven Jude Hoffenberg, 57, who, for a few months before the S.E.C. sued to freeze his assets in 1993, was trying to buy the New York Post.  He is currently incarcerated in the Federal Medical Center in Devens, Massachusetts, serving a 20-year sentence for bilking investors out of more than $450 million in one of the largest Ponzi schemes in American history.

- In 1987, Hoffenberg, according to sources, set Epstein up in the offices he still occupies in the Villard House, on Madison Avenue, across a courtyard from the restaurant Le Cirque.  Hoffenberg hired his new protégé as a consultant at $25,000 a month, and the relationship flourished.  "They traveled everywhere together – on Hoffenberg's plane, all around the world, they were always together," says a source.  Hoffenberg has claimed that Epstein confided in him, saying, for example, that he had left Bear Stearns in 1981 after he was discovered executing "illegal operations."

- Hoffenberg claimed in a 1993 hearing before a grand jury in Illinois that Epstein was the "technician" at Towers, executing illicit schemes, although, having no broker's license, he had to rely on others to make the trades.

- Epstein, according to Hoffenberg, also came up with a scheme to manipulate the price of Emery Freight stock in an attempt to minimize the losses that occurred when Hoffenberg's bid went wrong, and the share price began to fall.  This was alleged to have involved multiple clients' accounts controlled by Epstein.

- Several of Epstein's Bear Stearns contemporaries recall that Epstein left the company very suddenly.  Within the company, there were rumors that the executive committee asked that Epstein resign after his two supporters, Ace Greenberg and Jimmy Cayne, were outnumbered.

- In 1998, the U.S. Attorney sued Epstein for illegally subletting the former home of the deputy consul general of Iran to attorney Ivan Fisher and others.  Epstein paid $15,000 a month in rent to the State Department, but he charged Fisher and his colleagues $20,000.  Though the exact terms of the agreement are sealed, the court ruled against Epstein.

- Currently, Citibank is suing Epstein for defaulting on loans from its private-banking arm for $20 million.  Epstein claims that Citibank "fraudulently induced" him into borrowing the money for investments.  Citibank disputes this charge.

### C.  Epstein Brokers JPM's Purchase of Highbridge Capital And Helps Put JPM Executives on the Board of the Robin Hood Foundation

114.    Even if the 2003 *Vanity Fair* article never came to Defendants' attention and, as a result, they were unaware of Epstein's true character at the time, there is a deal from the early 2000s leaving any such claim of unfamiliarity with Epstein implausible.

115.    The Epstein private jet flight logs, spanning from 1990 to 2005, have received considerable media coverage due to the inclusion of names of former presidents and other prominent figures.  However, less publicly recognized names, such as that of Eva Anderson ("Anderson"), have managed to elude intensive scrutiny.  Currently a practicing physician, Anderson is the former Miss Sweden, a Miss Universe Contestant, and, from at least the 1980s to the early 1990s, was Epstein's girlfriend.

116.    In 1994, Anderson married Glenn Dubin ("Dubin"), the co-founder of both Highbridge Capital ("Highbridge"), an alternative asset management firm, and the non-profit The Robinhood Foundation.  Epstein reportedly invested millions of dollars into Highbridge in 1998, and it is possible that Epstein himself introduced Dubin and Anderson.

117.    One of Epstein's most prominent accusers, Virginia Giuffre, alleged in her lawsuit against Ghislaine Maxwell that in 2001, Ghislaine Maxwell had directed her to have sex with Dubin, even though he had been married since 1994 and Giuffre was only 16.

118.    Just a few years following this incident, in 2004, Epstein allegedly facilitated a meeting between Staley and Dubin to broker the sale of Highbridge to JPM for a majority interest valued at over $1 billion.[42]  As reported by *The Telegraph*, "Epstein personally introduced the two men while Staley was head of the private bank at JP Morgan.  JP Morgan later purchased

---

[42] Joseph A. Giannone, *JPMorgan Buys Rest of Highbridge*, REUTERS (June 11, 2009, 9:43 AM), https://www.reuters.com/article/us-jpmorganchase-highbridge-idUSTRE55A3PX20090611.

Highbridge Capital in a $1bn deal that enhanced Staley's status at the bank – and netted Epstein a fee of $10m."[43]

119.    JPM now suggests that Staley somehow concealed Epstein's name and relationship with the bank from his superiors, Dimon and the Board itself.  However, it is unlikely that a financial institution like JPM would approve a transaction exceeding a billion dollars without instituting some sort of top-level due diligence review.

120.    Highbridge was not the only conduit through which Epstein leveraged Dubin to extend his influence over key members at JPM.  Two prominent figures in the Epstein saga, Staley and Erdoes, both served on the board of Dubin's New York City children's charity, The Robinhood Foundation.  Founded by Dubin in the early 1980s, the charity also currently has Kristen Lemkau, the CEO of U.S. Wealth Management for JPM, serving as the co-chair of the organization's leadership council.  Following Epstein's arrest in 2019, The Robinhood Foundation faced intense public scrutiny for its connections to Epstein, and for allowing Staley to remain on its board.

121.    To truly comprehend the extent of involvement by Anderson and Dubin within Epstein's network of enablers, it is instructive to examine their actions following Epstein's 2008 conviction as a pedophile.  As *Business Insider* revealed:

> The Dubins invited Epstein to their Palm Beach home for Thanksgiving dinner in 2009.  In an email to Epstein's probation officer, Eva [Anderson] wrote, "I am 100% comfortable with Jeffrey Epstein around my children," while acknowledging Epstein was convicted of procuring a minor for prostitution.  At the time, the couple's three kids were underage.[44]

---

[43] Helen Cahill, *Jeffrey Epstein Scandal Casts A Shadow Over Glittering New York Charity*, Telegraph (Jan. 2, 2022 3:00 PM), https://www.telegraph.co.uk/business/2022/01/02/jeffrey-epstein-scandal-casts-shadow-glittering-new-york-charity/.

[44] Kate Briquelet & Michael Daly, *NYC Power Couple's Butler Says Swedish Teen Told Him of Epstein Island Horrors*, Daily Beast (Aug. 9, 2019, 3:46 PM), https://www.thedailybeast.com/jeffrey-epstein-scandal-butler-for-glenn-and-eva-dubin-says-swedish-teen-told-him-she-was-pressured-for-sex.

122.    Merely months prior to the Thanksgiving dinner at the Dubin residence, Epstein had assisted Staley and JPM in finalizing the purchase of the remaining stake in Highbridge, which at the time had assets under management of approximately $21 billion.[45]   Considering the size of the initial investment and eventual purchase, the Highbridge deal would have a certainly been a material transaction that warranted due diligence from the highest levels of JPM.

### D.  Epstein Brokered a Meeting Between JPM and the Prime Minister of Israel

123.    Between 2009 and 2011, Epstein helped Staley schedule meetings for Dimon to meet with Israeli Prime Minister Benjamin Netanyahu, Microsoft founder Bill Gates, and Britain's Prince Andrew.  Despite Epstein and Staley's collaboration in setting up these meetings with such high-profile individuals, Dimon purportedly testified that he never heard of Epstein until 2018 or 2019.[46]  Dimon's unequivocal assertion rings untrue.

124.    It is almost unfathomable that the CEO and Chairman of JPM would not be aware of how an in-person meetings with some of the world's most prominent leaders was arranged, including who set it up.

