UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE JP MORGAN CHASE & CO.
DERIVATIVE LITIGATION

Master Case No. 1:23-CV-03903 (JSR)

**DERIVATIVE ACTION**

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

**Page**

Table of Authorities.............................................................................................................ii

II.      Relevant Background Facts as Pleaded in Complaint ............................................4

III.     No Demand Was Made, and Demand Futility Is Not Adequately Pleaded............9

    A.     Legal Standard for Demand Futility ........................................................9

    B.     Plaintiffs Fail to Plead Particularized Facts Demonstrating that a Majority
        of the Demand Board Directors Face a "Substantial Likelihood of
        Liability."..............................................................................................10

        1.     Eight Demand Board members assumed membership on the
                JPMorgan Board only after JPMorgan terminated Epstein as a
                client. ......................................................................................11

        2.     Plaintiffs fail to plead particularized facts demonstrating that the
                remaining Demand Board Directors knowingly failed to oversee
                internal controls. ....................................................................13

        3.     Plaintiffs fail to plead particularized facts demonstrating the
                Directors' "utter failure" to implement any internal controls...................15

    C.     Plaintiffs Fail to Plead Particularized Facts Demonstrating That Any
        Demand Board Director "Lacks Independence." .................................16

IV.      Plaintiffs Have Failed to State a Claim Against Any Defendant..........................18

    A.     Legal Standard Under Rule 12(b)(6) .....................................................18

    B.     The Complaint Fails to State a Fiduciary Duty Claim Against Any
        Director Defendant ................................................................................18

    C.     The Complaint Fails to State a Fiduciary Duty Claim Against Mr. Dimon ..........20

    D.     The Complaint Fails to State a Claim for Unjust Enrichment..............................24

V.       Conclusion ..........................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Am. Int'l Grp., Inc. Derivative Litig.*,
    700 F. Supp. 2d. 419 (S.D.N.Y. 2010), *aff'd,* 415 F. App'x 285 (2d Cir. 2011)....................10

*Aronson* v. *Lewis*,
    473 A.2d 805 (Del. 1984) .......................................................................................10

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009).............................................................................................18

*Cantor Fitzgerald, L.P.* v. *Cantor*,
    724 A.2d 571 (Del. Ch. 1998).................................................................................24

*In re Caremark Int'l Inc. Derivative Litig.*,
    698 A.2d 959 (Del. Ch. 1996).....................................................................3, 11, 19

*Caspian Select Credit Master Fund Ltd.* v. *Gohl*,
    No. CV 10244-VCN, 2015 WL 5718592 (Del. Ch. Sep. 28, 2015)......................................25

*In re Citigroup Inc. S'holder Derivative Litig.*,
    964 A.2d 106 (Del. Ch. 2009)..............................................................................9, 14

*Constr. Indus. Laborers Pension Fund* v. *Bingle*,
    No. 2021-0940-SG, 2022 WL 4102492 (Del. Ch. Sept. 6, 2022), *aff'd,* No.
    411, 2022, 2023 WL 3513271 (Del. May 17, 2023).......................................................11, 19

*Corp. Risk Holdings LLC* v. *Rowlands*,
    No. 17-CV-5225 (RJS), 2018 WL 9517195 (S.D.N.Y. Sept. 28, 2018) ...............................15

*David B. Shaev Profit Sharing Acct.* v. *Armstrong*,
    No. Civ.A. 1449-N, 2006 WL 391931 (Del. Ch. Feb. 13, 2006), *aff'd,* 911
    A.2d 802 (Del. 2006) ............................................................................................14

*In re Delta and Pine Land Co. S'holders Litig.*,
    No. Civ.A. 17707, 2000 WL 875421 (Del. Ch. June 21, 2000) ............................................10

*Desimone* v. *Barrows*,
    924 A.2d 908 (Del. Ch. 2007).................................................................................11

*Firemen's Ret. Sys. of St. Louis* v. *Sorenson*,
    No. CV 2019-0965-LWW, 2021 WL 4593777 (Del. Ch. Oct. 5, 2021) ................................13

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Genworth Fin., Inc. Consol. Derivative Litig.*, No. CV 11901-VCS, 2021 WL
    4452338 (Del. Ch. Sept. 29, 2021) ........................................................23

*Gov't of the U.S. Virgin Islands* v. *JPMorgan Chase Bank, N.A.*,
    23-cv-10904 (S.D.N.Y. 2023).............................................................4, 25

*Guttman* v. *Huang*,
    823 A.2d 492 (Del. Ch. 2003)................................................................15

*Harcum* v. *Lovoi*,
    C.A. No. 2020-0398-PAF, 2022 WL 29695 (Del. Ch. Jan. 3, 2022) ....................24

*Horman* v. *Abney*,
    No. CV 12290-VCS, 2017 WL 242571 (Del. Ch. Jan. 19, 2017) ........................23

*In re ITT Corp. Derivative Litig.*,
    588 F. Supp. 2d 502 (S.D.N.Y. 2008) .....................................................15

*Jane Doe 1* v. *JPMorgan Chase Bank, N.A.*,
    22-cv-10019 (JSR) (S.D.N.Y. 2022) ..................................................4, 25

*Kahn* v. *M & F Worldwide Corp.*,
    88 A.3d 635 (Del. 2014), *overruled on other grounds by Flood* v. *Synutra*
    *Int'l, Inc.*, 195 A.3d 754 (Del. 2018) .....................................................17

*Kococinski* v. *Collins*,
    935 F. Supp. 2d 909 (D. Minn. 2013) (D. Minn. 2013)...................................10

*Kravitz* v. *Tavlarios*,
    No. 19 Civ. 8438 (NRB), 2020 WL 3871340 (S.D.N.Y. July 8, 2020), *aff'd*,
    No. 20-2579-CV, 2021 WL 5365582 (2d Cir. Nov. 18, 2021)...........................15

*Manbro Energy Corp.* v. *Chatterjee Advisors, LLC*,
    No. 20 CIV. 3773 (LGS), 2021 WL 2037552 (S.D.N.Y. May 21, 2021) ...............25

*Beam ex rel. Martha Stewart Living Omnimedia, Inc.* v. *Stewart*,
    845 A.2d 1040 (Del. 2004) ...................................................................17

*In re McDonald's Corp. S'holder Derivative Litig.*,
    289 A.3d 343 (Del. Ch. 2023)..........................................................20, 21

*In re Merrill Lynch & Co., Inc., Sec., Derivative & ERISA Litig.*,
    773 F. Supp. 2d 330 (S.D.N.Y. 2011) (JSR) ............................................12

iii

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

*Meyers* v. *Keeler*,
    414 F. Supp. 935 (W.D. Okla. 1976) ...................................................................11

*In re Morgan Stanley Derivative Litig.*,
    542 F. Supp. 2d 317 (S.D.N.Y. 2008) ................................................................17

*Okla. Firefighters Pension & Ret. Sys.* v. *Corbat*,
    No. CV 12151-VCG, 2017 WL 6452240 (Del. Ch. Dec. 18, 2017).......................13

*In re: Old Bpsush, Inc.*,
    No. 16-12373 (BLS), 2021 WL 4453595 (D. Del. Sept. 29, 2021).......................23

*Pettry* v. *Smith*,
    C.A. No. 2019-0795-JRS, 2021 WL 2644475 (Del. Ch. Jun. 28, 2021) ..........14, 20

*In re Pfizer Inc. S'holder Derivative Litig.*,
    722 F. Supp. 2d 453 (S.D.N.Y. 2010) ................................................................24

*Rahbari* v. *Oros*,
    732 F. Supp. 2d 367 (S.D.N.Y. 2010) ................................................................18

