**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| IN RE JP MORGAN CHASE & CO. DERIVATIVE LITIGATION |

**Master Case No. 1:23-CV-03903 (JSR)**

**DERIVATIVE ACTION**

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTIONS TO DISMISS**

## TABLE OF CONTENTS

**Page**

CITATION CONVENTIONS ......................................................................... iii

TABLE OF AUTHORITIES ........................................................................... iv

PRELIMINARY STATEMENT ........................................................................ 1

FACTUAL BACKGROUND ............................................................................ 4

I.     COMPLIANCE WITH BSA/AML REGULATIONS IS MISSION-CRITICAL............. 4

II.    JPM FAILED TO EVEN ATTEMPT TO COMPLY WITH ITS BSA/AML
       OBLIGATIONS WHILE EPSTEIN WAS A CLIENT ...................................... 5

III.   THE BOARD FAILED TO COMPLY WITH THE CONSENT ORDER AND
       DPA AFTER THE EPSTEIN RELATIONSHIP WAS TERMINATED......................... 5

IV.    DEFENDANTS' BREACHES OF DUTY SIGNIFICANTLY HARMED JPM.............. 7

ARGUMENT ............................................................................................. 7

I.     DEMAND IS EXCUSED BECAUSE A MAJORITY OF THE BOARD COULD
       NOT IMPARTIALLY CONSIDER A DEMAND ............................................. 7

       A.    DIMON FACES A SUBSTANTIAL LIKELIHOOD OF LIABILITY FOR TURNING A
             BLIND EYE TO THE COMPANY'S LEGAL VIOLATIONS WITH RESPECT TO
             EPSTEIN ..................................................................................... 9

       B.    BURKE, CROWN, AND FLYNN FACE A SUBSTANTIAL LIKELIHOOD OF
             LIABILITY FOR FAILING TO IMPLEMENT BSA/AML BOARD LEVEL
             REPORTING SYSTEMS .................................................................. 11

       C.    BAMMANN, BURKE, COMBS, CROWN, FLYNN, AND NEAL FACE A
             SUBSTANTIAL LIKELIHOOD OF LIABILITY FOR FAILING TO COMPLY WITH
             THE DPA AND CONSENT ORDERS .................................................. 16

       D.    NOVAKOVIC AND BAMMANN LACK INDEPENDENCE ............................. 18

       E.    DEMAND IS EXCUSED AS TO THE CLAIM AGAINST STALEY AND THE UNJUST
             ENRICHMENT CLAIM .................................................................... 21

II.    THE RULE 12(B)(6) MOTIONS MUST BE DENIED BECAUSE THE
       COMPLAINT STATES CLAIMS FOR BREACH OF FIDUCIARY DUTY AND
       UNJUST ENRICHMENT .................................................................... 22

       A.    THE COMPLAINT STATES BREACH OF FIDUCIARY DUTY CLAIMS AGAINST
             DIMON, BURKE, COMBS, CROWN, FLYNN, AND KESSLER ..................... 22

       B.    THE COMPLAINT STATES AN UNJUST ENRICHMENT CLAIM AGAINST ALL
             DEFENDANTS .............................................................................. 23

       C.    STALEY'S RULE 12(B)(6) ARGUMENTS ARE MERITLESS ..................... 23

             1.    The Complaint States a Fiduciary Breach Claim Against Staley ............ 23

      2.      The Claims Against Staley Are Timely ................................................... 24

      3.      Staley's Claims-Splitting Argument Fails ............................................... 25

CONCLUSION ................................................................................................................ 25

## <u>CITATION CONVENTIONS</u>

| | |
|---|---|
| Verified Amended Stockholder Derivative Complaint (Doc. 17). | ¶__. |
| Memorandum of Law in Support of Defendants' Motion to Dismiss (Doc. 25). | DOB __. |
| Defendant James E. Staley's Memorandum of Law in Support of Motion to Dismiss Complaint (Doc. 29). | SOB __. |
| Exhibit to the Declaration of Christine M. Mackintosh in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions to Dismiss. | Ex. __. |

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re BGC P'rs, Inc. Derivative Litig.*,
    2019 WL 4745121 (Del.Ch.) ................................................................................7

*Braddock v. Zimmerman*,
    906 A.2d 776 (Del. 2006) ...................................................................................9

*C.f. Mason-Mahon v. Flint*,
    166 A.D.3d 754 (N.Y. App. 3d 2018) ................................................................14

*Calma v. Templeton*,
    114 A.3d 563 (Del. Ch.)....................................................................................23

*In re CBS Corp. S'holder Class Action & Derivative Litig.*,
    2021 WL 268779 (Del. Ch.) .............................................................................22

*In re Clovis Oncology, Inc. Derivative Litig.*,
    2019 WL 4850188 (Del. Ch.) ...........................................................................12

*Curtis v. Citibank, N.A.*,
    226 F.3d 133 (2d Cir. 2000)..............................................................................25

*Delaware Cty. Emps. Ret. Fund v. Sanchez*,
    124 A.3d 1017 (Del. 2015) ...............................................................................18

*In re Delta & Pine Land Co. S'holders Litig.*,
    2000 WL 875421 (Del. Ch.) .............................................................................21

*Epiphany Cmty. Nursery Sch. v. Levey*,
    171 A.D.3d 1 (2019) .........................................................................................25

*In re Ezcorp Inc Consulting Agreement Derivative Litig.*,
    2016 WL 301245 (Del. Ch.) .....................................................................3, 19, 20

*Helprin v. Harcourt, Inc.*,
    277 F. Supp. 2d 327 (S.D.N.Y. 2003)...................................................................6

*Howe v. Bank of N.Y. Mellon*,
    783 F. Supp. 2d 466 (S.D.N.Y. 2011).................................................................24

*Hughes v. Xiaoming Hu*,
    2020 WL 1987029 (Del. Ch.) .............................................................2, 11, 12, 16

*Jane Doe 1 v. JPMorgan Chase Bank, N.A.*,
    2023 WL 3167633 (S.D.N.Y. May 1, 2023) ................................................................ *passim*

*Khan v. Portnoy*,
    2008 WL 5197164 (Del. Ch.) .................................................................................20

*Largo Legacy Grp., LLC v. Charles*,
    2021 WL 2692426 (Del. Ch.) .................................................................................24

*Marchand v. Barnhill*,
    212 A.3d 805 (Del. 2019) ...........................................................................11, 14, 15

*Marino v. Grupo Mundial Tenedora S.A*,
    810 F. Supp. 2d 601 (S.D.N.Y. 2011)......................................................................24

*In re Massey Energy Co. Derivative and Class Action Litig.*,
    2011 WL 2176479 (Del. Ch.) .............................................................................9, 14

*In re McDonald's Corp. S'holder Derivative Litig.*,
    289 A.3d 343 (Del. Ch.)......................................................................................9, 23

*Melbourne Mun. Firefighters' Pension Tr. Fund on Behalf of Qualcomm, Inc. v. Jacobs*,
    2016 WL 4076369 (Del. Ch.) .................................................................................15

*Metro Commc'n Corp. BVI v. Advanced Mobilecom Techs. Inc.*,
    854 A.2d 121 (Del. Ch.).........................................................................................11

*Meyers v. Keeler*,
    414 F. Supp. 935 (W.D. Okla. 1976) ......................................................................22

*Off v. Ross*,
    2008 WL 5053448 (Del. Ch.) .................................................................................20

*Ontario Provincial Council of Carpenters' Pension Trust Fund v. Walton*,
    2023 WL 3093500 (Del. Ch.) .................................................................................14