---

[45] Joseph A. Giannone, *JPMorgan Buys Rest of Highbridge*, REUTERS (June 11, 2009, 9:43 AM), https://www.reuters.com/article/us-jpmorganchase-highbridge-idUSTRE55A3PX20090611.

[46] Kate Briquelet, *Epstein Connected JPMorgan Exec to Netanyahu, Prince Andrew*, DAILY BEAST (June                    20,                    2023,                    3:30                    PM), https://archive.is/20230620224740/https://www.thedailybeast.com/jeffrey-epstein-epstein-hooked-up-jpmorgan-exec-jes-staley-with-benjamin-netanyahu-prince-andrew-emails-show#selection-1243.0-1243.59.

## V.    EPSTEIN REMAINS A JPM CLIENT WHILE THE TRUTH ABOUT HIM COMES INTO THE PUBLIC EYE

### A.    The Highest Reaches of JPM Unambiguously Knew that Epstein Was a Convicted Sex Offender Accused of Continuing Sexual Abuse

125.    In March 2005, press reports emerged reporting that Epstein paid a 14-year-old girl in Palm Beach, Florida for a "massage" and then molested her.  Following the release of these allegations, a number of underage girls – many of them high school students – told police that Epstein also hired them to give sexual massages.

126.    In July 2006, Epstein was arrested in Palm Beach, Florida, after a grand jury indicted him for soliciting a minor for prostitution.  JPM – including Staley and Erdoes – were immediately aware of Epstein's arrest and his pedophilia.  For instance, on August 27, 2006, Staley emailed Erdoes:  "Last night went to the Huggy Bear concert.  The age difference between husbands and wives would have fit in well with Jeffrey.  What a joke."[47]

127.    Epstein's arrest received national news coverage, leaving no doubt about the heinous nature of his crimes.  For instance, on September 3, 2006, *The New York Times* reported:

> In the summer and autumn of last year, when most of the mansions here stood empty behind their towering hedges, the police stealthily watched one at the end of a waterside lane.  They monitored the comings and goings of its owner's private jet, subpoenaed his phone records and riffled through his trash.
>
> The owner was Jeffrey Epstein, 53, an intensely private New York money manager with several billionaire clients.  Months earlier, the stepmother of a 14-year-old girl told the Palm Beach police that a wealthy older man, whom the girl later identified as Mr. Epstein, might have had inappropriate sexual contact with her.
>
> In sworn statements to the police, the 14-year-old and other teenage girls said a friend had arranged for them to visit Mr. Epstein's home

---

[47] Deposition of James Dimon, *Government of the United States Virgin Islands v. JP Morgan Chase Bank, N.A.*, 1:22-cv-10904-JSR (S.D.N.Y. May 26, 2023) ("Dimon Tr.") at 133-34.

and give him massages, usually in their underwear, in exchange for cash.

Most of the girls, according to the police, said Mr. Epstein had masturbated during the massages, and a few said he had penetrated them with his fingers or penis. They identified him in photos and accurately described the inside of his home. Some recalled that his employees had fed them snacks or rented them cars.

Mr. Epstein pleaded not guilty in August to the crime he was ultimately charged with, soliciting prostitution. But at a time when prosecutors around the nation have become increasingly severe in dealing with people accused of sex offenses, the case has raised questions about whether Mr. Epstein's prominence won him preferential treatment.

By the account of the police, they found probable cause to charge Mr. Epstein with much more serious offenses: one count of lewd and lascivious molestation and four counts of unlawful sexual activity with a minor. [48]

128.    The fact of Epstein's ongoing relationship with JPM was hardly a secret within the bank. Indeed, JPM employees – including Erdoes – circulated this *New York Times* article internally. The first line in the email read: "Did you see this article in the NYT this weekend? Lovely guy to work with."[49]

129.    On October 17, 2006, the Company's Global Corporate Security Division designated Epstein a "high-risk client" because "[s]everal newspaper articles were found that detail the indictment of Jeffrey Epstein in Florida on felony charges of soliciting underage prostitutes."[50] As a result, JPM determined not to "proactively solicit new investment business from Mr. Epstein."[51]

---

[48] Abby Goodnough, *Questions of Preferential Treatment Are Raised in Florida Sex Case*, N.Y. TIMES (Sept. 3, 2006), https://www.nytimes.com/2006/09/03/us/03epstein.html.

[49] Dimon Tr. at 98.

[50] Dimon Tr. at 127-28.

[51] Dimon Tr. at 18-19.

130.    Having so designated Epstein, internal review and approval processes were necessarily triggered.  Nevertheless, the Company continued to retain Epstein as a client.

131.    Knowledge of Epstein's crimes (and his associated massive cash withdrawals to fund his sexual abuse) extended to the top of JPM's organization.  At her recent deposition, Erdoes admitted that the Company was aware by 2006 not only that Epstein was abusing women and underage girls, but that Epstein paid these victims in cash.[52]  This was the same year that a JPM Rapid Response Team noted that Epstein routinely withdrew $40,000 to $80,000 in cash from his accounts several times each month, and more than $750,000 per year.[53]

132.    Erdoes knew Epstein personally.  Indeed, Erdoes visited Epstein at his New York home in both 2011 and 2013.[54]  Erdoes is also reported to have exchanged "dozens of emails" with Epstein, including with regard to a charitable fund that JPM considered launching together with Epstein.[55]

133.    In June 2008, Epstein pled guilty to soliciting a minor for prostitution.  As part of the plea agreement, Epstein was sentenced to an 18-month jail term, followed by one year of community confinement, and was required to register as a sex offender.  As with his 2006 arrest, Epstein's plea deal received national media attention (and concomitant attention within JPM).[56]

---

[52] *USVI* Compl. ¶ 92.

[53] *USVI* Compl. ¶ 92.

[54] Khadeeja Safdar & David Benoit, *JPMorgan's Ties to Jeffrey Epstein Were Deeper That the Bank Has Acknowledged*, WALL ST. J. (Apr. 21, 2023, 3:55 PM), https://www.wsj.com/articles/jpmorgan-jeffrey-epstein-525febe3?mod=Searchresults_pos9&page=1.

[55] *Id.*

[56] *See, e.g.*, Samuel Goldsmith, *Jeffrey Epstein Pleads Guilty to Prostitution Charges*, N.Y. POST (June 30, 2008, 5:04 PM), https://nypost.com/2008/06/30/jeffrey-epstein-pleads-guilty-to-prostitution-charges/.

134.    According to JPM, "[p]er bank policy, felons are considered high risk and require additional approval."[57]

135.    Epstein's guilty plea led some JPM employees to assume that the Company would immediately terminate its relationship with the now-convicted sex offender.  As of July 15, 2008, a JPM Rapid Response Team document indicated that "Catherine [Keating, the CEO of the Company's Private Bank] will go back to Jes [Staley, then the CEO of JPM's Asset Management Division] to tell him we are uncomfortable with Epstein and do not want to go to [Stephen] Cutler [JPM's General Counsel] for approval."[58]  In other words, the most senior members of the Private Bank knew that trying to retain Epstein as a client was an absurd ask to the General Counsel, given all of the red flags surrounding Epstein.