*Rales* v. *Blasband*,
    634 A.2d 927 (Del. 1993) ....................................................................................9

*Ret. Sys.* v. *Roche*,
    2020 WL 7023896 (Del. Ch. Nov. 30, 2020) .......................................................24

*Rojas* v. *Ellison*,
    C.A. No. 2018-0755-AGB, 2019 WL 3408812 (Del. Ch. Jul. 29, 2019)..............16

*In re SAIC Derivative Litig.*,
    948 F. Supp. 2d 366 (S.D.N.Y. 2013) ................................................................14

*Scalisi* v. *Fund Asset Mgmt., L.P.*,
    380 F.3d 133 (2d Cir. 2004)...............................................................................9

*South* v. *Baker*,
    62 A.3d 1 (Del. Ch. 2012)............................................................................14, 16

*Steinberg* v. *Dimon*,
    No. 14 Civ. 688 (PAC), 2014 WL 3512848 (S.D.N.Y. July 16, 2014)..................15

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Stone* v. *Ritter*,
   911 A.2d 362 (Del. 2006) ...................................................................................11, 15

*Teamsters Union 25 Health Servs. & Ins. Plan* v. *Baiera*,
   119 A.3d 44 (Del. Ch. 2015) .........................................................................................17

*Tri-State Pension Fund* v. *Zuckerberg*,
   262 A.3d 1034 (Del. 2021) .....................................................................................2, 9, 16

*United Food & Com. Workers Union* v. *Zuckerberg*,
   250 A.3d 862 (Del. Ch. 2020), *aff'd sub nom. Zuckerberg*, 262 A.3d 1034 ..........................12

**Statutes**

D.G.C.L. § 102(b)(7) .........................................................................................................10

**Other Authorities**

Daniel E. Slotnik, *James Crown, Chicago Businessman and Avid Philanthropist,
   Dies at 70*, N.Y. Times (July 3, 2023),
   nytimes.com/2023/06/27/business/james-crown-dead.html ...................................................4

Fed. R. Civ. P. 12(b)(6)..............................................................................................1, 2, 18

Fed. R. Civ. P. 23.1 ......................................................................................................1, 2

Fed. R. Civ. P. 23.1(b)(3)..............................................................................................9

*JPMorgan Names Two to Board, Creates Lead Director Role*, Bloomberg (Sept.
   9, 2013) https://www.bloomberg.com/news/articles/2013-09-09/jpmorgan-
   names-two-to-board-creates-lead-director-role#xj4y7vzkg ...................................................5

v

Pursuant to Federal Rules of Civil Procedure 23.1 and 12(b)(6), Defendants[1] submit this memorandum of law in support of their motion to dismiss with prejudice the Amended Stockholder Derivative Complaint, dated June 30, 2023 (the "Complaint") [Dkt. 17].

## I.    Preliminary Statement

Plaintiffs are stockholders of JPMorgan Chase & Co. ("JPMorgan" or the "Company") who assert derivative claims for breach of fiduciary duty against eight former and current directors and a former officer of JPMorgan.  These claims concern the Company's prior relationship with Jeffrey Epstein, whose accounts at a Company subsidiary (the "Bank") were terminated in August 2013.  For all its length, the 65-page Complaint contains few factual allegations about Defendants themselves—no doubt, because many of the Director Defendants were not even on the Board when Epstein was a Bank client, and those actually on the Board at the time are not alleged to have known about Epstein's accounts.  The Complaint should be dismissed with prejudice because it both (1) fails to plead demand futility as a matter of law, and (2) fails to state claims for breach of fiduciary duty and unjust enrichment.

***Demand Futility Not Pleaded.***  Shareholders may usurp the role of a company's board of directors and pursue claims belonging to the company only in rare circumstances.  To displace that authority, Delaware law—which applies here because JPMorgan is incorporated in Delaware—requires that a shareholder first make a demand on the company's board to investigate the alleged claims.  Compl. ¶ 60.[2]  Plaintiffs here concede that they did not make a

---

[1] This memorandum is submitted on behalf of all defendants apart from James Staley, including JPMorgan; Stephen Burke, Todd Combs, James Crown, Timothy Flynn, Mellody Hobson, John Kessler, and Phebe Novakovic (the "Director Defendants"); and James Dimon (together, with the Director Defendants, the "Defendants").  JPMorgan joins only in Part III of this motion, addressing demand futility.

[2] References to "Ex. _ at _" refer to the exhibits to the attached Declaration of Audra J. Soloway and the corresponding page citation.  References to "¶" refer to paragraphs in the Complaint.

1

demand, instead contending that making a demand on the members of JPMorgan's Board as of the date the Complaint was filed (the "Demand Board") would be "futile."  Compl. ¶¶ 185, 188.

To surmount the stringent demand futility standard, however, Plaintiffs must plead that a majority of the Demand Board was conflicted because they (1) "received a material personal benefit from the alleged misconduct," (2) "would face a substantial likelihood of liability on any of the claims," or (3) "lack[] independence from someone" conflicted under (1) or (2).  *United Food & Com. Workers Union & Participating Food Indus. Emps.' Tri-State Pension Fund* v. *Zuckerberg*, 262 A.3d 1034, 1058 (Del. 2021) ("*Zuckerberg*").  Rule 23.1 additionally requires that these facts be pled with particularity.  The sparse, conclusory allegations of the Complaint, however, satisfy none of these prongs:

- Under prong 1, there are no allegations whatsoever that ***any*** Demand Board Director received a material personal benefit from the alleged misconduct.

- Under prong 2, the Complaint does not contain any well-pleaded facts, let alone particularized ones, establishing that any Demand Board Director faces a substantial likelihood of liability for the claims—let alone a majority of the Demand Board. Indeed, eight of the 11 Demand Board Directors joined the Board only *after* the Bank terminated Epstein's accounts in 2013, and face no risk of liability.

- Under prong 3, the Complaint does not contain any well-pleaded facts that any Demand Board Director lacks independence from a purportedly conflicted Demand Board Director.  As an initial matter, there are no conflicted Demand Board Directors. Moreover, the Complaint asserts only that certain Demand Board Directors have had long-standing business relationships with others, and that one director invested in a real estate venture decades ago in which Epstein was allegedly involved, which is plainly insufficient.

- Accordingly, the Complaint lacks particularized factual allegations of demand futility to allow Plaintiffs to bring this action, and must be dismissed.

***Failure to State a Claim.***  Even if Plaintiffs had adequately pleaded demand futility (they have not), the breach of fiduciary duty claims fail to state a claim under Rule 12(b)(6) against both the non-management Director Defendants, as well as CEO Dimon.

With respect to the non-management Director Defendants, Plaintiffs face the difficult hurdle of alleging oversight failure under the demanding standard set forth in *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996).  This hurdle is further heightened because JPMorgan's charter exculpates its directors from liability for breaches of fiduciary duty except those that arise from acts taken in bad faith or from intentional misconduct.  The Complaint fails to identify any well-pleaded facts showing, as required by *Caremark*, that any Director Defendant consciously disregarded red flags concerning Epstein's accounts and banking activity.  In fact, the Complaint does not plead that any Director Defendant even knew that Epstein was a client, much less that they disregarded the Bank's anti-money laundering obligations.  Nor can the Complaint satisfy *Caremark* by alleging that the Director Defendants utterly failed to implement controls; to the contrary, it concedes that JPMorgan had robust internal controls for board oversight.