*In re Oxford Health Plans, Inc.*,
    192 F.R.D. 111 (S.D.N.Y. 2000) ............................................................................14

*In re Pfizer Inc. S'holder Deriv. Litig.*,
    722 F. Supp. 2d 453 (S.D.N.Y. 2010)............................................................. *passim*

*In re Pilgrim's Pride Corp. Derivative Litig.*,
    2019 WL 1224556 (Del. Ch.) .................................................................................20

*In re Ply Gem Indus., Inc. S'holders Litig.*,
    2001 WL 1192206 (Del. Ch.) .................................................................................20

*Ret. Fund v. Collis*,
   2022 WL 17841215 (Del. Ch.) ......................................................................13

*Ret. Fund v. Collis*,
   287 A.3d 1160 (Del. Ch.) ............................................................................24

*Ret. Sys. v. Pyott*,
   46 A.3d 315 (Del. Ch.) ............................................................................8, 11

*Rich v. Chong*,
   66 A.3d 963 (Del. Ch.) ................................................................................11

*Sandys v. Pincus*,
   152 A.3d 124 (Del. 2016) ............................................................................18

*Silverzweig v. Unocal Corp.*,
   1989 WL 3231 (Del. Ch.), *aff'd sub nom.*, *Silversweig v. Unocal Corp.*, 561
   A.2d 993 (Del. 1989) ...................................................................................22

*Staehr v. Hartford FiFin. Servs.Grp., Inc.*,
   547 F.3d 406 (2d Cir. 2008) .........................................................................11

*Teamsters Local 443 Health Servs. & Ins. Plan v. Chou*,
   2020 WL 5028065 (Del Ch.) ................................................................2, 9, 21

*In re Tesla Motors, Inc. S'holder Litig.*,
   2018 WL 1560293 (Del. Ch.) .......................................................................20

*In re Tyson Foods, Inc.*,
   919 A.2d 563 (Del. Ch.) ...............................................................................24

*United Food & Commercial Workers Union & Participating Food Indus. Emps.
   Tri-State Pension Fund v. Zuckerberg*,
   262 A.3d 1034 (Del. 2021) .............................................................................8

*Westmoreland Cty. Emp. Ret. Sys. v. Parkinson*,
   727 F.3d 719 (7th Cir. 2013) ........................................................................18

*Whittington v. Dragon Grp., LLC*,
   991 A.2d 1 (Del. 2009) .................................................................................24

## Other Authorities

Khadeeja Safdar, David Benoit, *Jamie Dimon Says He Never Discussed Jeffrey
   Epstein's Accounts at JPMorgan; Jes Staley Says Dimon Did*, WALL STREET
   JOURNAL (May 31, 2023) ..............................................................................10

Rule 12(B)(6) ...........................................................................................22, 23

Rule 23.1 ........................................................................................................................9, 22

Plaintiffs, derivatively on behalf of Nominal Defendant JPMorgan Chase & Co. ("JPM" or the "Company"), submit this memorandum of law in opposition to the motions to dismiss filed by Defendants and Nominal Defendant JPM (the "Motions").[1]

## PRELIMINARY STATEMENT

For fifteen years, JPM allowed a known felon convicted of soliciting a minor for prostitution and widely identified as having engaged in rampant sexual abuse to use the Company's facilities to further his criminal scheme. Epstein's abhorrent crimes received global attention and were well known throughout the organization, prompting many—including the Company's General Counsel and the CEO of the Company's Private Bank—to sound the alarm about the need to sever the relationship. But Epstein was also a very valued client with close ties to JPM second-in-command James E. Staley, and so the Company instead condoned Epstein's use of the Company to perpetuate his criminal activities, violating BSA and AML laws and regulations in the process.

The threshold question presented by the Motions is whether demand on the Board to sue Defendants, including CEO Jamie Dimon, would have been futile. The answer to that question is "yes" where, as here, at least half of the board at the time the original complaint was filed (the "Demand Board") either face a substantial likelihood of liability or lack independence from someone who faces a substantial likelihood of liability. Here, seven members of the twelve-person Demand Board face a substantial likelihood of liability and an additional member lacks independence, excusing demand as to all counts.

Dimon faces a substantial likelihood of liability because the Complaint's particularized allegations support a pleading-stage inference that Dimon knew JPM was violating the law by

---

[1] Capitalized terms used herein but not otherwise defined have the meanings ascribed to them in the Verified Amended Stockholder Derivative Complaint. Unless otherwise noted, all citations are omitted and all emphasis is added.

facilitating Epstein's crimes, but took no action. Several members of JPM management who report directly to Dimon knew by no later than 2006 that Epstein was abusing underage girls and paying victims in cash. A 2008 document contemplated terminating JPM's relationship with Epstein "pending Dimon review." Staley testified that he spoke with Dimon about whether to maintain Epstein as a client in 2006 when he was arrested, in 2008 when he pleaded guilty, and several other times before 2012. These and other particularized allegations support a pleading-stage inference that Dimon was aware of "corporate misconduct"—the "proverbial 'red flag'"—yet breached his duty of loyalty by "consciously disregard[ing his] duty to address that misconduct." *Teamsters Local 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065, at *17 (Del Ch.).

The Board members at the time Epstein was a client (*e.g.*, Burke, Crown, and Flynn), for their part, face a substantial likelihood of liability for failing to "establish[] [the Board's] own reasonable system of [BSA/AML compliance] monitoring and reporting, choosing instead to rely entirely on management." *Hughes v. Xiaoming Hu*, 2020 WL 1987029, at *16 (Del. Ch.). "*Caremark* envisions some degree of board-level monitoring system, not blind deference to and complete dependence on management." *Id.* at *4. Blind deference to and complete dependence on management is the only explanation for the Board's apparent failure to learn of Epstein's activities (and JPM's concomitant violations of law) while he was a client. Indeed, the Board's failure to establish its own system of BSA/AML compliance monitoring is confirmed by the 2013/2014 findings of the DOJ and OCC, who uncovered the same BSA/AML noncompliance that facilitated Epstein's crimes, levied criminal fines of $2.1 billion, and entered into a deferred prosecution agreement ("DPA") with JPM in connection with the Madoff Ponzi scheme.

Even after the Epstein relationship was terminated, and contrary to Defendants' claim that post-Epstein Board members did nothing wrong, the Board (*e.g.*, Dimon, Bammann, Burke,

Combs, Crown, Flynn, and Neal) continued breaching their duties. The Madoff DPA and Consent Orders entered into as a result of the Board's oversight failures expressly obligated management to report *past* misconduct (*e.g.*, Epstein) to the Board. And—as Defendants appear to concede (DOB 7)—there is every reason to believe that management did so, including because JPM's General Counsel had previously sounded the alarm about Epstein and signed the DPA. Yet the Board—ignoring its obligation under the DPA and Consent Orders to ensure that information was provided to the DOJ—failed to require any retroactive SAR filings, failed to inform the DOJ or OCC of JPM's relationship with Epstein, and failed to hold any JPM executives accountable for facilitating Epstein's crimes. The Board's failure to comply with its heightened obligations makes the "inference of deliberate disregard by each and every member of the board…entirely reasonable." *In re Pfizer Inc. S'holder Deriv. Litig.*, 722 F. Supp. 2d 453, 462 (S.D.N.Y. 2010).