136.    The next month, in August 2008, a JPM employee wrote that she "would count Epstein's assets as a probable outflow for '08 ($120mm or so?) as *I can't imagine it will stay (pending [Jamie] Dimon review*)."[59]  The fact that Epstein's account status was expected to be presented to Dimon suggests either that it was (as per known internal protocols) or that the matter was resolved in favor of keeping Epstein without forcing Dimon to leave a paper trail of his involvement in the matter.

137.    Thus, a plausible conclusion arising from that August 2008 email is that Dimon – the Company's CEO and Chairman – was aware of Epstein's crimes by that time and would decide whether the Company would retain Epstein as a client.  Yet, the bank chose to keep doing business with Epstein.

---

[57] *USVI* Compl. ¶ 50.

[58] Dimon Tr. at 138.

[59] *USVI* Compl. ¶ 51.

138.    In 2009, a once-secret 2008 non-prosecution agreement between Epstein and the United States became public.  It revealed allegations that Epstein may have used interstate commerce to induce minors to engage in prostitution, engaged in illicit sexual conduct with minors, and trafficked minors.

139.    Epstein's guilty plea in 2008, jail sentence, and additional allegations of sex crimes did not put an end to his relationship with Staley, who allegedly participated in Epstein's crimes.[60] Between 2008 and 2013, Staley used his Company email account to exchange 1,200 emails with Epstein.[61]  And, both before and after Epstein's arrest and prison sentence, Staley frequently called Epstein's Palm Beach, Florida home, according to the below messages included in the complaint in the *Jane Doe* Action (including at least one call when Staley called with Wexner):[62]

---

[60] *Doe 1 v. Deutsche Bank Aktiengesellschaft*, 2023 WL 3167633, at *4 n.3 (S.D.N.Y. May 1, 2023).

[61] *USVI* Compl. ¶ 53.

[62] *Jane Doe* Compl. ¶¶ 148-49.





140.    In December 2008, Epstein and Staley discussed Staley visiting Epstein at his Florida home.  Although Epstein was not going to be in Palm Beach at the time, Epstein invited Staley to use his house.[63]   In early January 2009, around the time that Staley was staying at Epstein's Palm Beach house, Epstein wired $2,000 from his JPM account to a woman with an Eastern European surname (many of the women that Epstein trafficked were from Eastern Europe).[64]

141.    Later in 2009, Epstein and Staley again discussed getting together, this time in London.  In late August 2009, Epstein asked Staley whether he would need anything while he was in London.  Staley said yes.[65]   Just two days later, Epstein again used his JPM account to wire $3,000 to the same woman with an Eastern European surname he had paid while Staley was in Palm Beach.[66]

142.    Just months later, in November 2009, while Epstein was already in jail, Staley again took advantage of Epstein's hospitality – this time at Epstein's now-infamous private island, Little

---

[63] *USVI* Compl. ¶ 54.

[64] *USVI* Compl. ¶ 54.

[65] *USVI* Compl. ¶ 55.

[66] *USVI* Compl. ¶ 55.

St. James, Virgin Islands.  While there, Staley emailed Epstein:  "So when all hell breaks lo[o]se, and the world is crumbling, I will come here, and be at peace.  Presently, I'm in the hot tub with a glass of white wine.  This is an amazing place.  Truly amazing.  Next time, we're here together.  I owe you much.  And I deeply appreciate our friendship.  I have few so profound."[67]

143.    The following month, Staley made clear that he was fully aware of the risk that his ongoing relationship with Epstein posed to him.  On December 4, 2009, Staley met with Epstein in New York, and then emailed him: "I realize the danger in sending this email.  But it was great to be able, today, to give you, in New York City, a long heartfelt, hug."[68]

144.    Despite recognizing it, Staley continued to disregard the "danger" of Epstein.  The next day and later in December 2009, Epstein sent pictures of young women to Staley, to which Staley responded with cryptic commentary.[69]  Staley again visited Little St. James the following month, in January 2010.[70]  Later that year, in July 2010, Staley had the following exchange with Epstein via email, strongly suggesting that Epstein was procuring victims for Staley:[71]

> **Staley**:  Maybe they're tracking u?  That was fun.  Say hi to Snow White.
>
> **Epstein**:  [W]hat character would you like next?
>
> **Staley**:  Beauty and the Beast.
>
> **Epstein**:  [W]ell one side is available.

145.    Also in July 2010, a news article from *The Daily Beast* reported that, since his release from jail, Epstein had settled more than a dozen lawsuits brought by underage girls, and at

---

[67] *USVI* Compl. ¶ 56.

[68] *USVI* Compl. ¶ 57.

[69] *USVI* Compl. ¶¶ 58-59.

[70] *USVI* Compl. ¶ 60.

[71] *USVI* Compl. ¶ 61.

least seven victims received well over \$1 million. [72]   That same article noted allegations that Epstein was involved with Eastern European women in particular and that a modeling agency he helped fund brought "young girls . . . often from Eastern Europe" to the United States on Epstein's private jets.[73]

146.    JPM was aware of these allegations.   Memos from JPM compliance meetings specifically referenced articles regarding a federal investigation into "whether a modeling agency run by a friend . . . fed his appetite for underage foreign girls" and noted that "Epstein was known to fly young women from Eastern Europe to Palm Beach where they'd massage him, among other services."[74]

147.    In an internal email, an employee in the Company's risk management division referred to "new allegations of an investigation related to child trafficking," and asked whether JPM was "still comfortable with this client who is now a registered sex offender."[75]   Other JPM compliance employees decided that Epstein "should go."[76]   But reflecting the Company's fundamental attitude towards Epstein's crimes, a different JPM risk management employee dismissed these disturbing reports as routine:   "In my short tenure working on the account these stories pop up including these from the summer."[77]

---

[72] Conchita Sarnoff, *Jeffrey Epstein Pedophile Billionaire and His Sex Den*, DAILY BEAST (July 22, 2010 7:46 PM), https://www.thedailybeast.com/jeffrey-epstein-pedophile-billionaire-and-his-sex-den.

[73] *Id.*

[74] *USVI* Compl. ¶ 101.

[75] *USVI* Compl. ¶ 45.

[76] *USVI* Compl. ¶ 98.

[77] *USVI* Compl. ¶ 45.

148.   In December 2010, JPM granted Epstein a new $50 million line of credit.[78]

149.   The next year, in January 2011, JPM once again was made keenly aware of yet more allegations of human trafficking against Epstein.  And yet again, JPM brushed off the allegations.  That month, the Company conducted a review of Epstein's accounts because a "few news stories during 2010 connect[ed] Jeffrey Epstein to human trafficking."[79]  According to the complaint in the *USVI* Action, JPM's coverage team "met to discuss the situation and agreed to enhance monitoring and document a discussion with the client."[80]

150.   Staley – Epstein's apparent co-conspirator and accomplice – was the JPM executive that the Company entrusted to hold this "discussion" with Epstein.[81]  According to the documentation of the discussion, Epstein claimed "there was no truth to the allegations" against him and "no evidence."[82]  JPM internally concluded that it would "continue to monitor the accounts and cash usage closely going forward."[83]  The Company did not file a SAR.

151.   In March 2011, JPM's Global Corporate Security Division again internally reported that "[n]umerous articles detail various law enforcement agencies investigating Jeffrey Epstein for allegedly participating, directly or indirectly, in child trafficking and molesting underage girls."[84]  This report also noted that Epstein had "settled a dozen civil lawsuits out of court from his victims regarding solicitation."[85]

---

[78] *USVI* Compl. ¶ 46.