With respect to Mr. Dimon, Plaintiffs likewise fail to plead allegations establishing (1) bad faith misconduct arising from a failure to act in the face of specific knowledge of any red flag (duty of oversight) or (2) that he acted with gross negligence with respect to compliance and risk management concerning Epstein's accounts (duty of care).  Rather, the claims against Mr. Dimon are based on nothing more than pure speculation and innuendo.  These allegations, more suited to Page Six of the *New York Post* than a complaint in federal court, fail to demonstrate Mr. Dimon was even involved in the decision to continue the banking relationship with Mr. Epstein or with BSA/AML issues concerning Mr. Epstein's accounts, much less state a failure of oversight claim.

For all these reasons, the Complaint should be dismissed in its entirety with prejudice.

## II.     Relevant Background Facts as Pleaded in Complaint

Plaintiffs' claims are premised on the Bank's relationship with Jeffrey Epstein from

2008, when Epstein pleaded guilty to soliciting a minor for prostitution, until his 2019 death.

Compl. ¶ 183.  The Complaint's allegations are largely based on the claims advanced in two

related cases pending before the Court, *Jane Doe 1* v. *JPMorgan Chase Bank, N.A.*, 22-cv-10019

(JSR) (S.D.N.Y. 2022) and *Gov't of the U.S. Virgin Islands* v. *JPMorgan Chase Bank, N.A.*, 23-

cv-10904 (S.D.N.Y. 2023).  Defendants assume the Court's familiarity with the underlying

allegations in these cases.

Plaintiffs concede that they "did not make a demand on the Board [of JPMorgan] to

institute this Action because pre-suit demand is excused."  Compl. ¶ 185.  For the reasons

addressed below, a majority of the Demand Board is not conflicted for demand futility purposes,

regardless of whether the Demand Board is deemed to have 11 members or 12 members

(including Crown, who passed away on June 25, 2023, before this Complaint was filed).[3]

Five Demand Board Directors—Linda Bammann, Alicia Davis, Alex Gorsky, Michael

Neal, and Virginia Rometty—are current directors who are not named as defendants (the "Non-

Defendant Directors").  The other current directors and Crown are named as Defendants, along

with former director John Kessler, who served from 1996 to 2007.  For the convenience of the

Court, the below table sets forth the Demand Board and Director Defendants and their respective

Board tenures, as well as whether Epstein was a Bank client during their board service:

| Director | Board Service | Defendant | On Board Before Epstein Accounts Terminated |
|---|---|---|---|
| **Linda B. Bammann** | 2013-Present | No | No |
| **Stephen B. Burke** | 2004-Present | Yes | Yes |
| **Todd A. Combs** | 2016-Present | Yes | No |

---

[3] *See* Daniel E. Slotnik, *James Crown, Chicago Businessman and Avid Philanthropist, Dies at 70*, N.Y. Times (July 3, 2023), nytimes.com/2023/06/27/business/james-crown-dead.html.

| | | | |
|---|---|---|---|
| **James S. Crown** | 2004-2023 | Yes | Yes |
| **Alicia B. Davis** | 2023-Present | No | No |
| **James Dimon** | 2004-Present | Yes | Yes |
| **Timothy P. Flynn** | 2012-Present | Yes | Yes |
| **John W. Kessler** | 2004-2007 | Yes | Yes |
| **Alex Gorsky** | 2022-Present | No | No |
| **Mellody Hobson** | 2018-Present | Yes | No |
| **Michael A. Neal** | 2014-Present | No | No |
| **Phebe N. Novakovic** | 2020-Present | Yes | No |
| **Virginia M. Rometty** | 2020-Present | No | No |

Notably, eight of the Demand Board Directors—a clear majority—joined the Board only after the Bank terminated its banking relationship with Epstein in August 2013 (this includes all of the five Non-Defendant Directors, and Combs, Hobson, and Novakovic).[4]  To address this inconvenient fact, the Complaint asserts that various Demand Board Directors face a "substantial likelihood of liability" because they "served on the Board at times between Epstein's 2008 plea and his 2019 death,"  Compl. ¶ 189, and that directors who served before 2013 face "an even more heightened likelihood of liability for having served…before the Company purportedly terminated its relationship with Epstein in 2013."  Compl. ¶ 190.

The Complaint contains ***no*** particularized factual allegations even suggesting that ***any*** Director Defendant was aware of the Bank's relationship with Epstein, much less consciously disregarded red flags or committed misconduct in connection with Epstein's accounts.  Rather, to

---

[4] The Complaint incorrectly states that Bammann joined the Board before Epstein was terminated as a client.  Compl. ¶ 190.  This is incorrect because Bammann did not join the Board until September 2013.  *Compare* Doe 1 Compl. ¶ 473 ("By providing financing for Epstein's sex trafficking organization from about 2000 through about August 2013"); ¶ 438 ("[B]etween about 2000 and August 2013 and following, JP Morgan concealed its delivery of vast sums of cash to Epstein and his associates") *with JPMorgan Names Two to Board, Creates Lead Director Role*, Bloomberg (Sept. 9, 2013) https://www.bloomberg.com/news/articles/2013-09-09/jpmorgan-names-two-to-board-creates-lead-director-role#xj4y7vzkg (dating Bammann joining the board to September 2013).

the extent the Complaint contains *any* allegations with respect to *any* Director Defendant, those allegations are speculative assignations of guilt-by-association:

- As to **Burke**, **Combs**, **Flynn**, and **Hobson**, the Complaint contains no allegations whatsoever, apart from identifying them as Board members and detailing certain aspects of their professional backgrounds.  Compl. ¶¶ 35, 37–39.

- Plaintiffs' only allegations against former director **Crown** are that, at some unspecified time decades ago, he "was involved in the New Albany project," a project to re-develop farmland into a town modeled on an 18th Century Georgian village, "which relied on Epstein for its success."  Compl. ¶ 88, 194.  Plaintiffs also allege that Crown recruited Dimon to Bank One Corporation, and that Crown served as the head of the JPMorgan Board of Directors' Risk Committee while Epstein was a client of the Bank.  Compl. ¶¶ 14, 103, 104, 107.

- With respect to **Novakovic**, Plaintiffs concede that she joined the Board after Epstein's death, *see* Compl. ¶ 36, but assert her non-independence from Crown on grounds that Novakovic is the CEO of General Dynamics, which is alleged to be Crown's "family business."  Compl. ¶¶ 195, 12.  Plaintiffs fashioned this purported conflict for the first time after Crown passed away, by adding Novakovic to a later-filed pleading.[5]

---

[5] The first-filed complaint did not sue Novakovic, and conceded her independence. [Dkt. 1]  It was not until the second-filed complaint that Novakovic was added as a defendant and identified as purportedly conflicted due to her connection to Crown—but that complaint was filed on June 27, 2023 [*City of Miami Gen. Emps. & Sanitation Emps. Retirement Trust* v. *JPMorgan Chase & Co.*, 23-cv-05459 (JSR) (S.D.N.Y. 2023), Dkt. 1] after Crown's death on June 25, at which point any influence by Crown over Novakovic's consideration of a demand had plainly ceased.  It is pure gamesmanship for Plaintiffs to sue Novakovic (who only joined the Board after Epstein's death) and assert her purported lack of independence only after Crown's death, when the purported conflict no longer exists.  Further, Defendants asked Plaintiffs to dismiss their claims

- Plaintiffs allege that former director **_Kessler_**, a corporate lawyer, had a business relationship with Les Wexner—an Epstein associate—and invested in the New Albany project on which Epstein worked decades ago, and in which Wexner, Kessler, and Epstein all invested and owned property.  Compl. ¶¶ 11–13, 87–96, 105.  Plaintiffs also allege the unremarkable fact that Kessler was involved in recruiting Dimon to join Bank One Corporation, which later merged with JPMorgan.  Compl. ¶¶ 90–91, 96.