Finally, the Complaint's particularized allegations raise a reasonable doubt as to Novakovic and Bammann's ability to impartially consider authorizing a lawsuit against Crown and Dimon, respectively. Novakovic is the CEO of a company in which the Crown family has substantial influence and "Delaware decisions have recognized that when a director is employed by" a company "where the interested party who would be adversely affected by pursuing litigation controls or has substantial influence over those entities, a reasonable doubt exists about that director's ability to impartially consider a litigation demand." *In re Ezcorp Inc Consulting Agreement Derivative Litig.*, 2016 WL 301245, at *36 (Del. Ch.). Bammann faces similar independence concerns. She owes a significant portion of her professional success to Dimon, having worked under Dimon at both Bank One and JPM and having been appointed to the JPM Board in 2013—her sole employment since—when Dimon was Chairman and CEO. The requisite "nuanced and realistic approach" to assessing her independence leads to the inescapable

conclusion that she could not impartially consider a demand to sue Dimon for misconduct that could end his career.

Defendants' breaches of duty significantly harmed JPM. This action seeks to shift responsibility for that harm from JPM's stockholders to those responsible. None of Defendants' arguments support dismissal. The Motions should be denied.

## FACTUAL BACKGROUND

Plaintiffs assume the Court's familiarity with the Complaint and the *USVI* and *Doe* Actions and therefore only briefly summarize the Complaint's allegations below.

## I.    COMPLIANCE WITH BSA/AML REGULATIONS IS MISSION-CRITICAL

JPM has acknowledged in SEC filings that it "is subject to extensive and comprehensive regulation under U.S. federal and state laws." ¶¶49-50. JPM has also disclosed that failure to comply with banking laws and regulations can subject JPM to "significant penalties and collateral consequences," including "greater exposure to litigation" and reputational damage. ¶¶50-51.

Because JPM is susceptible to serving as a conduit for financial crimes, it is subject to a series of strict AML laws and regulations. ¶52. The BSA and Patriot Act require JPM to, *inter alia*, implement adequate risk-based AML policies and systems to detect and prevent money laundering and other uses of a bank's services and resources to facilitate criminal activity. ¶53. Such requirements include maintaining a due diligence program, filing SARs after detecting suspicious behavior, and filing currency transaction reports for transactions exceeding $10,000/day. *Id.*

Importantly, federal regulations require AML risk oversight at the **board** level. The FFIEC Manual provides, among other things, that "[t]he board of directors…is ultimately responsible for ensuring that the bank maintains an effective BSA/AML internal control structure, including suspicious activity monitoring and reporting." ¶¶54-55. According to the FFIEC Manual, customer due diligence policies and procedures are "critical" for "[a]voiding criminal exposure from persons

who use…the bank's products and services for illicit purposes." ¶56.

With respect to "high-risk customers," such as Epstein, the FFIEC Manual instructs that "[e]nhanced due diligence…is especially critical in understanding their anticipated transactions and implementing a suspicious activity monitoring system that reduces the bank's reputation, complaint, and transaction risks." ¶57. That suspicious activity monitoring system includes the filing of SARs, "the cornerstone of the BSA reporting system," if the bank knows, suspects, or has reason to suspect that a customer may be engaging in money laundering or other illegal activity. ¶58. Indeed, when a bank suspects suspicious activity, it *must* file a SAR within 30 days to the U.S. Department of Treasury's Financial Crimes Enforcement Network. ¶59. Upon the filing of a SAR, management should provide sufficient information in its SAR filings to the board—or an appropriate committee thereof—to fulfill its fiduciary duties. ¶60.

## II. JPM FAILED TO EVEN ATTEMPT TO COMPLY WITH ITS BSA/AML OBLIGATIONS WHILE EPSTEIN WAS A CLIENT

JPM onboarded Epstein in 1998. *Id.* By that time, he was well known for managing the fortunes of some of the world's richest and most powerful people. ¶¶8-9. And JPM was eager to curry favor with Epstein, as evidenced by its directive to Staley to "get to know him." ¶109.

Company executives—who knew for at least seven years that Epstein was engaged in criminal activity—repeatedly expressed the need to sever the relationship, but JPM nevertheless permitted Epstein to use his corporate accounts to further his criminal activities with impunity. *See, e.g.*, ¶¶113-22, 125-58. The Board, for its part, failed even to attempt to implement adequate AML risk oversight and, as a result, apparently remained ignorant to Epstein's crimes (or even the fact that Epstein was a client) until the relationship was terminated in 2013. *Id.*

## III. THE BOARD FAILED TO COMPLY WITH THE CONSENT ORDER AND DPA AFTER THE EPSTEIN RELATIONSHIP WAS TERMINATED

In January 2013, the OCC found (and JPM consented to entry of an order finding) in

connection with the Madoff Ponzi scheme that JPM (i) "failed to adopt and implement a compliance program that adequately covers the required BSA/AML program elements", (ii) "did not develop adequate due diligence on customers…a repeat problem, and failed to file all necessary SARs related to suspicious customer activity", and (iii) had numerous "critical deficiencies" in its BSA/AML compliance program, including "systemic deficiencies in its transaction monitoring systems, due diligence processes, risk management, and quality assurance programs." Ex. 1, Art. I.[2] In January 2014, the Company agreed to pay $2.1 billion in criminal fines and restitution (the largest BSA sanctions ever imposed) and entered into a DPA in which it admitted that it never filed a Madoff-related SAR over the course of several years despite suspicions about Madoff's Ponzi scheme. ¶¶170-71; DPA Ex. C ¶26.

As part of prosecutors' willingness to forego criminally prosecuting JPM for its Madoff misconduct, JPM agreed to implement numerous Board-level undertakings to affirmatively identify and report all suspicious activities and transactions. Among other things, the Consent Orders required the Board to (i) implement an exhaustive review of all past SAR filings and *ensure that any other potentially suspicious activity was identified and reported*, (ii) review all transactions by non-bank financial institutions, which would have included JPM's use of Highbridge Capital's private jets to transport girls for Epstein's sex trafficking operation (¶¶114-20), and (iii) oversee these reviews, with written findings "reported to the Board." *See* Ex. 1, Arts. VIII, IX. The Consent Orders were unequivocal that JPM's obligations to remedy its BSA compliance failures fell to the *Board*—not management—and that the "Board shall ensure that the

---

[2] The DPA is DOB Ex. 1 and the Consent Orders—attached hereto as Exs. 1-2—are referenced in the DPA and incorporated by reference into the Complaint. ¶¶170-71; *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 331 (S.D.N.Y. 2003) (documents incorporated by reference where, as here, the Complaint makes "a clear, definite and substantial reference to the documents").

Bank achieves and thereafter maintains compliance" with its obligations under the BSA and the Consent Orders. Ex. 1, Art. III(a)-(d).

Moreover, the DPA imposed an affirmative obligation on JPM to inform the DOJ of "all criminal conduct by JPMorgan or any of its employees…as to which JPMorgan's Board, senior management, or U.S. legal compliance personnel are aware" and any "violations of the BSA that have come to the attention of JPMorgan's U.S. legal and compliance personnel." DPA ¶¶10, 20. That unquestionably should have included Staley's, Cutler's, Erdoes', Dimon's and other executives' knowledge of JPM's role in Epstein's sex trafficking, but no SAR was filed and nothing about JPM's relationship with Epstein was reported to the DOJ. ¶¶189-90. Reporting JPM's involvement may have been a breach of the DPA and subjected JPM to criminal prosecution—an extraordinarily severe consequence that perhaps explains, but does not excuse, the Board's failure to report anything Epstein-related. Indeed, rather than take these steps, JPM Managing Directors Nelson and Barrett continued to meet frequently with Epstein in New York and at his Santa Fe ranch until at least 2017. ¶157 n.95.

## IV.   DEFENDANTS' BREACHES OF DUTY SIGNIFICANTLY HARMED JPM

As a result of Defendants' breaches, JPM has incurred significant costs, including the $290 million settlement of the *Doe* Action, litigation costs incurred in the *Doe* and *USVI* Actions, and reputational harm. The *USVI* Action remains pending and likely will result in further harm.