[79] *USVI* Compl. ¶ 47.

[80] *USVI* Compl. ¶ 47.

[81] *USVI* Compl. ¶ 47.

[82] *USVI* Compl. ¶ 47.

[83] *USVI* Compl. ¶ 47.

[84] *USVI* Compl. ¶ 48.

[85] *USVI* Compl. ¶ 48.

152.    This same March 2011 report also noted that the owner of a company named "MC2 Model Management and Jeffrey Epstein engaged in racketeering that involved luring in minor children for sexual play for money[,]" and that MC2 Model Management's owner was a "frequent passenger on Epstein's private jet and often visited Epstein in jail."[86]  The March 2011 report also noted that Epstein paid MC2 Model Management $1 million in 2005, and that it was "unknown if the money was given as a secret investment or payment for services as a procurer."[87]

153.    MC2 Model Management's owner was Jean-Luc Brunel ("Brunel"), a French model scout who faced allegations of sexual assault spanning three decades.  Brunel allegedly groomed young females and partook in Epstein's sex trafficking ring.  On December 16, 2020, French prosecutors charged Brunel with rape of minors, but he died from an apparent suicide before his trial could proceed.[88]

154.    Also in 2011, a senior JPM compliance official who reviewed the Company's relationship with Epstein warned that there was "[l]ots of smoke" and "[l]ots of questions" surrounding Epstein's criminal behavior.[89]  According to the complaint filed in the *USVI* Action, these issues included that:[90]

- Epstein "is ***alleged to be involved in the human trafficking of young girls*** and law enforcement is also allegedly investigating his involvement in this activity."

- "He is also an alleged ***personal associate*** of the CEO of the Investment Bank (***Jes Staley***)."

---

[86] *USVI* Compl. ¶ 48.

[87] *USVI* Compl. ¶ 48.

[88] Jeffrey Epstein associate Jean-Luc Brunel is found dead in a French jail cell, NPR (Feb. 19, 2022, 12:20 PM), https://www.npr.org/2022/02/19/1081961087/jeffrey-epstein-jean-luc-brunel-dead.

[89] *USVI* Compl. ¶ 98.

[90] *USVI* Compl. ¶ 98 (emphases added) (alterations in original).

- "AML Operations went to a [Private Bank] risk meeting late last week **requesting that we exit this relationship**."

- "[W]hether Epstein is further exposed could have a potential **serious impact**."

- "The one new concerning thing is the one article about the DOJ investigation is saying they brought **under age girls to the US via a modeling agency M2 that is owned by a guy named Brunel**.  Turns out the banker said today **we extended Epstein a loan in relation to this modeling agency**."  The writer claims that the agency is "legit" and that "it would be hard for us to tell" if "girls were exploited via their contract or arrangement."  The loan was a letter of credit provided by JPM to MC2 Model Management.

- In 2004, **Epstein sponsored private bank accounts and credit cards for two 18 year olds** "that appear to be part of his inner entourage.  One is mentioned in many of the recaps of the escapades as a willing participant and assistant when hosting visitors.  **She has received about 450,000 since opening from Epstein . . . .  Both can be put in Palm Beach during 2004, by way of debit charges, which was when most allegations were from** . . . .  He did pay other girls, many models no huge amounts.  Sugar Daddy!"

- "His foundation account did pay donations to the Palm Beach Police Dept as reported just before the case started.  **The same foundation account did pay monies direct to models and payments direct to specialty schools (massage, culinary) and university's** [sic] **on behalf of models/aspiring actresses**.  Nothing was astronomical."

- "His business accounts Fiduciary we saw no client activity.  I know his biggest client, Wexner parted ways when he was convicted.  His [Due Diligence Reports] say he manages a few private clients [sic] money but never says who.  **I would like to know if in fact he is managing anyone's money at this point or is it all his money.  We saw no evidence of disbursements even in the rocky years 08-09.  When the well to do were running to their mattresses, he did not have any distributions from his accounts at Bear or JP**.  He does have money at other institutions so maybe it happened there."

155.  On July 20, 2011, Cutler emailed Staley and Erdoes, among others, concerning Epstein, and wrote:  "**This is not an honorable person in any way.  He should not be a client**."[91]

---

[91] Dimon Tr. at 181.

The next day, July 21, 2011, Cutler emailed Erdoes again, writing about Epstein: "*I would like to put it and him behind us. Not a person we should do business with, period*."[92]

156.    Yet, JPM continued doing business with Epstein, as well as his partners in crime. In August 2011, Ghislaine Maxwell applied to open a new account with JPM for a "personal recruitment consulting business."[93]  Internally, the Company's AML director asked: "*What does she mean by personal recruitment?? Are you sure this will have nothing to do with Jeffrey?* If you want to proceed, *I suggest that we flag this as a High Risk Client*."[94]

157.    In fact, the Company retained Epstein as a client well into 2013. John Duffy – who served as Vice Chairman of JPM and as the CEO of the Company's private bank for ultrawealthy clients – visited Epstein at his New York home in April 2013.[95]  Just one month later, the private bank that Duffy ran re-authorized Epstein to borrow up to $50 million against his accounts.[96]

158.    At bottom, despite unequivocally knowing that Epstein was a serial sex offender, and despite the obviously suspicious nature of Epstein's activity with the Company, JPM took no corrective action against Epstein for years.  Finally, later in 2013, the Company purportedly

---

[92] Dimon Tr. at 184.

[93] *USVI* Compl. ¶ 49.

[94] *USVI* Compl. ¶49.

[95] Khadeeja Safdar & David Benoit, *JPMorgan's Ties to Jeffrey Epstein Were Deeper That the Bank Has Acknowledged*, WALL ST. J. (Apr. 21, 2023 3:35 PM), https://www.wsj.com/articles/jpmorgan-jeffrey-epstein-525febe3?mod=Searchresults_pos9&page=1.

[96] *USVI* Compl. ¶70; Khadeeja Safdar & David Benoit, *JPMorgan's Ties to Jeffrey Epstein Were Deeper That the Bank Has Acknowledged*, WALL ST. J. (Apr. 21, 2023 3:35 PM), https://www.wsj.com/articles/jpmorgan-jeffrey-epstein-525febe3?mod=Searchresults_pos9&page=1.

terminated its relationship with Epstein.  That same year, Staley left the Company.[97]  The U.S. Virgin Islands has alleged that JPM continued business with Epstein affiliated entities.