- Finally, as to non-Defendant **_Bammann_**, Plaintiffs allege that she worked for Dimon in the early 2000s at both Bank One and at JPMorgan—years before joining the JPMorgan Board in September 2013.  Compl. ¶ 193.

The sole remaining allegation relevant to the non-management Director Defendants relates to government investigations and a jumble of inflammatory references to bad actors that Plaintiffs fail to show are in any way related to the Bank's prior relationship with Mr. Epstein.  Compl. ¶¶ 170–73.  Specifically, Plaintiffs allege that in January 2014, the Bank settled two BSA violations with the Office of the United States Attorney for the Southern District of New York.  Compl. ¶ 170.  In the settlement agreement, the Bank acknowledged that it had failed to report suspicious activity concerning the activities of Bernie Madoff between 2006 and 2008.  Compl. ¶ 171; (Ex. 1 at 1, 24).  At the same time, the Bank agreed to pay a civil money penalty consent order to the OCC for $350 million.  Compl. ¶ 170.[6]  Plaintiffs also list, without any

---

against Crown in light of his death, and Plaintiffs' response was to file this Amended Complaint on June 30, 2023 [Dkt. 17] that amended references to Crown's Board service to past tense, but did not dismiss him from the lawsuit.  Defendants reserve all rights on this issue.

[6] The government investigations related to the OCC consent order ultimately required JPMorgan and affiliates to improve compliance efforts, including with respect to suspicious activity reports ("SARs").  The Complaint does not allege that such improvements were not actually made in 2014, or that JPMorgan has violated the consent order.

details, transactions that JPMorgan has purportedly handled for "bad actors" unrelated to Epstein, such as Jho Low and Paul Manafort.  Compl. ¶ 172.[7]  None of this purported misconduct is alleged either to relate to Epstein, or to have been known by the Board.

As to Mr. Dimon, the Bank's CEO, the Complaint's allegations are limited to (a) speculation that Mr. Dimon must have known of Mr. Epstein's criminality because, based on a lengthy, contorted story, Mr. Dimon and Mr. Epstein shared connections to the Columbus, Ohio business community (Compl. ¶¶ 14, 90-91, 96, 102–08, 191); (b) the assertion that a certain document concerning Epstein's bank accounts was marked "pending Dimon review," though the Complaint conspicuously stops short of alleging that this review ever occurred (Compl. ¶¶ 19, 136–37, 191); and (c) the claim that Mr. Epstein and a different defendant, Mr. Staley, coordinated to schedule meetings for Mr. Dimon with the likes of Benjamin Netanyahu, Bill Gates, and Prince Andrew, even though the Complaint nowhere pleads facts demonstrating Mr. Dimon attended these meetings or, if he did, that he had any knowledge of Mr. Epstein's purported involvement.  Compl. ¶ 123.

## III.   No Demand Was Made, and Demand Futility Is Not Adequately Pleaded.

### A.   Legal Standard for Demand Futility

"'A cardinal precept' of Delaware law 'is that directors, rather than shareholders, manage the business and affairs of the corporation.'"[8]  *Zuckerberg*, 262 A.3d at 1047 (citation omitted). This extends to a determination whether the corporation should file a lawsuit against its directors, its officers, its controller, or an outsider.  *Id*.  A stockholder may substitute his

---

[7] Plaintiffs also allege an equally irrelevant SEC fine concerning the deletion of electronic records which purportedly "includ[ed] emails and instant messages, dated from January to April 2018" but do not explain how this is relevant to Epstein at all.  Compl. ¶ 173.

[8] Because JPMorgan is incorporated in Delaware, Delaware law governing demand futility applies.  *Scalisi* v. *Fund Asset Mgmt., L.P.*, 380 F.3d 133, 138 (2d Cir. 2004).

judgment for that of the board and assert company claims only after either "(1) mak[ing] a demand on the company's board of directors" that the board rejects "or (2) show[ing] that demand would be futile."  *Id.*

Federal Rule of Civil Procedure 23.1(b)(3) requires that a shareholder-derivative complaint "state with particularity" any "effort by the plaintiff to obtain the desired action from the directors" and "the reasons for not obtaining the action or not making the effort."  It is the "rare case" where the requirement is excused based upon allegations that demand is futile.  *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 121 (Del. Ch. 2009).  To plead demand futility, Plaintiffs must allege "particularized facts creating a reasonable doubt that a majority of the Board…would be disinterested or independent in making a decision on" whether to bring suit.  *Rales* v. *Blasband*, 634 A.2d 927, 930 (Del. 1993).

To plead that directors are conflicted, Plaintiffs must allege with particularity that they (1) "received a material personal benefit from the alleged misconduct," (2) "would face a substantial likelihood of liability on any of the claims," or (3) "lack[] independence from someone" conflicted under (1) or (2).  *Zuckerberg*, 262 A.3d at 1058.  In this case, Plaintiffs make no allegation whatsoever that any director received a material personal benefit from any alleged misconduct (Compl. ¶¶ 135–51), making prong one of *Zuckerberg* inapplicable.[9]  And Plaintiffs' efforts to satisfy prongs two and three plainly fail.

---

[9] To support its unjust enrichment claim, Plaintiffs allege in conclusory fashion that Defendants "benefit[ed] from their misconduct in the form of profits, benefits, and other compensation." Compl. ¶ 217.  But under *Zuckerberg*'s first prong, ordinary board compensation does not constitute a material benefit.  *See e.g., In re Am. Int'l Grp., Inc. Derivative Litig.*, 700 F. Supp. 2d 419, 432 (S.D.N.Y. 2010), *aff'd*, 415 F. App'x 285 (2d Cir. 2011) (finding that "[p]laintiff's allegations regarding director compensation [did] not raise any reasonable doubt as to directorial disinterestedness" because plaintiff did not "allege that the compensation that these directors received was anything other than customary director compensation") (citing *Orman* v. *Cullman*, 794 A.2d 5, 29 n. 62 (Del. Ch. 2002)).

**B.    Plaintiffs Fail to Plead Particularized Facts Demonstrating that a Majority of the Demand Board Directors Face a "Substantial Likelihood of Liability."**

Demand may be excused under the second prong of the *Zuckerberg* test only in "rare" circumstances where a complaint alleges with particularity that a majority of directors engaged in such "egregious" misconduct that they face not merely a "threat" but a "substantial likelihood of director liability." *Aronson* v. *Lewis*, 473 A.2d 805, 815 (Del. 1984).  And here, Plaintiffs' hurdle is higher still: Pursuant to Delaware General Corporation Law Section 102(b)(7), JPMorgan's charter exculpates its directors from liability for breaches of fiduciary duty except those that arise from acts taken in bad faith or from intentional misconduct.[10]  *See* Ex. 2 at 4 (Restated Certificate of Incorporation of JPMorgan Chase & Co. at Art. 6(1)).