## <u>ARGUMENT</u>

## I.   DEMAND IS EXCUSED BECAUSE A MAJORITY OF THE BOARD COULD NOT IMPARTIALLY CONSIDER A DEMAND

The demand futility test focuses on "whether the derivative plaintiff has shown some reason to doubt that the board will exercise its discretion impartially and in good faith." *In re BGC P'rs, Inc. Derivative Litig.*, 2019 WL 4745121, at *6 (Del.Ch.). A plaintiff can show reason to

doubt a board's ability to exercise its discretion impartially and in good faith by adequately pleading that at least half of the directors (i) "face[] a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand" *or* (ii) "lack[] independence from someone who…would face a substantial likelihood of liability of any of the claims that are the subject of the litigation demand." *United Food & Commercial Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021). Defendants suggest that demand is excused only if at least half of the board face a substantial likelihood of liability, DOB 11-12, but the Delaware courts aggregate directors who face a substantial likelihood of liability and those who lack independence. *Zuckerberg*, 262 A.3d at 1059.

In evaluating a motion to dismiss for failure to make a demand, the Court "is required to accept the truth of all facts pleaded in the Complaint, and plaintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged." *Pfizer*, 722 F. Supp. 2d at 458. The particularity requirement does not obligate a plaintiff "to demonstrate a reasonable probability of success on the claim," only to "make a threshold showing…that [its] claims have some merit." *La. Mun. Emps.' Ret. Sys. v. Pyott*, 46 A.3d 315, 351 (Del. Ch.).

Demand is excused as to all counts because the Complaint adequately pleads that seven of twelve Demand Board directors face a substantial likelihood of liability and an additional director lacks independence:

| DIRECTOR | SUBSTANTIAL LIKELIHOOD OF LIABILITY | LACKS INDEPENDENCE |
|---|---|---|
| Dimon | X | |
| Bammann | X | X |
| Burke | X | |
| Combs | X | |
| Crown[3] | X | |

---

[3] Crown passed away in a tragic accident less than two months after the filing of the Original Complaint. Defendants concede (by silence), as they must, that the filing of the Amended

| Flynn | X | |
|---|:---:|:---:|
| Neal | X | |
| Novakovic | | X |

**A.** **DIMON FACES A SUBSTANTIAL LIKELIHOOD OF LIABILITY FOR TURNING A BLIND EYE TO THE COMPANY'S LEGAL VIOLATIONS WITH RESPECT TO EPSTEIN**

Dimon had oversight duties in his capacity as an officer and director. *In re McDonald's Corp. S'holder Derivative Litig.*, 289 A.3d 343, 369 (Del. Ch.). "An officer who receive[d] credible information indicating that the corporation is violating the law cannot turn a blind eye," *id.* at 370, because "Delaware law does not charter law breakers." *Massey*, 2011 WL 2176479, at *20. Rather, a fiduciary acts in bad faith where it "consciously disregard[s] its duty to address [corporate] misconduct." *Chou*, 2020 WL 5028065, at *17.

The following particularized allegations support a pleading-stage inference that Dimon knew that the Company was not complying with BSA/AML obligations with respect to Epstein but failed to cause the Company to sever its relationship with Epstein:

- The CEO of JPM's Asset and Wealth Management business—who reported directly to Dimon—knew in 2006 that Epstein was abusing women and underage girls and paying victims in cash. ¶131.

- A July 2008 document contemplates a conversation in which the CEO of JPM's Private Bank would tell Staley that "we are uncomfortable with Epstein and do not want to go to Cutler [JPM's General Counsel] for approval." ¶135.

- A month later, a JPM employee wrote that she "would count Epstein's assets as a probable outflow for '08 ($120mm or so?) as I can't imagine it will stay (***pending [Jamie] Dimon review***)." ¶136.

- Between 2009 and 2011, Epstein helped schedule meetings for Dimon with Benjamin

---

Complaint did not alter the relevant board for assessing demand futility. *See Braddock v. Zimmerman*, 906 A.2d 776, 786 (Del. 2006) ("[W]hen an amended derivative complaint is filed, the existence of a new independent board of directors is relevant to a Rule 23.1 demand inquiry only as to derivative claims in the amended complaint that are not already validly in litigation."). All of the claims in the amended complaint were already validly in litigation.

9

Netanyahu, Bill Gates, and Prince Andrew. ¶123.

- From 2006-2011, employees routinely raised concerns about Epstein. *See, e.g.*, ¶¶146-54.

- In July 2011, the Company's General Counsel emailed Staley and Erdoes that Epstein should not be a client. ¶155.

Despite these and other glaring red flags, Epstein remained a client until 2013.

Defendants effectively argue that the Complaint suffers from a lack of *proof*. To wit, Defendants assert, *inter alia*, that (i) "the Complaint fails to allege with specificity that Mr. Dimon was aware of any red flags concerning Epstein's criminal activities," (ii) fails to allege that Dimon conducted the contemplated review of Epstein, (iii) "fails to plead what information was made available to Mr. Dimon [for the review] or what decision he even purportedly made," and (iv) "does not allege that Mr. Dimon was aware that Mr. Epstein was involved in the meetings Mr. Staley purportedly attempted to schedule on Mr. Dimon's behalf[.]" DOB 21-22.

But proof is not required at the pleading stage, and Defendants cannot deny Plaintiffs the reasonable inferences to which they are entitled. It is possible that (i) the CEO did not know that one of his largest clients was using the Company to facilitate sex trafficking for over a decade; (ii) several members of senior management knew of Epstein's crimes but unilaterally chose to conceal this knowledge from the CEO; (iii) the contemplated "Dimon review" of Epstein never happened or Dimon was provided insufficient information; (iv) Dimon never asked Staley how he secured the meetings with Netanyahu, Gates, and/or Prince Andrew (or the meetings did not occur), ***and*** (v) Staley perjured himself when he testified that he discussed Epstein with Dimon in 2006 when Epstein was arrested, in 2008 when Epstein pleaded guilty, and at various other times about whether to maintain Epstein as a client.[4]

---

[4] Khadeeja Safdar, David Benoit, *Jamie Dimon Says He Never Discussed Jeffrey Epstein's Accounts at JPMorgan; Jes Staley Says Dimon Did*, WALL STREET JOURNAL (May 31, 2023), https://www.wsj.com/articles/jamie-dimon-says-he-never-discussed-jeffrey-epsteins-accounts-at-

But it is far more likely—and, at a minimum, reasonably inferable—that Dimon knew who Epstein was and what he was doing, but prioritized profits over legal compliance (or otherwise chose to put his head in the sand). *Metro Commc'n Corp. BVI v. Advanced Mobilecom Techs. Inc.*, 854 A.2d 121, 131 (Del. Ch.) ("[A] fiduciary may not choose to manage an entity in an illegal fashion."). At the motion to dismiss stage, the Court "must credit [the plaintiff-friendly] inference, even if [it] believe[s] it more likely that [Dimon] acted in good faith." *Pyott*, 46 A.3d at 356; *Pfizer*, 722 F. Supp. 2d at 458 (plaintiffs are entitled to "all reasonable inferences").