### B. Adequate Compliance Systems Plainly Should Have At Least Resulted in the Filings of SARs and Reporting to the Board

159.    As alleged above, JPM employees – including those at the highest reaches of the Company, such as Staley and Erdoes – knew Epstein was a felon convicted for sexual abuse, a pedophile who allegedly trafficked young girls from all over the world (including on his private plane), and regularly wired and withdrew large sums of cash from his JPM accounts.  Those facts alone should have triggered the filing of SARs and reporting to the Board.  Again, federal banking laws *require* a SAR filing in connection with:

> Transactions conducted or attempted by, at, or through the bank . . . *aggregating $5,000 or more*, if the bank . . . *knows, suspects, or has reason to suspect* that the transaction": (a) "*[m]ay involve potential money laundering or other illegal activity*"; (b) "[i]s designed to evade the BSA or its implementing regulations"; or (c) "*[h]as no business or apparent lawful purpose* or is not the type of transaction that the particular customer would normally be expected to engage in, and *the bank knows of no reasonable explanation for the transaction* after examining the available facts, including the background and possible purpose of the transaction.[98]

160.    Nevertheless, upon information and belief, JPM *never* filed a SAR related to Epstein.  And, according to the complaint filed in the *USVI* Action, it does not appear that JPM engaged in any investigation of the source of Epstein's funds.[99]

---

[97] Luc Cohen, *Ex-JPMorgan executive Staley to be questioned under oath about Epstein ties*, REUTERS (June 9, 2023, 1:08 PM), https://www.reuters.com/legal/ex-jpmorgan-executive-staley-be-questioned-under-oath-about-epstein-ties-2023-06-09/#:~:text=Staley%20left%20JPMorgan%20in%202013,his%20role%20at%20the%20time.

[98] Bank Secrecy Act / Anti-Money Laundering Examination Manual, Federal Financial Institutions Examination Council, at 60-61 (2006), available at https://www.ffiec.gov/pdf/bsa_aml_examination_manual2006.pdf.

[99] *USVI* Compl. ¶ 76.

161.    Moreover, according to Dimon's deposition testimony, between 2006 – when Epstein was arrested for soliciting a minor for prostitution – and 2013, the Board ***never*** discussed Epstein's relationship with JPM.[100]    Indeed, in connection with the *Jane Doe* Action, Dimon submitted a sworn answer to an interrogatory that, between 2000 and 2018, he received no information from any officer, director, employee, or agent of JPM concerning Epstein.[101]

162.    Dimon not only continues to profess ignorance, but he also seeks to deflect blame entirely from JPM.  During his deposition, Dimon said, concerning a victim, "I hope she gets justice against the people who perpetrated the crime, ***which was not us***,"[102] and later quipped, "we cannot do law enforcement's job."[103]  Of course, JPM interfered with law enforcement doing its job (and the Company affirmatively violated the law) ***by not filing a single SAR related to Epstein***.

163.    Also at his deposition, Dimon testified that Epstein's cash activity would have been visible to JPM in real time.[104]  Had the Company focused on Epstein's ***specific*** transactions – some of which are discussed below in more detail – JPM should have filed SARs and provided specific updates to the Board.

164.    In total, between 2003 and 2013, at least 20 women trafficked and abused by Epstein were paid through JPM accounts.[105]  These women received payments, typically multiple payments, in excess of $1 million collectively during this period.[106]  According to the complaint

---

[100] Dimon Tr. at 53-54.

[101] Dimon Tr. at 67-68.

[102] Dimon Tr. at 211.

[103] Dimon Tr. at 225-26.

[104] Dimon Tr. at 149.

[105] *USVI* Compl. ¶ 42.

[106] *USVI* Compl. ¶ 42.

in the *USVI* Action, "among the recipients of these payments were numerous women with Eastern European surnames who were publicly and internally identified as Epstein recruiters and/or victims."[107]  For example, Epstein paid more than $600,000 (including more than $165,000 after Epstein's 2008 plea) to a woman who – according to news reports contained in JPM's due diligence reports – Epstein purchased at the age of 14.[108]  Like other women who received payments from Epstein, that victim listed Epstein's apartment on 66th Street in New York City as her address, which should have been a glaring red flag to the Company.[109]

165.    Epstein also withdrew more than $775,000 in cash between 2003 and 2013 from JPM accounts, which is especially significant as Epstein was known to pay for "massages," or sexual encounters, in cash.[110]  Financial information evaluated in connection with the *USVI* Action also reflects payments drawn from JPM accounts of nearly $1.5 million to known recruiters, including to the MC2 Model Management (a company which, as discussed above, JPM compliance had flagged in 2011), and another $150,000 to a private investigative firm.[111]

166.    Epstein and/or his associates also made 95 foreign remittances with no known payee during this same time period – all transactions which JPM should have flagged and investigated.[112]  For example, Hyperion Air, Inc. ("Hyperion") – the Epstein-controlled company that owned Epstein's private jet used to traffic his victims – issued over $547,000 in checks

---

[107] *USVI* Compl. ¶ 66.

[108] *USVI* Compl. ¶ 99.

[109] *USVI* Compl. ¶ 66.

[110] *USVI* Compl. ¶ 42.

[111] *USVI* Compl. ¶ 42.

[112] *USVI* Compl. ¶ 67.

***payable to cash*** purportedly for "fuel expenses when traveling to foreign countries."[113] Additionally, between January 2012 and June 2013, Hyperion converted more than $120,000 into foreign currency.[114]  Many of these cash withdrawals "either exceeded the $10,000 reporting threshold or were seemingly structured to avoid triggering the reporting requirement."[115]

167.    Epstein also used other entities under his control and with accounts at JPM, including his purported charitable organizations C.O.U.Q. Foundation and Enhanced Education, to funnel payments to his victims and associates.[116]  JPM seemingly did no due diligence on the nature of these various business entities, which appear to have no legitimate business purpose and, upon information and belief, were part of Epstein's criminal enterprise.

168.    For example, Epstein and/or his representatives "used the C.O.U.Q. Foundation account to pay $29,464.66 to three young women, including two known victims, and over $20,000 to a company called Phoenix Realty Home Inc."[117]

169.    It is clear that JPM's compliance systems, at least between 2006 until Epstein's 2019 arrest, were grossly deficient and failed to comply with both banking laws and regulations and Delaware fiduciary duty law.  As detailed above, there were screaming red flags concerning Epstein – including his conviction, innumerable press reports, various government investigations, and highly suspicious activity in his Company accounts – yet JPM did ***nothing*** about it, besides sitting on their hands until belatedly firing Epstein as a client.  Simply put, that was plainly inadequate under the law.

---

[113] *USVI* Compl. ¶ 67.

[114] *USVI* Compl. ¶ 67.

[115] *USVI* Compl. ¶ 67.

[116] *USVI* Compl. ¶ 68.

[117] *USVI* Compl. ¶ 68.

**VI.    A BROKEN AML COMPLIANCE SYSTEM:   JPM "FAILED TO IDENTIFY SIGNIFICANT VOLUMES OF SUSPICIOUS ACTIVITY," IS ORDERED TO PAY $350 MILLION IN FINES, AND PLEADS GUILTY TO TWO FELONY COUNTS**

170.    In January 2014, JPM settled two felony violations of the BSA with the Department of Justice stemming from its failure to alert authorities to suspicious activity after red flags about Bernie Madoff's illegal conduct were raised at the bank.[118]  As part of the settlement agreement, JPM agreed to pay $1.7 billion in penalties.[119]  Federal prosecutors noted that "the Madoff Ponzi scheme was conducted almost exclusively" through various accounts held at JPM.[120]  In fact, in the early 2010s, JPM's board of directors risk committee lacked any directors who had worked at a bank or as financial risk managers.[121]

171.    Additionally, the OCC ordered JPM to pay a $350 million fine for deficiencies in JPM's BSA and AML compliance programs.  The penalty was based in part on JPM's failure to report suspicions about Bernie Madoff to U.S. law enforcement and regulators.