In the face of this high pleading standard, Plaintiffs rely upon an oversight claim. Oversight claims are "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark*, 698 A.2d at 967.  To state such a claim, Plaintiffs must plead particularized facts demonstrating either that "(a) the directors utterly failed

---

[10] As to the claim Plaintiffs seek to assert against Mr. Staley in particular, it is obvious that demand would not be futile.  As noted above, JPMorgan has *already* brought claims against Mr. Staley identical to those that Plaintiffs now seek to assert on behalf of JPMorgan.  *See supra* at Part III.  Demand cannot be futile where, as here, a board has already acted on the very matter on which the shareholder demands action.  *See, e.g.*, *In re Delta and Pine Land Co. S'holders Litig.*, No. Civ.A. 17707, 2000 WL 875421, at *6 (Del. Ch. June 21, 2000) ("As this Court has previously found, the existence of a board-initiated action conclusively defeats any claim that demand would have been futile.  Indeed, there is something to be said for the idea that this Court should inquire no further if it finds that the corporate directors are litigating the same claims advanced in the derivative action.") (internal quotation marks omitted); *see also Kococinski* v. *Collins*, 935 F. Supp. 2d 909, 919 n.17 (D. Minn. 2013) (noting that "if a board of directors had already commenced a lawsuit addressing the conduct that a potential derivative plaintiff wanted to challenge, there would be little reason for the derivative plaintiff to commence the same action") (D. Minn. 2013); *Meyers* v. *Keeler*, 414 F. Supp. 935, 939 (W.D. Okla. 1976) (demand not futile where board has "already taken action on the very matter which [p]laintiff [] asserts they would not take action upon").  Indeed, permitting Plaintiffs' claim against Mr. Staley to proceed would simply result in unnecessary, duplicative litigation.

to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone* v. *Ritter*, 911 A.2d 362, 370 (Del. 2006).  In light of JPMorgan's exculpatory charter provision, "the lack of oversight pled must be so extreme that it represents a breach of the duty of loyalty," which "requires a pleading of scienter, demonstrating bad faith." *Constr. Indus. Laborers Pension Fund* v. *Bingle*, No. 2021-0940-SG, 2022 WL 4102492, at *1 (Del. Ch. Sept. 6, 2022), *aff'd*, No. 411, 2022, 2023 WL 3513271 (Del. May 17, 2023).  In other words, Plaintiffs must allege facts demonstrating that the Board "knew that internal controls were inadequate" but "chose to do nothing." *Desimone* v. *Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007).  The Complaint falls far short of meeting this rigorous pleading standard.

### 1. Eight Demand Board members assumed membership on the JPMorgan Board only after JPMorgan terminated Epstein as a client.

There is no colorable argument whatsoever that there is any risk of liability for at least *eight* of the Demand Board Directors—Defendants Combs, Hobson, Novakovic and non-Defendants Bammann, Rometty, Gorsky, Neal, and Davis—for the obvious reason that these directors all assumed their positions on JPMorgan's board *only after* Epstein's relationship with JPMorgan was terminated in August 2013.  Compl. ¶¶ 36, 38, 39.  These directors cannot possibly bear liability in connection with any alleged Epstein-related compliance shortcomings by the Bank before their Board membership began.  *See, e.g.*, *In re Merrill Lynch & Co., Inc., Sec., Derivative & ERISA Litig.*, 773 F. Supp. 2d 330, 340 (S.D.N.Y. 2011) (JSR) (majority of Bank of America board faced no substantial risk of liability for claims alleged against Merrill Lynch officers and directors based on pre-merger conduct); *United Food & Com. Workers Union* v. *Zuckerberg*, 250 A.3d 862, 894 (Del. Ch. 2020) (holding that a board member was not

11

interested in part because he had joined the board after the challenged action had taken place), *aff'd sub nom. Zuckerberg*, 262 A.3d 1034.

In the face of this critical deficiency, Plaintiffs lodge several speculative and conclusory allegations: *First,* Plaintiffs say that the Bank "potentially continued to engage with Epstein related entities until his death in jail in 2019" (Compl. ¶ 26), but the Complaint offers no well-pleaded factual allegations showing any continuing engagement with Epstein following termination of his accounts, much less a lack of oversight by Defendants from 2013-2019 so extreme that it amounts to bad faith. *Second,* Plaintiffs say that the Bank "actively concealed Epstein's crimes by failing to file any legally required Suspicious Activity Reports ('SARs'), which are mandated for large cash withdrawals and other suspicious transactions." *Id.* Plaintiffs, however, do not allege any particularized facts about the Company's actual SAR filing practices concerning Epstein—indeed, Plaintiffs rely fully on the *USVI* and *Doe* complaints (which actually plead that SARs were filed), and offer no good faith factual basis to support the conclusory and contradictory assertion that zero SARs were filed. Plaintiffs also fail to allege that any director would, in the ordinary course, have any knowledge of or involvement in the SAR filing process at a client-specific level, and therefore fail to allege that any director should have known about specific SAR filings related to Epstein. In any event, Plaintiffs again fail to explain how Directors who joined the Board *after* the Epstein account terminations could possibly be culpable for SAR filings, or the alleged lack thereof, during his tenure as a client.

Accordingly, given that eight Demand Board Directors joined the Board after the Bank terminated Epstein's accounts in 2013, there is no question that ***a majority*** of an 11- (or 12-) person board faces no substantial risk of personal liability under the *Zuckerberg* analysis.

**2.** ***Plaintiffs fail to plead particularized facts demonstrating that the remaining Demand Board Directors knowingly failed to oversee internal controls.***

While not necessary to address, Plaintiffs also cannot satisfy *Caremark* for the Demand Board Directors who served while Epstein's accounts at the Bank were active—Burke, Dimon, and Flynn (and Crown, even if included). To satisfy *Caremark,* both knowledge of the misconduct and a conscious failure to act upon that knowledge are required. *See Firemen's Ret. Sys. of St. Louis* v. *Sorenson*, No. CV 2019-0965-LWW, 2021 WL 4593777, at *13 (Del. Ch. Oct. 5, 2021) (plaintiff must allege directors "knew about 'red flags' alerting them to corporate misconduct and consciously failed to act after learning about evidence of illegality") (internal quotation marks omitted). Importantly, merely pleading facts that "imply that the [demand board] could have done a better job addressing the issues highlighted by, among other sources, . . . consent orders" is "not enough to state a *Caremark* claim." *Okla. Firefighters Pension & Ret. Sys.* v. *Corbat*, No. CV 12151-VCG, 2017 WL 6452240, at *17 (Del. Ch. Dec. 18, 2017).

The Complaint is devoid of well-pleaded factual allegations that the Demand Board Directors who served while Epstein was a Bank client (or any other director) were even aware of that banking relationship, let alone were aware of any red flags concerning Epstein's accounts and thereafter consciously disregarded a duty owed by the Board to act on such red flags, as is required to sustain a claim under the second *Caremark* prong. *See Pettry* v. *Smith*, C.A. No. 2019-0795-JRS, 2021 WL 2644475, at *7 (Del. Ch. Jun. 28, 2021). Even the Complaint's allegations that Staley was involved in Epstein's crimes does not in any way suggest the Board was informed of issues concerning Epstein's accounts. Compl. ¶¶ 139-50. Entirely absent, therefore, are any allegations that any Director Defendant was ever "presented with 'red flags' alerting it to potential misconduct" and consciously and deliberately ignored such warnings, as

13

required to state a prong-two *Caremark* claim.  *David B. Shaev Profit Sharing Acct.* v.

*Armstrong*, No. Civ.A. 1449-N, 2006 WL 391931, at *5 (Del. Ch. Feb. 13, 2006), *aff'd*, 911

A.2d 802 (Del. 2006); *South* v. *Baker*, 62 A.3d 1, 17 (Del. Ch. 2012) (no substantial likelihood

of liability where "[a]lthough the complaint asserts that the directors knew of and ignored

[certain safety incidents], the complaint nowhere alleges anything that the directors were told

about the incidents, what the Board's response was, or even that the incidents were connected in

any way").