**B. BURKE, CROWN, AND FLYNN FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY FOR FAILING TO IMPLEMENT BSA/AML BOARD LEVEL REPORTING SYSTEMS**

Directors are obligated to ensure management has implemented mechanisms and procedures sufficient to identify, monitor, and mitigate risks, and that there is a reporting system in place that enables the *board* to be kept informed as to how effectively management deals with those risks. *See Hughes*, 2020 WL 1987029, at *13-14; *Rich v. Chong*, 66 A.3d 963, 983-84 (Del. Ch.). "*Caremark* envisions some degree of board-level monitoring system, not blind deference to and complete dependence on management." *Hughes*, 2020 WL 1987029, at *16. "The board is obligated to establish information and reporting systems that 'allow management and the board, ***each within its own scope***, to reach informed judgments concerning both the corporation's compliance with law and its business performance.'" *Id.* (quoting *Caremark*, 608 A.2d at 959).

Moreover, JPM is subject to extensive AML laws and regulations and JPM acknowledges in SEC filings that noncompliance can expose the Company "to significant penalties and collateral consequences." ¶¶49-60. "As *Marchand* makes clear, when a company operates in an environment

---

jpmorgan-jes-staley-says-dimon-did-b11f0da5. *See Staehr v. Hartford FiFin. Servs.Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (affirming the judicial notice of media reports and regulatory filings on a motion to dismiss).

where externally imposed regulations govern its 'mission critical' operations, the board's oversight function must be more rigorously exercised." *In re Clovis Oncology, Inc. Derivative Litig.*, 2019 WL 4850188, at *12 (Del. Ch.). "Delaware courts are more inclined to find *Caremark* oversight liability at the board level when the company operates in the midst of obligations imposed upon it by positive law yet fails to implement compliance systems, or fails to monitor existing compliance systems, such that a violation of law, and resulting liability, occurs." *Id.*

The Complaint's particularized allegations support a "pleading-stage inference that the board never established its own reasonable system of monitoring and reporting, choosing instead to rely entirely on management." *Hughes*, 2020 WL 1987029, at *16. Such an inference is supported by the fact that, as Defendants claim, Epstein's use of JPM to further his criminal scheme was never discussed at the Board level despite the national attention Epstein received and management's knowledge that the Company should not be doing business with Epstein, including:

- When Epstein was onboarded in 1998, Know Your Customer due diligence would have unearthed the investigation into Epstein's alleged insider trading while at Bear Stearns and his proximity to the Tower Financial Ponzi scheme. ¶¶63, 112.

- Epstein's 2006 arrest for soliciting a minor for prostitution received national attention and was discussed at the upper levels of JPM management. ¶¶126-31.

- The Company was aware by 2006 that Epstein was abusing women and underage girls and was paying the victims in cash. ¶131.

- Epstein's 2008 guilty plea for soliciting a minor for prostitution received national attention and caused some JPM employees, including the CEO of the Company's Private Bank, to advocate dropping him as a client. ¶¶133-35.

- In 2010, memos from JPM compliance reference a federal investigation into Epstein. An employee in JPM's risk management division referred to "new allegations of an investigation related to child trafficking," and asked whether JPM was "still comfortable with this client who is now a registered sex offender." ¶¶146-47.

- In January 2011, JPM conducted a review of Epstein's accounts because a "few news stories during 2010 connect[ed] Jeffrey Epstein to human trafficking." ¶149.

- In March 2011, JPM's Global Corporate Security Division internally reported that

"[n]umerous articles detail various law enforcement agencies investigating Jeffrey Epstein for allegedly participating, directly or indirectly, in child trafficking and molesting underage girls." ¶151.

- In 2011, a senior JPM compliance official reviewed the Company's relationship with Epstein and warned that there was "[l]ots of smoke" and [l]ots of questions" surrounding Epstein's criminal behavior, including, *inter alia*, that (i) Epstein "is alleged to be involved in the human trafficking of young girls," (ii) AML Operations was "requesting that we exit this relationship," and (iii) JPM had "extended Epstein a loan in relation to [a] modeling agency" that was under DOJ investigation. ¶154.

- In July 2011, Cutler emailed Staley and Mary Erdoes (CEO of JPM's Asset and Wealth Management business), among others, that Epstein "***is not an honorable person in any way. He should not be a client***" and later emailed Erdoes, "***I would like to put it and him behind us. Not a person we should do business with, period.***" ¶155.

- In August 2011, Ghislaine Maxwell applied to open a new account for a "personal recruitment consulting business," prompting the Company's AML director to ask: "What does she mean by personal recruitment?? Are you sure this will have nothing to do with Jeffrey? If you want to proceed, I suggest that we flag this as a High Risk Client." ¶156.

One would have imagined that at least some of that information about one of the Company's largest clients would have made its way to the Board; Defendants insist that it did not.

Although the Board apparently did not know, Epstein's use of the Company to further his well-publicized sex-trafficking operation—and the Company's concomitant breaches of its BSA/AML obligations—were happening in plain sight. In 2006, the JPM Rapid Response Team noted that Epstein routinely withdrew ***$40,000 to $80,000 in cash*** from his accounts ***several times each month***—which, according to Dimon, would have been visible to JPM in real time (¶163)— yet the Company failed to file SARs as required by federal law. ¶¶131, 159. At least 20 women trafficked and abused by Epstein were paid through JPM accounts between 2003 and 2013, many of whom had Eastern European surnames that were publicly and internally identified as Epstein recruiters and/or victims. ¶164. And Epstein paid an additional $1.5 million to well-known recruiters. ¶165. Simply put, management "did not just see red flags; they were wrapped in them." *Lebanon Cty. Emps.' Ret. Fund v. Collis*, 2022 WL 17841215, at *16 (Del. Ch.).

But it was the Board that was "ultimately responsible for ensuring that the bank maintains an effective BSA/AML internal control structure, including suspicious activity monitoring and reporting." ¶55. The Board's utter failure to install oversight systems apparently blinded the Board to Epstein's use of JPM to further his criminal activity for *years*. *C.f. Mason-Mahon v. Flint*, 166 A.D.3d 754, 759 (N.Y. App. 3d 2018) ("In view of the illegal purpose, magnitude, and duration of the alleged wrongdoing…the allegations were such that the [wrongdoing] should have come to the attention of…the board of directors."). "When a plaintiff can plead an inference that a board has undertaken no efforts to make sure it is informed of a compliance issue intrinsically critical to the company's business operation, then that supports an inference that the board has not made the good faith effort that *Caremark* requires." *Marchand v. Barnhill*, 212 A.3d 805, 822 (Del. 2019); *In re Oxford Health Plans, Inc.*, 192 F.R.D. 111, 117 (S.D.N.Y. 2000) (applying Delaware law) ("[W]here liability is based upon a failure to supervise and monitor, and to keep adequate supervisory controls in place, demand futility is ordinarily found, especially where the failure involves a scheme of significant magnitude and duration which went undiscovered by the directors.").[5]

JPM's admissions (and the government's findings) in connection with JPM's complicity in the Bernie Madoff scandal confirm that the Board failed to undertake required efforts to inform itself of BSA/AML compliance. *See In re Massey Energy Co. Derivative and Class Action Litig.*, 2011 WL 2176479, at *21 (Del. Ch.) (looking to company's record as a "recidivist" in assessing

---

[5] *See also Ontario Provincial Council of Carpenters' Pension Trust Fund v. Walton*, 2023 WL 3093500, at *33 (Del. Ch.) ("If the corporate trauma resulted from a central compliance area that fiduciaries acting in good faith would monitor, and if the corporate fiduciaries did not have a monitoring system that reflects a good faith effort to bring timely and actionable information to their attention, then the absence of such a system may support an inference that the corporate fiduciaries willfully blinded themselves to a known risk.").