172.    Even after it faced these highly publicized penalties, JPM has continued its illicit conduct, servicing funds for notorious bad actors:

- From 2003 through 2014, JPM handled hundreds of transactions totaling nearly $2 billion for Dmytro Firtash, a Ukrainian oligarch who is wanted on criminal charges in the United States.[122]

---

[118] Ben Protess & Jessica Silver-Greenberg, *JPMorgan Is Penalized $2 Billion Over Madoff*, N.Y. TIMES (Jan. 7, 2014, 9:37 PM), https://archive.nytimes.com/dealbook.nytimes.com/2014/01/07/jpmorgan-settles-with-federal-authorities-in-madoff-case/.

[119] *Id.*

[120] *Id.*

[121] Dawn Kopecki & Max Abelson, *JPMorgan Gave Risk Oversight to Museum Head*, BLOOMBERG BUSINESSWEEK (May 24, 2012), http://www.law.harvard.edu/programs/corp_gov/MediaMentions/05-24-12_Businessweek.pdf.

[122] Alicia Tatone, *Global Banks Defy U.S. Crackdowns by Serving Oligarchs, Criminals and Terrorists*, INT'L CONSORTIUM OF INVESTIGATIVE JOURNALISTS (Sept. 20, 2020),

- From 2010 through 2015, a shell company operated by Semion Mogilevich, a Russian mafia figure described as the "Boss of Bosses," sent and received more than $1 billion in transactions through JPM. Mogilevich has been at the top of the FBI's most wanted listed since 2009.[123]

- From 2012 through 2016, JPM moved more than $63 million for companies linked to Alejandro "Piojo" Isturiz, a former Venezuelan government official who has been charged by U.S. authorities as a player in an international money laundering scheme.[124]

- From 2013 through 2016, Jho Low, a financier accused by authorities in multiple countries of being the mastermind behind the embezzlement of more than $4.5 billion from a Malaysian economic development fund called 1Malaysia Development Berhad, or 1MDB, moved over $1.2 billion through JPM.[125]

- From 2016 through 2017, JPM shuttled at least $6.9 million in transactions for Paul Manafort in the 14 months after he resigned from Donald Trump's 2016 presidential campaign amid allegations of money laundering and corruption "spawning from his work with a pro-Russian political party in Ukraine."[126]

- Even after JPM allegedly closed Epstein's accounts with the bank in 2013, a current JPM employee continued to meet with Epstein at this Manhattan townhouse until at least 2017.[127]

- In December 2019, JPM faced a regulatory penalty for its KYC deficiencies. FINRA fined JPM $200,000 for failure to supervise custodian accounts resulting in violations of KYC rules from 2014 to 2018.[128]

173. In addition to its AML and KYC woes, earlier this month, June 2023, the SEC fined

JPM $4 million for mistakenly deleting 47 million electronic records, including emails and instant

---

https://www.icij.org/investigations/fincen-files/global-banks-defy-u-s-crackdowns-by-serving-oligarchs-criminals-and-terrorists/.

[123] *Id.*

[124] *Id.*

[125] *Id.*

[126] *Id.*

[127] Khadeeja Safdar & David Benoit, *JPMorgan's Ties to Jeffrey Epstein Were Deeper Than the Bank Has Acknowledge*d, WALL ST. J. (Apr. 21, 2023, 3:35 PM), https://www.wsj.com/articles/jpmorgan-jeffrey-epstein-525febe3.

[128] FINRA, Letter of Acceptance, Waiver and Consent No. 2017053791901 (Dec. 26, 2019), https://www.finra.org/sites/default/files/2019-12/jp-morgan-awc-122619.pdf.

messages, dated from January to April 2018, *i.e.*, right when allegations concerning Epstein were squarely in the public eye.  As a result of the deletion, the SEC stated that JPM could not come up with requested documents in eight SEC investigations and four other regulatory probes.[129]

## VII.   THE *JANE DOE* AND *USVI* ACTIONS BRING TO LIGHT JPM'S PARTICIPATION IN EPSTEIN'S CRIMES

174.    On November 24, 2022, the initial complaint in the *Jane Doe* Action was filed. That suit arose from "JP Morgan Chase Bank, N.A.'s . . . participation and intentional involvement in Jeffery Epstein's widespread and well-publicized sex-trafficking operation, as well as the direct financial benefits it received therefrom."[130]  The complaint in the *Jane Doe* Action publicized, for the first time, JPM's alleged involvement in and facilitation of Epstein's crimes.

175.    On December 27, 2022, the initial complaint in the *USVI* Action was filed.  That suit arose from the Attorney General of the U.S. Virgin Islands' "ongoing effort to protect public safety and to hold accountable those who facilitated or participated in, directly or indirectly, the trafficking enterprise Epstein helmed."[131]  According to the operative complaint in that action:

> The [U.S. Virgin Islands'] investigation revealed that JP Morgan knowingly, negligently, and unlawfully provided and pulled the levers through which recruiters and victims were paid and was indispensable to the operation and concealment of the Epstein trafficking enterprise. Financial institutions can connect – or choke – human trafficking networks, and enforcement actions filed and injunctive relief obtained by attorneys general are essential to ensure that enterprises like Epstein's cannot flourish in the future.[132]

---

[129] Austin Weinstein, *JPMorgan (JPM) Mistakenly Deleted 47 Million Records, SEC Alleges*, BLOOMBERG (June 22, 2023, 10:50 AM), https://www.bloomberg.com/news/articles/2023-06-22/jpmorgan-mistakenly-deleted-47-million-records-sec-alleges#xj4y7vzkg.

[130] First Am. Compl. at 1, *Jane Doe 1 Doe v. JP Morgan Chase Bank, N.A.*, 22-cv-10019 (S.D.N.Y. 2023) (22-cv-10019).

[131] Second Am. Compl. at 2, *Government of the United States Virgin Islands v. JP Morgan Chase Bank, N.A.* (S.D.N.Y. 2023) (22-cv-10904).

[132] *Id.*

176.    On March 20, 2023, this Court granted in part and denied in part the motions to dismiss filed in the *Jane Doe* and *USVI* Actions.

177.    On May 26, 2023, Dimon sat for a deposition in connection with the *Jane Doe* and *USVI* Actions.  During the weekend of June 10-11, 2023, Staley sat for a deposition in connection with the *Jane Doe* and *USVI* Actions.

178.    The following Monday, June 12, 2023, JPM announced that it had settled the *Jane Doe* Action for $290 million. [133]  That settlement, if approved by this Court, would be one of the largest ever for a civil sex-trafficking case.[134]

179.    The *USVI* Action remains pending.

## VIII.    DEFENDANTS BREACHED THEIR FIDUCIARY DUTY AND HAVE CAUSED HARM TO JPM

180.    As fiduciaries of JPM, a Delaware corporation, Defendants' fiduciary duties required them to institute an adequate oversight system in order to ensure compliance with positive law, including federal laws (such as the BSA and Patriot Act) concerning AML.  Defendants plainly did not do so.

181.    As discussed above in detail, JPM's compliance team repeatedly flagged that Epstein was a convicted felon, accused of running a sex trafficking ring financed primarily in cash, and withdrew and transferred huge sums of money.  Executives at the highest reaches of the Company were aware of these facts.  It is indisputable that Staley (who allegedly participated personally in Epstein's sex ring) and Erdoes were aware of the allegations levied against Epstein, as was Cutler, the General Counsel who vociferously advocated for JPM to sever ties with Epstein.