       Nor does the mere existence of the alleged regulatory investigations or enforcement

actions in 2013 and 2014 support a *Caremark* claim for the Director Defendants on the Board at

that time.  *See* Compl. ¶¶ 170–71.  The DOJ settlement, OCC fine, and other allegations set forth

in the Complaint did not concern the Bank's relationship with Epstein, which had already been

terminated.  Compl. ¶¶  172–73; *see In re SAIC Derivative Litig.*, 948 F. Supp. 2d 366, 387

(S.D.N.Y. 2013) (rejecting argument that "knowledge of wrongdoing in other transactions

should have put the Board on a heightened state of alert"); *Citigroup*, 964 A.2d at 129 (rejecting

contention that "alleged prior, unrelated wrongdoing would make directors sensitive to similar

circumstances") (internal quotation marks omitted).  Moreover, if anything, the Director

Defendants on the Board at the time of the government settlements would have been reassured

by enhancement of the Company's compliance procedures—and the Complaint does not allege

that these enhancements were not actually made, or that the Board subsequently learned of any

SAR-related compliance problems following those government investigations in 2014.  Plaintiffs

thus fail to allege "information regarding the individual [d]irectors' responses, if any" to the

alleged regulatory enforcement, and thus fail to establish that any "[d]irector[] failed to act or

[that] the actions they took were inappropriate in light of the information they received." *In re ITT Corp. Derivative Litig.*, 588 F. Supp. 2d 502, 513 (S.D.N.Y. 2008).

In sum, where, as here, the Complaint fails to offer "well-pled, particularized allegations of fact detailing the precise roles" the Demand Board Directors played, the information that came to their attention, "and any indication as to why they would have perceived the [complained of] irregularities," Plaintiffs cannot sustain a claim that such directors face a significant risk of liability. *Guttman* v. *Huang*, 823 A.2d 492, 503 (Del. Ch. 2003).

### 3. *Plaintiffs fail to plead particularized facts demonstrating the Directors' "utter failure" to implement any internal controls.*

Plaintiffs also fail to satisfy *Caremark* by pleading that the Demand Board Directors "utterly failed to implement any reporting or information system or controls." *Stone*, 911 A.2d at 370. "The issue [under prong one of *Caremark*] is not whether JPMorgan's controls were adequate, but whether any existed." *Steinberg* v. *Dimon*, No. 14 Civ. 688 (PAC), 2014 WL 3512848, at *3 (S.D.N.Y. July 16, 2014). The standard "requires only that a reporting system exist, not even that it be 'reasonable.'" *Corp. Risk Holdings LLC* v. *Rowlands*, No. 17-CV-5225 (RJS), 2018 WL 9517195, at *5 (S.D.N.Y. Sept. 28, 2018) (quoting *Cent. Laborers' Pension Fund* v. *Dimon*, 638 F. App'x 34, 37–38 (2d Cir. 2016)). "[S]o long as directors 'try' to implement such system, they discharge their duty to monitor the corporation." *Kravitz* v. *Tavlarios*, No. 19 Civ. 8438 (NRB), 2020 WL 3871340, at *9 (S.D.N.Y. July 8, 2020), *aff'd*, No. 20-2579-CV, 2021 WL 5365582 (2d Cir. Nov. 18, 2021). Indeed, under the first prong of *Caremark*, "plaintiffs usually lose because they must concede the existence of board-level systems of monitoring and oversight such as a relevant committee, a regular protocol requiring board-level reports about the relevant risks, or the board's use of third-party monitors, auditors,

or consultants." *Rojas* v. *Ellison*, C.A. No. 2018-0755-AGB, 2019 WL 3408812, at *9 (Del. Ch. Jul. 29, 2019) (quoting *Marchand* v. *Barnhill*, 212 A.3d 805, 823 (Del. 2019)).

That is the case here.  The Complaint concedes that robust systems do exist at JPMorgan to identify suspicious activity.  Compl. ¶ 2.  The Complaint also quotes from internal memoranda written by officials in JPMorgan's risk management, Global Corporate Security, compliance, and other unspecified functions, acknowledging that internal reporting processes existed and were leveraged by employees.  *See* Compl. ¶¶ 24, 146, 151, 154.  In addition, the Complaint describes the numerous committees of the JPMorgan Board of Directors:  it acknowledges the Bank's Audit and Risk Committees by mentioning directors' memberships on them, and referencing their responsibilities.  *See* Compl. ¶¶ 33, 37–39, 104, 112, 170.  The existence of these committees alone "refutes the assertion that the directors utterly failed to attempt to fulfill their oversight obligations,"  *Baker*, 62 A.3d at 18 (internal quotation marks omitted), and preclude any claim by Plaintiffs based on *Caremark*'s first prong.

### C.     Plaintiffs Fail to Plead Particularized Facts Demonstrating That Any Demand Board Director "Lacks Independence."

The Complaint also does not plead facts sufficient to satisfy the third prong of the *Zuckerberg* test—that "at least half of the members of the Demand Board" "lack[] independence from someone who received a material personal benefit from the alleged misconduct that is the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand."  *Zuckerberg*, 262 A.3d at 1058–59.  Importantly, "[i]n the demand futility context, directors are presumed to be independent." *Teamsters Union 25 Health Servs. & Ins. Plan* v. *Baiera*, 119 A.3d 44, 59 (Del. Ch. 2015) (internal quotation marks omitted).  To overcome this presumption, a plaintiff must allege that half of the directors "had ties to the person whose proposal or actions he or she is evaluating that

16

are sufficiently substantial that he or she could not objectively discharge his or her fiduciary duties." *Kahn* v. *M & F Worldwide Corp.*, 88 A.3d 635, 649 (Del. 2014), *overruled on other grounds by Flood* v. *Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018).

Plaintiffs allege that Bammann and Crown (even if relevant) were not independent from CEO Dimon (who purportedly faces a substantial risk of liability), and that Crown separately faces a substantial risk of liability because of his unspecified involvement decades ago in the New Albany development project, creating a purported conflict for Novakovic.  These arguments fail for numerous reasons:

*First*, for the reasons stated *infra,* Dimon and Crown do not face a substantial risk of liability and therefore are not conflicted.

*Second*, even if Dimon faced a substantial risk of liability, Bammann and Crown do not lack independence from Dimon.  Plaintiffs allege Bammann "owes a significant portion of her professional success to Dimon" simply because she worked with him at Bank One Corporation and then JPMorgan in the early 2000s.  Compl. ¶ 193.  Similarly, Plaintiffs point to Crown's board service for Bank One when Dimon was CEO and his support for Dimon at both Bank One and JPMorgan.  Compl. ¶ 194.  Courts routinely hold that merely asserting close personal or business relationships is insufficient to plead lack of independence in the demand futility context. *In re Morgan Stanley Derivative Litig.*, 542 F. Supp. 2d 317, 326 (S.D.N.Y. 2008); s*ee also Beam ex rel. Martha Stewart Living Omnimedia, Inc.* v. *Stewart*, 845 A.2d 1040, 1051–52 (Del. 2004) ("Mere allegations that [the directors] move in the same business and social circles, or a characterization that they are close friends, is not enough to negate independence for demand excusal purposes."); *Rahbari* v. *Oros*, 732 F. Supp. 2d 367, 388 n. 24 (S.D.N.Y. 2010) ("[M]ere

personal or business relationships will not raise a reasonable inference that a director cannot

consider demand, absent specific factual allegations to support such a conclusion").

*Third,* Plaintiffs cannot disqualify Crown as an independent director merely by citing the

decades-ago New Albany real estate venture in which Crown purportedly was "involved" in

some unspecified way, and for which Epstein was purportedly brought in to restructure and

invest.  The Complaint offers no facts explaining Crown's involvement, whether he even had any

contact with Epstein, or whether he had any financial entanglements with Epstein—much less

any connection that is relevant decades later.  Compl. ¶¶ 11, 105.  The mere coincidence that

both Crown and Epstein (along with many others) were involved in a long-ago real estate project

certainly cannot create a substantial likelihood of liability for Crown (much less, by extension,

Novakovic, who allegedly was employed by Crown's family business).