*Caremark* claim). The Madoff Ponzi scheme was conducted almost exclusively through JPM accounts and JPM settled two felony violations—and paid a $1.7 billion criminal fine (the largest such sanction ever)—stemming from its failure to alert authorities to suspicious activity. ¶170. Defendants claim that Madoff is unrelated to Epstein, DOB 7, but the oversight deficiencies that enabled the Madoff Ponzi scheme were the same as those that enabled Epstein's crimes.

Indeed, the OCC found that JPM "***failed to adopt and implement a compliance program that adequately covers the required BSA/AML program elements due to an inadequate system of internal controls, and ineffective independence testing***." Ex. 1, Art. I. The OCC highlighted JPM's "previously identified systemic weaknesses in the adequacy of customer due diligence and the effectiveness of monitoring…constituting a deficiency in its BSA/AML compliance programs." *Id.* JPM—including the Board—was ordered to take a series of actions to comply with their BSA/AML reporting obligations, *id.*, Arts. II-IV, IX-X, XII, confirming the Board's prior failure to make "the good faith effort that *Caremark* requires." *Marchand*, 212 A.3d at 822.

Defendants' arguments leave them in a *Caremark* catch-22. They assert that JPM implemented robust systems to identify suspicious activity, but also that these "robust" systems left them unaware of Epstein's crimes (or even that he was a client). DOB 13-16. Defendants cannot have it both ways. Epstein was not just any client; he was an extremely valuable client that repeatedly met with JPM's most senior executives. And his transgressions were not isolated, secret, or insignificant; they were repeated, well known, and abhorrent. If JPM had implemented robust systems to identify suspicious activity, the Board necessarily would have known that one of JPM's largest clients was using the corporate machinery to further his sex-trafficking operation. If it knew, the Board breached its duties by failing to promptly sever the relationship and report Epstein's misconduct. *Melbourne Mun. Firefighters' Pension Tr. Fund on Behalf of Qualcomm,*

*Inc. v. Jacobs*, 2016 WL 4076369, at *12 (Del. Ch.) (when board learns of illegality, it has an "immediate duty" to alter the company's "business practices"). If it did not know—as Defendants say—the Board breached its duties because *Caremark* does not permit "blind deference to and complete dependence on management." *Hughes*, 2020 WL 1987029, at *16.

Defendants otherwise engage in misdirection. They claim that the Complaint concedes that JPM had robust systems in place, DOB 16; SOB 11, but ignore that the Complaint speaks to *management* reporting systems, not the *board* level reporting systems required by Delaware law.[6] Indeed, despite relying on the DPA, Defendants ignore that the DOJ's and OCC's findings confirm the lack of a board level reporting system. Defendants separately assert that the existence of Audit and Risk Committees forecloses a *Caremark* prong one claim, DOB 16, but in fact "[t]he mere existence of an audit committee and the hiring of an auditor does not provide universal protection against a *Caremark* claim." *Hughes*, 2020 WL 1987029, at *14.

*     *     *

JPM violated the law by allowing Epstein to use the Company to further his repugnant crimes for more than a decade. The particularized allegations support a pleading-stage inference that the Board willfully blinded itself to BSA/AML compliance, in breach of its duty of loyalty. The Board members who served while Epstein was a client—including Burke, Crown, and Flynn (and Dimon and Kessler)—thus face a substantial likelihood of liability.

### C.   BAMMANN, BURKE, COMBS, CROWN, FLYNN, AND NEAL FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY FOR FAILING TO COMPLY WITH THE DPA AND CONSENT ORDERS

In connection with entering into the DPA and Consent Orders, JPM agreed to (i) implement

---

[6] Defendants' authority undercuts their claim. *See* SOB 11 (citing *In re Gen. Motors Co. Derivative Litig.*, 2015 WL 3958724, at *14 (Del. Ch.) (dismissing claim because company "had a system **for reporting risk to the Board,** but in [plaintiff]s view it should have been a better system").

an exhaustive review of all past SARs filings and ***ensure that any other potentially suspicious activity was identified and reported***, (ii) review all transactions by non-bank financial institutions, and (iii) oversee these reviews, with written findings "reported to the Board." *See* Ex. 1, Arts. VIII, IX. The Board was required to "ensure that the Bank achieves and thereafter maintains compliance" with its obligations under the Consent Orders. Ex. 1, Art. III(a)-(d); *supra*, Factual Background §III. And JPM was required to inform the DOJ of "all criminal conduct by JPMorgan or any of its employees…as to which JPMorgan's Board, senior management, or U.S. legal compliance personnel are aware" and "any violations of the BSA that have come to the attention of JPMorgan's…legal and compliance personnel." DPA ¶¶10, 20.

It is reasonably inferable that JPM management—including Cutler, who repeatedly raised concerns about Epstein and who signed the DPA—complied with its obligations by identifying for the Board past suspicious activity concerning Epstein, particularly given that allegations concerning Epstein were increasingly "squarely in the public eye." ¶173; *Pfizer*, 722 F. Supp. 2d at 461 ("[T]hese agreements obligated Pfizer's chief Compliance Officer to report directly to the board…There is no reason to believe this reporting requirement was not fully complied with…"). It logically follows that it is reasonably inferable that the post-DPA Board members (*e.g.*, Bammann, Burke, Combs, Crown, Flynn, and Neal) learned of JPM's failure to timely file Epstein-related SARs and of Epstein's criminal conduct more generally.[7] Yet, the Board failed to comply

---

[7] As set forth herein, Bammann, Burke, Combs, Crown, Flynn, and Neal served on the Board during the term of the DPA (from 2014 to 2016) and the Consent Orders (OCC required committee disbanded in 2019). Hobson and Novakovic did not join the Board until 2018 and 2020, respectively. Although the Complaint credibly alleges that JPM continued to engage with Epstein until his death—including the frequent visits from JPM Managing Directors through 2017—and did not begin belatedly complying with its BSA obligations with respect to Epstein accounts until August 2019 (*see, e.g., USVI* (ECF No. 16) at ¶91), Plaintiffs are no longer pursuing the claims against them. Novakovic, however, lacks independence for reasons discussed below.

with the DPA and Consent Orders by informing the DOJ of Epstein's crimes or JPM's BSA violations in connection therewith (or to take any other action against JPM executives until belatedly suing Staley *after* it became public that he sexually assaulted an Epstein victim). ¶¶189-90. That was a breach of duty. *See Westmoreland Cty. Emp. Ret. Sys. v. Parkinson*, 727 F.3d 719, 726, 728 (7th Cir. 2013) (breach of duty to ignore "clear and specific guidance from [regulators]").

Defendants contend that directors who joined the Board after the Epstein relationship was terminated cannot be held liable, DOB 5, but ignore the post-Epstein Board's failure to comply with the heightened duties imposed by the DPA and Consent Orders. The post-Epstein Board's failure to comply with those heightened duties makes the "inference of deliberate disregard by each and every member of the board…entirely reasonable." *Pfizer*, 722 F. Supp. 2d at 462.[8]

### D.   NOVAKOVIC AND BAMMANN LACK INDEPENDENCE

A plaintiff can plead that a director is not independent by alleging facts from which the director's ability to act impartially against an interested party "can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party." *Delaware Cty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1024 n.25 (Del. 2015). At the pleading stage, a plaintiff satisfies this test by alleging that the director has relationships with an interested party that "*might* have a material effect on the parties' ability to act adversely toward each other." *Sandys v. Pincus*, 152 A.3d 124, 134 (Del. 2016). As *Pincus* observed, "[c]ausing a lawsuit to be brought against another person is no small matter, and is the sort of thing that *might plausibly* endanger a relationship." *Id.*

---

[8] Although Defendants contend that JPM appropriately filed Epstein-related SARs (*see* DOB at 12, SOB at 19 n.17), that improper and counterfactual claim is contrary to the Complaint, the OCC's findings, the evidence in the *Doe* and *USVI* Actions, and the Court's class certification order—which notes SARs were filed in *2002*, years before the Board's misconduct alleged here.