---

[133] Khadeeja Safdar & David Benoit, *JPMorgan to Pay $290 Million to Settle Jeffrey Epstein Accusers' Suit*, WSJ (June 12, 2023, 12:42 PM), https://www.wsj.com/articles/jpmorgan-chase-agrees-to-settle-jeffrey-epstein-accusers-suit-9dbbabff

[134] *Id.*

Moreover, it is inferable from the Company's own documents that Dimon personally reviewed Epstein's account in 2008 and decided to retain him as a JPM client.

182.    Nevertheless, the Board and Company officers never acted on this information, terminated the Company's relationship with Epstein, or filed the legally required SARs.  It was a clear breach of duty for JPM fiduciaries to be willfully blind and deaf to the highly publicized allegations against Epstein, who was a prominent figure in the financial world.

183.    These breaches of fiduciary duty occurred at least from Epstein's 2008 guilty plea through his 2019 death, a period over which the JPM filed zero SARs related to Epstein.

184.    Defendants' breaches of fiduciary duty have caused massive harm to the Company. The Company already has agreed to settle the *Jane Doe* Action for $290 million, and the *USVI* Action remains pending.  Moreover, JPM's deep and lasting affiliation with Epstein has caused incalculable reputational harm (as the Company's own filings warn is a severe risk of not complying with its regulatory obligations).

## DEMAND FUTILITY ALLEGATIONS

185.    Plaintiffs did not make a demand on the Board to institute this Action because pre-suit demand is excused.

186.    Plaintiffs repeat and reallege each allegation above as if set forth in full in this Demand Futility Allegations section.

187.    Demand is excused because there exists a reasonable doubt that, at a minimum, at least half of the Board at the time that this Complaint is filed could properly exercise independent and disinterested business judgment in responding to a demand.

188.    The demand Board has 12 members:  Bammann, Burke, Combs, Crown, Davis, Dimon, Flynn, Alex Gorsky ("Gorsky"), Hobson, Michael A. Neal ("Neal"), Novakovic, and Rometty.  Demand is therefore futile if at least six of the 12 directors either lack independence,

are not disinterested, or both.  Here, at least nine directors lack independence, are not disinterested, or both:  Bammann, Burke, Combs, Crown, Dimon, Flynn, Hobson, Neal, and Novakovic.

189.     Bammann, Burke, Combs, Crown, Dimon, Flynn, Hobson, and Neal are not disinterested because they face a substantial likelihood of liability, whether in this Action, the *USVI* Action or in the *Jane Doe* Action.  Each of these directors have served on the Board at times between Epstein's 2008 plea and his 2019 death.  Yet, the Company plainly failed to comply with positive law, as evidenced by the fact that the Board never discussed JPM's relationship with Epstein and the Company did not file a single SAR related to Epstein over this timeframe.

190.     Bammann, Crown, Dimon, Burke, and Flynn face an even more heightened likelihood of liability, given that they all served on the Board before the Company purportedly terminated its relationship with Epstein in 2013.

191.     Moreover, and separately, Dimon faces a substantial likelihood of liability because it appears that he knew about JPM's relationship with Epstein as of at least 2008 (if not earlier, during his days in Columbus, Ohio and at Bank One) and knew about Epstein's guilty plea, yet Dimon failed to cause the Company to terminate its relationship with Epstein, failed to address Epstein with the Board, and failed to cause the Company to file a single SAR concerning Epstein.

192.     Additionally, Bammann, Crown, and Novakovic are not independent from Dimon and/or Crown.

193.     Bammann owes a significant portion of her professional success to Dimon.  While Dimon was the CEO of Bank One, Bammann reached the status of Bank One's Executive Vice President and Chief Risk Management Officer from 2001 to 2004.  Then, after JPM acquired Bank One, when Dimon was JPM's President and Chief Operating Officer, Bammann served as the Company's Deputy Head of Risk Management.  Moreover, the Board invited Bammann to join

2013, while Dimon attained his current roles of CEO and Chairman. Bammann's only employment since 2013 has been her role as a JPM director.

194. Crown served on the board of directors of Bank One from 1991 until its sale to JPM in 2004, and Crown was one of the people who selected Dimon to be Bank One's CEO in 2000. Crown also advocated for Dimon to assume a leadership role at JPM. Moreover, Crown was involved in the New Albany project, which relied on Epstein for its success.

195. Novakovic, in turn, is not independent from Crown. Novakovic is the Chairman and CEO of General Dynamics, Crown's family business. Thus, Crown likely had the influence to fire Novakovic, and it is not plausible that Novakovic would be willing to bring litigation against Crown concerning the allegations of this Complaint.

## PLAINTIFFS' CLAIMS ARE TIMELY

196. Plaintiffs did not know, and could not have known, that Epstein used JPM to facilitate his trafficking enterprise or that the Company turned a blind eye to unusual cash transactions and wires and failed to carry out or follow up on basic due diligence and to timely comply with federal banking regulations until the filing of the complaint in the *Jane Doe* Action on November 24, 2022.

197. To the extent the statute of limitations even began to run before November 24, 2022, any perceived delay in Plaintiffs' filing of this Action arises due to the Board's and Company management's concerted and long-running efforts to conceal critical facts necessary to put Plaintiffs on notice of the specific facts showing the Board's and Company management's sustained and systemic breaches of fiduciary duty.

198. As discussed above, despite knowing Epstein was a felon convicted for sexual abuse, a pedophile who allegedly trafficked young girls from all over the world (including on his private plane), and wired and withdrew large sums of cash from his JPM accounts, the Company

failed to file a single SAR concerning Epstein and his accounts.  Additionally, JPM employees –

including those at the highest reaches of the Company, such as Dimon, Staley, and/or Erdoes –

actively concealed concerns about Epstein and failed to report them to the Board and/or timely fire

Epstein as a client.

199.    Moreover, JPM continues to try to avoid accountability for its role in Epstein's sex-

trafficking ring.  Dimon even repeatedly denied knowing who Epstein was until 2018 or 2019,

which appears to be false given the allegations above.  Instead, JPM has tried to lay all blame

exclusively on Staley, and the Company has asserted claims against him – but not against other

executives still at the Company and who clearly had knowledge of Epstein's crimes.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty
### (Against the Director Defendants)

200.    Plaintiffs reallege the preceding paragraphs as set forth above and incorporate them

herein by reference.

201.    The Director Defendants, as directors of JPM, were and/or are fiduciaries of the

Company and its stockholders.  As such, the Director Defendants owed and owe the Company and

its stockholders the highest duties of good faith, due care, loyalty and candor.

202.    The Company was and is subject to numerous AML laws and KYC regulations.

The Director Defendants' fiduciary duties oblige them to put systems in place to manage risk and

ensure compliance with these laws.

203.    The Director Defendants, consistent with their fiduciary duties, were required to

implement and maintain effective controls to ensure the Company's compliance with AML laws

and KYC regulations.

204.    The Director Defendants consciously breached their fiduciary duties and violated their corporate responsibilities to ensure the Company's compliance with the applicable laws even when Epstein's criminal activity and criminal use of his JPM accounts and funds put them on notice, either by ignoring red flags related to Epstein's actions and failing to adhere to their own internal controls or by knowingly disregarding their own internal controls and intentionally allowing the Company to continue facilitating Epstein's criminal conduct.