## IV.   Plaintiffs Have Failed to State a Claim Against Any Defendant.

### A.   Legal Standard Under Rule 12(b)(6)

Even if demand futility were pleaded (it is not), to survive a motion to dismiss under Rule

12(b)(6), the Complaint "must contain sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bel*

*Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).

### B.   The Complaint Fails to State a Fiduciary Duty Claim Against Any Director
###        Defendant

For the same reasons that Plaintiffs have failed to plead that any Demand Board Director

faces a substantial risk of liability, *see supra* Part(III)(B)(1), Plaintiffs have also failed to state a

claim against ***any*** Director Defendant for breach of fiduciary duty.  As elaborated above, because

JPMorgan's charter exculpates its directors from liability for breaches of fiduciary duty, except

those that arise from acts taken in bad faith or from intentional misconduct, JPMorgan's Director

Defendants face no possibility of liability for claims based on negligence, gross negligence, or any other conduct short of bad faith.  Instead, Plaintiffs must plead scienter demonstrating bad faith.  *Bingle*, 2022 WL 4102492, at *1.  Further, as noted above, the *Caremark* claims asserted here are "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment" and are routinely dismissed.  *Caremark*, 698 A.2d at 967.

The Complaint does not even attempt to plead the bad faith conduct of the Director Defendants Crown, Burke, Flynn, Hobson, Combs and Novakovic.  As addressed above, breach of a fiduciary duty under a *Caremark* oversight theory cannot be satisfied merely by offering conclusory allegations that directors were aware (or should have been aware) of wrongful conduct.  Here, there are simply no particularized allegations that any Director Defendant knew of Epstein's conduct, knew of Epstein's status as a client at the Bank, failed in any manner to respond to red flags regarding Epstein or JPMorgan's SAR or other BSA/AML compliance policies or practices, or otherwise failed in any way in executing their oversight duties (indeed, Defendants Combs, Hobson, and Novakovic were not even on the Board when Epstein was a client at the Bank).  *See supra* pp. 11–12.[11]

As to Kessler, a corporate lawyer who was a director of JPMorgan from 1995–2007, Plaintiffs allege that Kessler associated with Wexner, including in the New Albany real estate venture, on which Epstein supposedly also worked and invested.  Compl. ¶¶ 11–14, 34, 87–93, 194.  Even crediting these conclusory allegations, they amount to nothing more than a thin thread

---

[11] Plaintiffs half-hearted attempts at alleging knowledge of Epstein's crimes by the Director Defendants are not only generalized but also patently speculative.  *See, e.g.*, Compl. ¶ 5 (speculating that JPM executives who were aware of Epstein-related issues "presumably" attended Board meetings); *id.* (opining that Board members, by virtue of intelligence and business acumen, "very likely were aware" of Epstein's misconduct).  This rank speculation is plainly inadequate.

tying Kessler to Epstein through a common business partner and venture—entirely disconnected from Epstein's JPMorgan accounts or the activities at issue in *Doe* and *USVI*. These allegations certainly do not plead that Kessler "knew of evidence of corporate misconduct… yet acted in bad faith by consciously disregarding [his] duty to address [it]." *Pettry*, 2021 WL 2644475, at \*7.

### C.    The Complaint Fails to State a Fiduciary Duty Claim Against Mr. Dimon

The Court also should dismiss Plaintiffs' claim that Mr. Dimon breached his fiduciary duties for failure to meet the "most difficult theory" imposed under *Caremark.*

The Complaint principally alleges that Mr. Dimon breached his duty of loyalty, under *Caremark*, by allegedly failing to oversee risks arising from Epstein's banking activities. *See* Compl. ¶ 212. *Caremark* claims have historically concerned directors; Delaware law only very recently extended them to officers. *In re McDonald's Corp. S'holder Derivative Litig.*, 289 A.3d 343, 358 (Del. Ch. 2023). In *McDonald's*, the Court declined to dismiss a *Caremark* claim against the Global Chief People Officer of McDonalds because he ignored 18 particularly pleaded red flags indicating the executive's plain and obvious awareness that the company was violating law prohibiting sexual harassment. *Id*. at 359. The red flags included, for example: (i) complaints about the conduct of executives; (ii) two instances in which a dozen employees complained to the EEOC about sexual harassment and misconduct; (iii) a company walkout across thirty cities to protest sexual harassment; (iv) the defendant officer's personal engagement in sexual harassment witnessed by 30 employees, leading to discipline by the audit committee; (v) letters from U.S. Senators probing sexual harassment; and (vi) receiving specific information that the CEO was engaged in a prohibited relationship with an employee. *Id.* at 378. Thus, the court drew a pleadings stage inference that the defendant consciously and in bad faith ignored red flags that the company engaged in sexual harassment and misconduct. *Id.* at 379.

Here, Plaintiffs seek to pursue a red flag theory of liability against Mr. Dimon.  *See*

Compl. ¶ 212.[12]  But in stark contrast to *McDonald's*, the allegations relating to Mr. Dimon are

largely fantastical, unrelated to any knowledge of Epstein, much less Epstein's criminal

activities, and thus come nowhere close to stating a claim.  Unlike the allegations in

*McDonald's*, there are no allegations of the widespread, obvious awareness generated by things

like public walkouts across the nation, letters from U.S. Senators, or dozens of complaints to

U.S. agencies.  Fatally, the Complaint fails to allege that Mr. Dimon had any actual role in the

decision to retain Mr. Epstein as a client or any role in SARs filings, BSA/AML compliance, or

reporting of potential wrongdoing to law enforcement.  Likewise, the Complaint fails to allege

with specificity that Mr. Dimon was aware of any red flags concerning Epstein's criminal

activities, much less that he personally engaged in the purported red flag behavior like the officer

in *McDonald's*.  This is fatal because, under *McDonald's*, to establish breach of the duty of

oversight, plaintiffs must establish that the officer was in fact responsible for receiving and

addressing the supposed red flags.  *See In re McDonald's*, 289 A.3d at 350.

Plaintiffs cannot salvage a claim by offering mere speculation based on a single

document that neither is addressed to nor copied Mr. Dimon, referring to a potential "Dimon

review."  Compl. ¶¶ 19, 136.  The Complaint does not identify the employee who sent the email

or explain the nature of the supposed "review."  Further, the Complaint conspicuously fails to

allege that the review occurred.[13]  This is no doubt because Plaintiffs have no ground to believe

---

[12] The Complaint does not assert officer liability under *Caremark* prong one (*i.e.*, failure to set
up monitoring).  Nor could it, since the Complaint instead takes the tack of asserting
(unsuccessfully) that information about Epstein's activities was available.

[13] *See* Compl. ¶ 19 ("Whether Staley blocked the expected 'Dimon review' or someone with
authority (such as Dimon or a Board member) provided informal and tacit support to Epstein and
thus obviated the formal "Dimon review" process, Epstein remained with JPM."), *id.* ¶ 136
("The fact that Epstein's account status was expected to be presented to Dimon suggests either

21

that the review occurred.  And, even if such a review did occur (which the Complaint does not

allege), the Complaint fails to plead what information was made available to Mr. Dimon or what

decision he even purportedly made.

None of the Complaint's other allegations are sufficient either.  The long and winding

story of Mr. Epstein's supposed connections to members of the Columbus business community

and the utterly unrelated support for Mr. Dimon from the Columbus business community is pure

innuendo.  The Complaint nowhere alleges that any of Mr. Dimon's Columbus business contacts

introduced Mr. Epstein to Mr. Dimon, much less alerted Mr. Dimon about Mr. Epstein's sexual

crimes or raised any concern to Mr. Dimon about JPMorgan's due diligence or compliance

efforts with respect to Mr. Epstein's accounts.  The Complaint similarly does not allege that Mr.