**Novakovic** lacks independence from Crown. The Crown family inherited General Dynamics Corporation in 1959 and Crown served as a General Dynamics director from 1987 until his 2023 death. ¶¶12, 33. Novakovic joined General Dynamics in 2002 and became the Chairman and CEO of General Dynamics in 2013, a position she continues to enjoy at the pleasure of the Crown family. ¶¶36, 195. "Delaware decisions have recognized that when a director is employed by or receives compensation from other entities, and where the interested party who would be adversely affected by pursuing litigation controls or has substantial influence over those entities, a reasonable doubt exists about th[e] director's ability to impartially consider a litigation demand." *Ezcorp*, 2016 WL 301245, at *36.

Staley argues that the Complaint fails to allege that Crown or his family had substantial influence over General Dynamics, SOB 13-14, but the Complaint's particularized allegations support that inference. *See e.g.*, ¶¶12, 33, 195. The rest of the Defendants, for their part, bizarrely claim (in a footnote) that Crown's death somehow impacts the analysis. DOB 6 n.5. But even if it does, given that the Crown family continues to run General Dynamics, Novakovic would logically be as hesitant to authorize a lawsuit against Crown's estate—which could also unearth troubling ties between Crown and Epstein—as she would have been against Crown himself.

In addition to facing a substantial likelihood of liability,[9] **Bammann** lacks independence of Dimon because she owes a significant portion of her professional success to Dimon. While Dimon was the CEO of Bank One, Bammann reached the status of Bank One's Executive Vice President and Chief Risk Management Officer from 2001 to 2004. ¶193. After JPM acquired Bank One—and when Dimon was JPM's President and Chief Operating Officer—Bammann served as

---

[9] If the Court agrees that Bammann faces a substantial likelihood of liability, it need not reach independence.

the Company's Deputy Head of Risk Management. *Id.* Bammann was then added to the Board in 2013—which has been her only employment since[10]—when Dimon was Chairman and CEO. ¶193. Considered holistically (as they must be), these allegations support a pleading-stage inference that Bammann may have felt a sense of owingness to Dimon that might have compromised her ability to impartially consider a demand. *In re Ply Gem Indus., Inc. S'holders Litig.*, 2001 WL 1192206, at *1 (Del. Ch.).

Defendants' assertion that Bammann's independence cannot be compromised because her working relationship with Dimon ended some time ago, SOB 13, ignores that "past benefits conferred…may establish an obligation or debt (a sense of 'owingness') upon which a reasonable doubt as to a director's loyalty to a corporation may be premised." *Ply Gem*, 2001 WL 1192206, at *1; *see also Off v. Ross*, 2008 WL 5053448, at *11 (Del. Ch.) ("[A] director 'may feel beholden to someone for past acts.'"). Defendants also contend that "merely asserting close personal or business relationships is insufficient," DOB 17, but the Complaint in fact pleads particularized allegations supporting an inference that Bammann owes a significant portion of her professional success to Dimon. *See, e.g.*, ¶193. That is sufficient to compromise her independence.

Defendants' arguments also ignore that Delaware takes a "nuanced and realistic approach to independence." *In re Pilgrim's Pride Corp. Derivative Litig.*, 2019 WL 1224556, *9 (Del. Ch.). Jamie Dimon is a giant in the industry who worked with Bammann. It blinks reality to suggest that Bammann—or, frankly, any other member of the Board—could impartially consider whether to authorize a lawsuit against Dimon for something that may destroy his reputation and end his career. *Cf. In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *19 (Del. Ch.) (recognizing

---

[10] *Cf. Khan v. Portnoy*, 2008 WL 5197164, at *12 (Del. Ch.) (director compensation material where it exceeded compensation from other employment).

relevance of Musk's "extraordinary influence within the Company generally" as relevant to independence analysis). The fact that the Board—including Bammann—is attempting to pin it all on Staley supports the inference that the Board is disposed toward protecting Dimon.

### E.   DEMAND IS EXCUSED AS TO THE CLAIM AGAINST STALEY AND THE UNJUST ENRICHMENT CLAIM

For the same reasons, a majority of the Board was incapable of considering a demand as to Count II against Staley and Count III for unjust enrichment. Staley claims that the analysis against him is different because demand futility is a "claim by claim determination," SOB 9-10, but Delaware courts have consistently held that a board's ability to consider litigation against officers is disabled where, as here, such litigation could implicate the board's own wrongdoing. *See, e.g.*, *Chou*, 2020 WL 5028065, at *26 (excusing demand where "the Director Defendants could not bring their business judgment to bear on a demand to prosecute [claims raised only against officers], because such litigation would implicate their own wrongdoing adequately pled in [claims raised against current directors]").

Staley (and the rest of the Defendants) separately argue that demand cannot be futile because JPM has already sued Staley. SOB 8; DOB 10 n.10. JPM's belated and reactive decision to sue Staley is not the gleaming seal of impartiality that Defendants make it out to be, but rather a transparent attempt to deflect blame from Defendants' own longstanding facilitation of Epstein's horrific crimes onto a high-ranking executive no longer affiliated with JPM. Instead of proactively holding Staley accountable for his misconduct, JPM sued him because, to use Staley's words, it was finally "[c]onfronted with documented failures in its anti-money-laundering compliance" and "sought to change the narrative and deflect blame."[11]

---

[11] *Doe/USVI*, Doc. 91 at 1. Timing and Board conflicts distinguishes this case from those on which Defendants rely on. *See, e.g.*, *In re Delta & Pine Land Co. S'holders Litig.*, 2000 WL 875421, at *6 (Del. Ch.) (Delta board sued ten days after planned merger collapsed, no similar board conflict);

And that encapsulates the problem. In litigating the claim against Staley, the Company (controlled by the Board, including Defendants) is, incentivized to deflect blame. If evidence implicates Staley and additional Defendants, the Company could choose not to introduce it. If settling the claim against Staley at a non-maximizing price means that damaging information about other Defendants (or non-Defendant JPM employees, *e.g.*, Erdoes) never comes to light, the Company may choose that route. Thus, even if the Court will not usurp the claim against Staley from the Company at this stage of its litigation, Plaintiffs should be permitted unfettered access to the evidence against Staley and a seat at the table of any settlement discussions (should they occur) to ensure that the Company's interests—not Defendants'—are being represented.

## II.   THE RULE 12(B)(6) MOTIONS MUST BE DENIED BECAUSE THE COMPLAINT STATES CLAIMS FOR BREACH OF FIDUCIARY DUTY AND UNJUST ENRICHMENT

### A.   THE COMPLAINT STATES BREACH OF FIDUCIARY DUTY CLAIMS AGAINST DIMON, BURKE, COMBS, CROWN, FLYNN, AND KESSLER

For the reasons discussed above, Defendants Dimon, Burke, Combs, Crown, and Flynn face a substantial likelihood of liability for breaching their fiduciary duties. "Because the pleading standard under Chancery Rule 23.1 is more demanding than the standard imposed by Chancery Rule 12(b)(6), it follows that the motion to dismiss the claims against these same [] Board members for failure to state viable claims must also be denied." *In re CBS Corp. S'holder Class Action & Derivative Litig.*, 2021 WL 268779, at *4 (Del. Ch.). The Complaint also states a claim against Kessler, who was on the Board from 2004 – 2007, owed the same duties as the other directors, and

---

*Silverzweig v. Unocal Corp.*, 1989 WL 3231, at *1, *4 (Del. Ch.), *aff'd sub nom.*, *Silversweig v. Unocal Corp.*, 561 A.2d 993 (Del. 1989) (Unocal board made proactive and unprompted decision to sue Goldman Sachs and others in connection with a tender offer; defendant directors faced no risk of liability); *Meyers v. Keeler*, 414 F. Supp. 935, 939 (W.D. Okla. 1976) (independent, proactive board action).

engaged in the same misconduct. ¶¶11-15, 87-92, 102-08,

### B. THE COMPLAINT STATES AN UNJUST ENRICHMENT CLAIM AGAINST ALL DEFENDANTS

"At the pleading stage, an unjust enrichment claim that is entirely duplicative of a breach of fiduciary duty claim…is frequently treated 'in the same manner when resolving a motion to dismiss." *Calma v. Templeton*, 114 A.3d 563, 591 (Del. Ch. 2015) (citation omitted); DOB 24. Because the Complaint states claims for fiduciary breaches, the unjust enrichment claim survives.