205.    As a result of the Director Defendants' conscious failure to perform their fiduciary duties and exercise their oversight responsibilities, the Company has sustained significant damages, both financial and reputational.  Such damages include, and will include, damage awards, settlements, expenses, penalties, fines, increased regulatory scrutiny, and other liabilities described herein.

206.    The Director Defendants' continuing decision not to correct this failure exposes the Company to comparable and continuing risks of damages in the future.

207.    As a result of the bad faith misconduct alleged herein, the Director Defendants are liable to the Company.

### COUNT II
### Breach of Fiduciary Duty
### (Against the Officer Defendants)

208.    Plaintiffs reallege the preceding paragraphs as set forth above and incorporate them herein by reference.

209.    The Officer Defendants, as officers of JPM, were and/or are fiduciaries of the Company and its stockholders.  As such, the Officer Defendants owed and owe the Company and its stockholders the highest duties of good faith, due care, loyalty and candor.

210.    The Company was and is subject to numerous AML laws and KYC regulations. The Officer Defendants' fiduciary duties oblige them to put systems in place to manage risk and ensure compliance with these laws.

211.    The Officer Defendants, consistent with their fiduciary duties, were required to implement and maintain effective controls to ensure the Company's compliance with AML laws and KYC regulations.

212.    The Officer Defendants consciously breached their fiduciary duties and violated their corporate responsibilities to ensure the Company's compliance with the applicable laws even when Epstein's criminal activity and criminal use of his JPM accounts and funds put them on notice, either by ignoring red flags related to Epstein's actions and failing to adhere to their own internal controls or by knowingly disregarding their own internal controls and intentionally allowing the Company to continue facilitating Epstein's criminal conduct.

213.    As a result of the Officer Defendants' conscious failure to perform their fiduciary duties and exercise their oversight responsibilities, the Company has sustained significant damages, both financial and reputational.  Such damages include, and will include, damage awards, settlements, expenses, penalties, fines, increased regulatory scrutiny, and other liabilities described herein.

214.    The Officer Defendants' continuing decision not to correct this failure exposes the Company to comparable and continuing risks of damages in the future.

215.    As a result of the bad faith misconduct alleged herein, the Officer Defendants are liable to the Company.

## COUNT III
## Unjust Enrichment
## (Against the Individual Defendants)

216.    Plaintiffs reallege the preceding paragraphs as set forth above and incorporate them herein by reference.

217.    As a result of the conduct described herein, the Individual Defendants breached their fiduciary duties to the Company and its stockholders.  The Individual Defendants were in a position to benefit from their misconduct in the form of profits, benefits, and other compensation.

218.    The Individual Defendants have been unjustly enriched at the expense and to the detriment of Plaintiffs and the Company.

219.    It would be unconscionable and against fundamental principles of justice, equity, and good conscience for the Individual Defendants to retain the benefits that they received only by virtue of breaching their fiduciary duties.

220.    All profits, benefits, and other compensation that accrued to the Individual Defendants, collectively or individually, as a result of their misconduct should be disgorged.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs, on behalf of the Company, request judgment as follows:

A.    Declaring that this Action is a proper derivative action maintainable under the law and that Plaintiffs are proper and adequate representatives of the Company;

B.    Declaring that demand on the JPM Board is excused as futile;

C.    Finding the Director Defendants and Officer Defendants liable for breaching their fiduciary duties owed to the Company;

D.    Awarding damages sustained by the Company as a result of the breaches of fiduciary duty set forth above, together with pre- and post-judgment interest, from each of the Individual Defendants, jointly and severally;

E.      Directing JPM to take all necessary actions to reform and improve its compliance procedures and governance policies to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described herein;

F.      Ordering immediate disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their breaches of fiduciary duty and unjust enrichment;

G.      Awarding Plaintiffs' costs and expenses incurred in this Action, including, but not limited to, reasonable attorneys' fees, accountants' fees, consultants' fees, experts' fees, and costs and expenses; and

221.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

Date: June 30, 2023                             Respectfully submitted,

                                                **BERNSTEIN LITOWITZ BERGER**
                                                **& GROSSMANN LLP**

**BERNSTEIN LITOWITZ BERGER**                   /s/ *Mark Lebovitch*
**& GROSSMANN LLP**                             Mark Lebovitch
Daniel Meyer                                    Sara Swartzwelder
500 Delaware Avenue, Suite 901                  1251 Avenue of the Americas
Wilmington, DE  19801                           New York, New York 10020
(302) 364-3600                                  (212) 554-1400

                                                *Counsel for Plaintiff City of Miami General*
                                                *Employees & Sanitation Employees*
                                                *Retirement Trust*

**GRANT & EISENHOFER P.A.**

/s/ *Rebecca A. Musarra*
Rebecca A. Musarra
Christopher J. Orrico
Vivek Upadhya
485 Lexington Ave., 29th Floor
New York, New York 10017
rmusarra@gelaw.com
corrico@gelaw.com
vupadhya@gelaw.com
 (646) 722-8500

Michael J. Barry (admitted *pro hac vice*)
Christine M. Mackintosh (admitted *pro hac vice*)
123 Justison St.
Wilmington, DE 19801
mbarry@gelaw.com
cmackintosh@gelaw.com
 (302) 622-7000

*Counsel for Plaintiff Operating Engineers*
*Construction Industry and Miscellaneous Pension Fund*



## VERIFICATION

I, Edgard Hernandez, Administrator for the City of Miami General Employees' & Sanitation Employees' Retirement Trust (the "Trust"), hereby verify that the Trust currently holds JPMorgan Chase & Co. (the "Company") common stock and has held such stocks at all legally required times pertinent to this action.   The Trust is ready, willing, and able to pursue this stockholder derivative action on behalf of and for the benefit of the Company.

I have reviewed the allegations in the attached Verified Amended Stockholder Derivative Complaint, and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate, and complete.   As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason I believe them to be true.   Having received and reviewed a copy of the Verified Amended Stockholder Derivative Complaint, and having reviewed it with my counsel, I hereby authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _30_ day of June, 2023.

_____
Edgard Hernandez, Pension Administrator

2901 Bridgeport Avenue • Coconut Grove, Florida 33133-3607 • Telephone (305) 441-2300 • Fax (305) 441-2307 • www.gese.org

1

**VERIFICATION**

I, M. Scott Anderson, Trustee for the Operating Engineers Construction Industry and Miscellaneous Pension Fund (the "Operating Engineers"), hereby verify that the Operating Engineers have held stock in JPMorgan Chase & Co. at all relevant times herein. The Operating Engineers are ready, willing, and able to pursue this stockholder derivative action on behalf of and for the benefit of JP Morgan. I have reviewed the allegations in the attached Verified Amended Stockholder Derivative Complaint, and as to those allegations of which I have personal knowledge, I know those allegations to be true, accurate, and complete. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation, and for that reason I believe them to be true. Having received a copy of the Verified Amended Stockholder Derivative Complaint, and having reviewed it with my counsel, I hereby authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:

June 30, 2023

M. Scott Anderson, Administrator
Operating Engineers Construction
Industry and Miscellaneous Pension
Fund