Dimon was aware that Mr. Epstein was involved in the meetings Mr. Staley purportedly

attempted to schedule on Mr. Dimon's behalf, that those meetings occurred, or that, even if the

meetings occurred, Mr. Dimon would have learned anything about Mr. Epstein's criminality or

JPMorgan's compliance efforts through said meetings.

Finally, separate from and in addition to all the failings already pointed out, none of these

allegations come close to establishing any basis for inferring that Mr. Dimon acted in conscious

bad faith—an absolute prerequisite to Plaintiffs' claim under Delaware law.  *See Horman* v.

*Abney*, No. CV 12290-VCS, 2017 WL 242571, at *9 (Del. Ch. Jan. 19, 2017) (even if reporting

systems did not prevent corporate wrongdoing, no oversight claim without bad faith).  At

bottom, the Complaint against Mr. Dimon seeks impermissibly to articulate a *res ipsa loquitur*

theory—Mr. Epstein engaged in abhorrent conduct, the Bank allegedly failed to comply with

_____

that it was (as per known internal protocols) or that the matter was resolved in favor of keeping
Epstein without forcing Dimon to leave a paper trail of his involvement in the matter.").

BSA/AML requirements with respect to Epstein's accounts or timely close those accounts, Mr. Dimon was the Chairman of the Board and CEO, so he must be responsible.  But such theories are insufficient:  "Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and [defendants] must have known so."  *Genworth Fin., Inc. Consol. Derivative Litig.*, No. CV 11901-VCS, 2021 WL 4452338, at *13 (Del. Ch. Sept. 29, 2021).

To the extent the Complaint purports to assert that Mr. Dimon breached his duty of care, *see, e.g.*, Compl. ¶ 209, the Court should also dismiss that claim.  "The fiduciary duty of care requires that officers and directors both: (1) use that amount of care which ordinarily careful and prudent men would use in similar circumstances; and (2) make business decisions by consider[ing] all material information reasonably available."  *In re: Old Bpsush, Inc.*, No. 16-12373 (BLS), 2021 WL 4453595, at *8 (D. Del. Sept. 29, 2021) (internal quotation marks omitted).  A breach of the duty of care requires a showing of "gross negligence."  *Id.*  Plaintiffs must "plausibly show[]" that the Mr. Dimon was "recklessly uninformed or acted outside of the bounds of reason."  *Id.* (internal quotation marks omitted).

The Complaint does not plausibly show that Mr. Dimon acted with "gross negligence" for the same reasons that it fails to allege he acted in bad faith, that he had knowledge that the Company allegedly was not complying with BSA/AML requirements with respect to Epstein's accounts, or that he even had any role in BSA/AML compliance relating to Epstein's accounts. Instead, the allegations are purely conclusory.  *See, e.g.*, *Harcum* v. *Lovoi*, C.A. No. 2020-0398-PAF, 2022 WL 29695, at *26-27 (Del. Ch. Jan. 3, 2022) (dismissing duty of care claims where allegations as to officers' conduct were conclusory); *City of Warren Gen. Emps.' Ret. Sys.* v.

*Roche*, 2020 WL 7023896, at *19 (Del. Ch. Nov. 30, 2020) (dismissing duty of care claim where complaint did not allege that officers were involved in allegedly misleading proxy).

### D.     The Complaint Fails to State a Claim for Unjust Enrichment

Finally, Plaintiffs have also failed to state a claim against any Defendant for unjust enrichment.  Under Delaware law, a claim of unjust enrichment requires showing "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law."  *Cantor Fitzgerald, L.P.* v. *Cantor*, 724 A.2d 571, 585 (Del. Ch. 1998).

Plaintiffs' claim fails at the outset, as the Complaint does not contain well-pleaded facts suggesting that a single Defendant was enriched beyond their ordinary compensation.  *See* Compl. ¶ 217; *In re Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453, 465-66 (S.D.N.Y. 2010) (applying Delaware law and denying claims for unjust enrichment absent support for the proposition "that the mere retention of directors' and officers' ordinary compensation can sustain an unjust enrichment claim predicated on allegations that these defendants breached their fiduciary duties").  Plaintiffs also make no allegation that they were "impoverished" by the Defendants' ordinary compensation, and therefore cannot satisfy any of the remaining elements of the five-part test under *Cantor*.

Plaintiffs' claim for unjust enrichment also fails because it is premised solely on Plaintiffs' breach of fiduciary duty claim—which itself is deficient for the reasons stated above. *See supra* Section IV.B–C.  Under Delaware law, "[a]t the pleadings stage, an unjust enrichment claim that is entirely duplicative of a breach of fiduciary duty claim . . . is frequently treated in the same manner when resolving a motion to dismiss."  *Caspian Select Credit Master Fund Ltd.* v. *Gohl*, No. CV 10244-VCN, 2015 WL 5718592, at *16 (Del. Ch. Sep. 28, 2015) (quoting

*Calma ex rel. Citrix Sys., Inc.* v. *Templeton*, 114 A.3d 563, 591 (Del. Ch. 2015)).  Here, the

unjust enrichment claim is explicitly predicated on Defendants' alleged breaches of fiduciary

duties.  Compl. ¶¶ 217, 219 (alleging Defendants should not retain the unspecified benefits they

allegedly received "only by virtue of breaching their fiduciary duties").  Defendants' alleged

unjust enrichment is therefore "not separate or distinct from the alleged breach of fiduciary duty,

except as to the existence of such a duty."  *Manbro Energy Corp.* v. *Chatterjee Advisors, LLC*,

No. 20 CIV. 3773 (LGS), 2021 WL 2037552, at *9 (S.D.N.Y. May 21, 2021) (applying

Delaware law).

Accordingly, the unjust enrichment claim should be dismissed both because no actual

enrichment is alleged, and because it is duplicative of the defective fiduciary duty claim.

## V.   Conclusion

For the foregoing reasons, the Complaint should be dismissed with prejudice.[14]

Dated:   July 6, 2023

---

[14] Any dismissal should be with prejudice, as Plaintiffs have already filed two prior complaints prior to the operative complaint.  Certainly Plaintiffs should not be permitted to amend to add allegations that were already public when the Complaint was filed – particularly given that the claims are based on allegations brought in two related cases pending before the Court, *Jane Doe 1* v. *JPMorgan Chase Bank, N.A.*, 22-cv-10019 (JSR) (S.D.N.Y. 2022), and *U.S. Virgin Island* v. *JPMorgan Chase Bank, N.A.*, 23-cv-10904 (S.D.N.Y. 2023), and significant Epstein-related materials have been released into the public domain from these cases and other sources.

**WILMER CUTLER PICKERING HALE AND DORR LLP**

By:  */s/ Timothy Perla*
Timothy Perla
60 State Street
Boston, MA  02109
(t) (617) 526-6000
(f) (617) 526-5000
timothy.perla@wilmerhale.com

Noah A. Levine
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(t) (212) 230-8800
(f) (212) 230-8888
noah.levine@wilmerhale.com

*Counsel for Defendants JPMorgan Chase & Co. and James Dimon*

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

By:  */s/ Audra J. Soloway*
Audra J. Soloway
Jessica S. Carey
Jacobus J. Schutte
1285 Avenue of the Americas
New York, NY  10019-6064
Phone:  (212) 373-3000
Fax:  (212) 757-3990
asoloway@paulweiss.com

*Counsel for Director Defendants Stephen B. Burke, Todd A. Combs, James S. Crown, Timothy P. Flynn, Mellody Hobson, John W. Kessler, and Phebe N. Novakovic*