### C. STALEY'S RULE 12(B)(6) ARGUMENTS ARE MERITLESS

Staley argues that Plaintiffs fail to state a claim and that Plaintiffs' claims are time-barred. SOB 15-20. This Court already rejected those arguments when Staley made them in response to JPM's third-party complaint against him. *See Doe/USVI* Doc. 126, at 18-23; Doc. 163. The Court should reject them again for the same reasons.

#### 1. The Complaint States a Fiduciary Breach Claim Against Staley

One of Epstein's victims has now revealed that Staley assaulted at least one of Epstein's victims and "used aggressive force" in doing so while claiming Epstein had given Staley "permission to do what he wanted to her."[12] Staley nevertheless argues that he cannot be held liable because he had no obligations with respect to the Company's internal controls. Put differently, Staley argues that even if he knew that JPM was breaking the law (and even if he participated in Epstein's crimes), he had no obligation to tell the Board and no obligation to stop it from happening. The Court of Chancery has expressly rejected that argument: "***An officer who receives credible information indicating that the corporation is violating the law cannot turn a blind eye and dismiss the issue as 'not in my area*.*'" McDonald's*, 289 A.3d at 370.

---

[12] *Jane Doe 1 v. JPMorgan Chase Bank, N.A.*, 2023 WL 3167633, at *3 (S.D.N.Y. May 1, 2023).

Moreover, even assuming counterfactually that the Plaintiffs were required to plead that Staley had some specific oversight duty with respect to Epstein, Plaintiffs easily meet that standard. When Epstein was retained as a high-value client, Staley (as head of JPM's private banking division) was specifically tasked with "get[ing] to know" Epstein. ¶15. And when Staley became the CEO of JPM's Asset Management Division, an internal risk function memorandum noted that employees would report to Staley about the risk Epstein presented as a client. ¶18. Indeed, JPM has alleged that "Staley's act of disloyalty…occurred in his primary area of responsibility."[13] Staley cannot escape liability for his significant involvement in furthering Epstein's crimes, *e.g.* ¶¶135-44, by falsely claiming that Epstein was outside of his purview.

## 2. The Claims Against Staley Are Timely

The Court correctly rejected Staley's statute of limitations arguments in the related *Doe/USVI* Actions and should do so again here. Staley incorrectly relies on New York law. SOB 18. Delaware law,[14] which recognizes the concept of equitable tolling,[15] applies. Such tolling is available where "a plaintiff has reasonably relied upon the competence and good faith of a fiduciary." *In re Tyson Foods, Inc.*, 919 A.2d 563, 585 (Del. Ch.). Claims are tolled until "the plaintiff is aware of the injury, or should have discovered it in the exercise of reasonable diligence." *Lebanon Cnty. Emps.' Ret. Fund v. Collis*, 287 A.3d 1160, 1212 (Del. Ch.).[16]

---

[13] *Doe/USVI*, Doc. 59 at ¶76 (cited at SOB 21 n.18).

[14] In diversity cases brought in New York federal court, New York's conflict of law rules govern, *Marino v. Grupo Mundial Tenedora S.A*, 810 F. Supp. 2d 601, 606 (S.D.N.Y. 2011), New York law applies the internal affairs doctrine, *id.*, which in turn applies the laws of the state of incorporation. *Howe v. Bank of N.Y. Mellon*, 783 F. Supp. 2d 466, 475 (S.D.N.Y. 2011).

[15] Equitable claims under Delaware law are governed by the doctrine of laches, the equitable (and more flexible) analog of a statute of limitations defense. *See Whittington v. Dragon Grp., LLC*, 991 A.2d 1, 8 (Del. 2009). The relevant laches period here is three years. *See Largo Legacy Grp., LLC v. Charles*, 2021 WL 2692426, at *9 (Del. Ch.).

[16] Similarly, under New York law, "[w]here [the record] does not conclusively demonstrate that a

The claims against Staley were equitably tolled until the *Doe* and *USVI* Actions were filed in late 2022 because Plaintiffs previously had no way of knowing of Staley's knowledge of (much less participation in) Epstein's crimes. Indeed, if the **Company** could not be expected to discover the claims against Staley before the *Doe* and *USVI* Actions were filed, **Plaintiffs**—stockholders with no access to, *e.g.*, communications involving Staley and Epstein—certainly could not have been. And, by any measure, Plaintiffs acted with sufficient alacrity in filing suit against Staley, thereby defeating any claim of unreasonable delay.

### 3.     Staley's Claims-Splitting Argument Fails

Application of the claim-splitting doctrine is discretionary. *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000). The Court should exercise its discretion to reject Staley's claim-splitting argument for the same reason that Staley's demand futility argument should be rejected. Staley contends that because the Company is already pursuing claims against him, Plaintiffs should not be permitted to do so. SOB 20-21. But Plaintiffs already explained why the Company cannot be trusted to maximize the value of the claims against Staley. *See supra*, Argument § I.E. Any benefits of claim-splitting therefore are outweighed by the potential harm to the Company.

### <u>CONCLUSION</u>

For the foregoing reasons, the Motions should be denied. If the Court is inclined to grant the Motions, Plaintiffs should be permitted to amend the Complaint, including to incorporate the discovery produced after it was filed.

---

plaintiff had knowledge of facts from which the alleged fraud might be reasonably inferred, the cause of action should not be disposed of summarily on statute of limitations grounds." *Epiphany Cmty. Nursery Sch. v. Levey*, 171 A.D.3d 1, 7 (2019).

Dated:  July 20, 2023

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER
  & GROSSMAN LLP**

*/s/ Michael D. Blatchley*

Jeroen van Kwawegen
Michael D. Blatchley
1251 Avenue of the Americas
New York, NY 10020
(212) 554-1400

*Counsel for Plaintiff City of Miami
General Employees & Sanitation
Employees Retirement Trust*


**BERNSTEIN LITOWITZ BERGER
  & GROSSMAN LLP**

Daniel Meyer
Andrew Blumberg
500 Delaware Avenue, Suite 901
Wilmington, DE 19801
(302) 364-3600

**GRANT & EISENHOFER P.A.**

*/s/ Christine M. Mackintosh*

Rebecca A. Musarra
Christopher J. Orrico
Vivek Upadhya
485 Lexington Avenue, 29th Floor
New York, NY 10017
(646) 722-8500

Michael J. Barry (admitted *pro hac vice*)
Christine M. Mackintosh (admitted *pro
hac vice*)
123 Justison Street
Wilmington, DE 19801
(302) 622-7000

*Counsel for Plaintiff Operating Engineers
Construction Industry and Miscellaneous
Pension Fund*