UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF MIAMI GENERAL EMPLOYEES & SANITATION EMPLOYEES RETIREMENT TRUST and OPERATING ENGINEERS CONSTRUCTION INDUSTRY AND MISCELLANEOUS PENSION FUND<br><br>Plaintiffs,<br><br>-v-<br><br>JAMES DIMON, STEPHEN B. BURKE, TODD A. COMBS, JAMES S. CROWN, TIMOTHY P. FLYNN, MELLODY HOBSON, JOHN W. KESSLER, PHEBE N. NOVAKOVIC, and JAMES E. STALEY,<br><br>Defendants,<br><br>and<br><br>JPMORGAN CHASE & CO.,<br><br>Nominal Defendant. | 23-cv-03903 (JSR)<br><br><u>OPINION AND ORDER</u> |

JED S. RAKOFF, U.S.D.J.:

This is a derivative action brought by shareholders of JPMorgan Chase & Co. ("JPMorgan") against various officers and directors of JPMorgan. The amended complaint asserts claims for breach of fiduciary duty and unjust enrichment, based upon allegations that the defendants caused JPMorgan to retain Jeffrey Epstein as a client of the bank long after defendants knew -- or should have known -- that Epstein was using the bank's financial services to facilitate Epstein's criminal sex trafficking and exploitation of women and underaged girls. JPMorgan recently entered into two court-approved settlements concerning this

activity --one with a class of Epstein victims and another with the Government of the United States Virgin Islands –- in which JPMorgan has agreed to pay a total of $365 million. Plaintiffs seek to hold the defendants liable for causing this and other harms to the company.

On July 6, 2023, defendants moved to dismiss the amended complaint in its entirety, arguing both that plaintiffs' amended complaint fails to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) and that plaintiffs have failed to adequately allege that they are excused from making a pre-suit demand on JPMorgan's board of directors. *See* Dkt. 24; Dkt. 28. On August 9, 2023, this Court granted defendants' motions by "bottom-line" Order. *See* Dkt. 39. That Order noted that the Court did not reach defendants' motion pursuant to Rule 12(b)(6) because the Court found that the amended complaint failed to adequately allege that it would have been futile to make a pre-suit demand on JPMorgan's board. This Opinion sets forth more fully the reasons for that ruling.[1]

## I. Legal Standard

Under Delaware law, applicable here because JPMorgan is a Delaware corporation, "the board's authority to govern corporate affairs extends to decisions about what remedial actions a corporation should take after being harmed, including whether the corporation should file a lawsuit against its directors, its officers, its controller, or an outsider." *United Food & Com. Workers Union & Participating Food Indus.*

---

[1]   The Court's August 9, 2023, Order noted that judgment would not be entered until the issuance of this Opinion.

*Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1047 (Del. 2021); *see also Aronson v. Lewis,* 473 A.2d 805, 811 (Del. 1984) ("A cardinal precept of [Delaware corporations law] is that directors, rather than shareholders, manage the business and affairs of the corporation."). "In order for a stockholder to divest the directors of their authority to control the litigation asset and bring a derivative action on behalf of the corporation, the stockholder must (1) make a demand on the company's board of directors or (2) show that demand would be futile." *Zuckerberg*, 262 A.3d at 1047 (internal quotation omitted).

The plaintiffs here did not make a demand on the JPMorgan board before bringing suit, and so plaintiffs must allege that making a litigation demand on JPMorgan's board would have been futile. To do this, a plaintiff must allege that a majority of the members of JPMorgan's board, at the time the complaint was filed, would have been unable to disinterestedly consider a litigation demand. A plaintiff may show a given director is unable to disinterestedly consider a litigation demand in one of three ways: (1) the director "received a material personal benefit from the alleged misconduct," (2) the director "would face a substantial likelihood of liability on any of the claims," or (3) the director "lacks independence from someone" conflicted under (1) or (2). *Id.* at 1058. Pursuant to Federal Rule of Civil Procedure 23.1, allegations of demand futility must be pled "with particularity." *F5 Cap. v. Pappas*, 856 F.3d 61, 82-83 (2d Cir. 2017) (quoting Fed. R. Civ. P. 23.1(b)(3)).

In evaluating whether the director defendants face a substantial likelihood of liability on plaintiffs' claims, it is significant that JPMorgan's corporate charter —- in line with the virtually uniform practice of public corporate charters today —- contains a provision exculpating directors from liability for breaches of fiduciary duty except where they arise from acts taken in bad faith or as a result of intentional misconduct. *See* Soloway Decl. Ex. 2 (Dkt. 26-2), at 4; *see also* Del. Gen. Corp. L. § 102(b)(7) (authorizing such provisions). Therefore, to establish a substantial likelihood of liability, it is not enough to establish a breach of the duty of care, but rather plaintiff must allege "conduct that is not in good faith or a breach of the duty of loyalty." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 367 (Del. 2006).

The amended complaint alleges that the director-defendants breached the duty of loyalty by failing to adequately oversee the affairs of the corporation. Such a theory is often referred to as a "*Caremark* claim" after the seminal Delaware case elaborating the theory, and has been described as "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996). To make out a *Caremark* claim, a plaintiff must establish that either "(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed

of risks or problems requiring their attention." *Stone*, 911 A.2d at 370. Whether proceeding under either or both of these theories, it is necessary that a plaintiff show the directors were acting in bad faith, in the sense that the directors actually "knew that they were not discharging their fiduciary obligations." *City of Detroit Police & Fire Ret. Sys. ex rel. NiSource, Inc. v. Hamrock*, 2022 WL 2387653, at *11 (Del. Ch. June 30, 2022) (quoting *id.*).

## II. Discussion

At the time the plaintiffs filed suit, JPMorgan's board was comprised of twelve directors, and so to plead demand futility plaintiff must adequately allege that at least six directors were conflicted.[2] Of the twelve demand directors, only four were even on JPMorgan's board while Epstein was a client of the bank -- JPMorgan terminated Epstein as a client in 2013. Am. Compl. ¶ 3. Plaintiffs allege that one of these four directors, CEO and board chairman Jamie Dimon, was aware of Epstein's misconduct, and yet failed to take action to eliminate Epstein as a client sooner. *See* Pls. Opp. at 9-11. With

---

[2] One of JPMorgan's directors, James Crown, passed away between when the original complaint in this case was filed and when the amended complaint was filed. *See* Suggestion of Death (Dkt. 23) (noting Crown died five days before amended complaint was filed). While, as a general matter, demand futility is assessed based on the board's composition at the time the operative complaint is filed, a plaintiff who amends its complaint may rely on the board's composition at the time of a prior complaint if the derivative claims asserted in the amended complaint were already "validly in litigation." *Braddock v. Zimmerman*, 906 A.2d 776, 785-86 (Del. 2006). Determining whether a claim is "validly in litigation" requires application of a three-part test that generally evaluates the sufficiency of the prior complaint's derivative allegations. *See Barenbaum ex rel. FTE Networks, Inc. v. Palleschi*, 2020 WL 5819810, at *8 (S.D.N.Y. Sept. 30, 2020). Both parties fail to cite the relevant legal standard or provide any analysis about how this test applies here. Accordingly, the Court will assume without deciding that Crown should be included within the composition of the relevant demand board because the Court finds plaintiffs' claims fail even if he is.

respect to the other three directors in this category -- Stephen Burke, James Crown, and Timothy Flynn -- plaintiffs allege that they utterly failed to implement an effective board-level system of reporting to oversee compliance with the Bank Secrecy Act and anti-money laundering laws, and as a result failed to detect the bank's facilitation of Epstein's misconduct. *See* Pls. Opp. at 11-16. While defendants vigorously dispute whether even these directors face a substantial likelihood of liability, the Court need not resolve this question because the Court finds that plaintiffs have failed to allege with particularity that any of the remaining eight directors are conflicted.

Of the remaining eight directors, plaintiffs concede that four are disinterested and capable of considering a litigation demand. With respect to the other four such directors -- Linda Bammann, Todd Combs, Michael Neal, and Phebe Novakovic -- plaintiffs make two arguments. First, plaintiffs argue that Bammann, Combs and Neal are conflicted because they face a substantial likelihood of liability. Second, plaintiffs argue that Bammann and Novakovic are conflicted because they each lack independence from one or another director who was on JPMorgan's board while Epstein was a client -- Jamie Dimon and James Crown, respectively. As explained below, the Court finds neither argument plausible.

A. Substantial Likelihood of Liability of Bammann, Combs and Neal.

Plaintiffs claim that Bammann, Combs and Neal face a substantial likelihood of liability. However, none of these three directors were on JPMorgan's board of directors while Epstein was a client, and so

they cannot be accused of failing to eliminate Epstein as a client.
Rather, as articulated in plaintiffs' opposition brief, plaintiffs'
theory of liability with respect to these directors centers around a
deferred prosecution agreement ("DPA") the company entered into with
the U.S. Department of Justice ("DOJ") in 2014 in connection with
JPMorgan's completely unrelated facilitation of Bernie Madoff's Ponzi
scheme and a similar, related consent order ("Consent Order") JPMorgan
entered into with the Office of the Comptroller of the Currency
("OCC"). *See* Pls. Opp. at 16-18.

Plaintiffs observe that, in the DPA and Consent Order, JPMorgan
"agreed to (i) implement an exhaustive review of all past [suspicious
activity report, or "SAR"] filings and ensure that any other
potentially suspicious activity was identified and reported, (ii)
review all transactions by non-bank financial institutions, and (iii)
oversee these reviews, with written findings 'reported to the Board.'"
Pls. Opp. at 16-17 (quoting Soloway Decl. Ex. 1 (Dkt. 26-1) Art. VIII,
IX).  The DPA also required JPMorgan to report any criminal conduct
or violations of the Bank Secrecy Act to the DOJ. Soloway Decl. Ex. 1
(Dkt. 26-2) ¶¶ 10, 20.

Plaintiffs argue that it is "reasonable to infer" that JPMorgan
management complied with the DPA's obligations to review past
transactions and thereby learned of the alleged failures to file SARs
regarding Epstein. Pls. Opp. at 17. From this, plaintiffs claim that
"[i]t logically follows that it is reasonably inferable that the post-
DPA Board members . . . learned of JPM's failure to timely file

Epstein-related SARs and of Epstein's criminal conduct more generally." *Id.* Having supposedly learned this information, plaintiffs further argue the aforementioned directors breached their fiduciary duties by failing to report Epstein's misconduct to the DOJ or file a belated SAR, thereby breaching the DPA and Consent Order. *Id.*

Plaintiffs' argument is riddled with holes. *First*, the amended complaint's allegations do not line up with the argument outlined above. The amended complaint contains only a single, off-hand reference to the DPA and Consent Order and does so to suggest that, more generally, the company's compliance infrastructure was inadequate. *See* Am. Compl. ¶¶ 170-71. The amended complaint contains no discussion of the DPA's or Consent Order's contents, does not allege that the review conducted under the DPA uncovered Epstein-related issues and does not allege that any uncovered information about Epstein was passed on to the board. Plaintiffs cannot amend their complaint through their opposition papers, especially where, as here, plaintiffs were required by Rule 23.1 to plead particularized facts to support demand futility.

*Second*, even assuming these allegations had been included in the complaint, the inferences plaintiffs ask this court to draw from them are simply not plausible. It is not at all clear that the review of past money laundering filings mandated by the DPA and Consent Order uncovered Epstein-related conduct. The Consent Order required that the review "be supervised and certified by independent consultant(s) acceptable to the Examiner-in-Charge" -- a third-party reviewer appointed under the Consent Order -- and the results of the review

were to be reported to the Examiner-in-Charge. Mackintosh Decl. Ex. 1 (Dkt. 31-1) Art. VII, Sec. (2)-(3). Plaintiff asks the Court to implausibly infer that both the independent consultant and the independent examiner appointed under the Consent Order became aware of the Epstein-related conduct and yet were complicit in the company's alleged continued failure to file SARs relating to it.

Even assuming hypothetically that the review did identify the Epstein-related conduct, there is no reason to think that information was transmitted to the board. As the amended complaint acknowledges, JPMorgan is "one of the world's largest financial institutions." Am. Compl. ¶ 2. While the DPA did require the written findings of the review be reported to the board, it does not follow the board would have received information about every single client who was the subject of concerns. Indeed, if anything, the amended complaint seems to contradict any inference that the board was made aware, alleging "there is no evidence that JPM's board of directors . . . ever discussed Epstein prior to his death by apparent suicide in 2019." Am. Compl. ¶ 3. Thus, the Court cannot reasonably infer that these three board members were made aware of the company's alleged failure to file Epstein-related SARs.[3]

---

[3]     The absence of any allegation of actual evidence of the board's knowledge defeats any claim under the second prong of *Caremark*, which requires proof "the board knew of evidence of corporate misconduct -- the proverbial 'red flag' -- yet acted in bad faith by consciously disregarding its duty to address that misconduct." *Teamsters Loc. 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065, at *17 (Del. Ch. Aug. 24, 2020) (quotation omitted). To the extent plaintiffs' claim these directors are liable pursuant to the first prong of *Caremark*, requiring allegations of "an utter failure to attempt to assure a reasonable information and reporting system exists," the very existence of the Consent Order and DPA would defeat such a claim, because both agreements expressly required a reporting system be established.

*Third*, even setting aside these factual deficiencies, plaintiffs have failed to explain how the purported breach of fiduciary duty –– permitting a violation of the DPA/Consent Order and failure to correct previously-deficient SAR filings regarding Epstein -- actually caused the company any harm. To reiterate, these directors cannot be accused of failing to terminate Epstein as a client, because the company had already done so by the time they joined the board. And plaintiffs do not allege that JPMorgan was ever penalized by the DOJ or OCC for violating the DPA or Consent Order (or even that either government agency found a violation), so even assuming a violation of those agreements occurred in the abstract, it is not clear how that would support liability for the Epstein-related conduct. Nor do plaintiffs explain why failure to correct previously deficient SAR filings between 2014 and 2016 -- after Epstein was no longer a client -- caused the company any harm. In short, plaintiffs have failed to allege -- let alone allege with particularity –– facts giving rise to a reasonable inference that Bammann, Combs and Neal face a substantial likelihood of liability.[4]

---

*Hamrock*, 2022 WL 2387653, at *12 (quotation omitted) (noting that a plaintiff that attempts to allege a *Caremark* claim under both prongs typically loses under prong one "because the plaintiff must concede the existence of a board-level monitoring system to plead under prong two").

[4]    The absence of any allegation that that JPMorgan was penalized for violating the DPA or Consent Order distinguishes this case from the two authorities cited by plaintiffs, both of which involved situations where a company entered into a consent decree requiring board-level reporting, violated that consent decree, and then were later penalized for those violations. *See Westmoreland Cnty. Emp. Ret. Sys. v. Parkinson*, 727 F.3d 719, 727 (7th Cir. 2013); *In re Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453, 461-62 (S.D.N.Y. 2010). The absence of particularized factual allegations here is, of course, another distinguishing factor.

B. <u>Independence of Novakovic & Bammann</u>

The amended complaint offers one final route to establish demand futility. It claims that Novakovic and Bammann lack independence from directors facing a substantial likelihood of liability because they were on the board while Epstein was a client of the bank. If plaintiffs are correct that both of these directors lack independence, then demand would be excused (again assuming *arguendo* that the four directors on the board while Epstein was a client face a substantial likelihood of liability). But as explained below, the Court finds plaintiffs have failed to allege either Novakovic or Bammann lack independence such that they are incapable of disinterestedly considering a litigation demand.

In evaluating demand futility, "directors are presumed to be independent." *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 59 (Del. Ch. 2015) (internal quotation marks omitted). To overcome this presumption, plaintiffs must allege with particularity "facts from which the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party." *F5 Cap. v. Pappas*, 856 F.3d 61, 84 (2d Cir. 2017) (quoting *Sandys v. Pincus*, 152 A.3d 124, 128 (Del. 2016)). In making this determination, the Court may not view each of the amended complaint's allegations in isolation but must instead consider them wholistically. *See id.* at 83.

**Bammann**. Plaintiffs argue Bammann is not disinterested because she has extensive professional ties to Jamie Dimon, the CEO of JPMorgan and Chairman of its board. From 2001 to 2004 Bammann was an executive at another company called Bank One while Dimon was the CEO of Bank One. Am. Compl. ¶ 193. And then, after Bank One was acquired by JPMorgan, Bammann served as JPMorgan's deputy head of risk management while Dimon was President and COO of JPMorgan. *Id.* Finally, plaintiffs allege Bammann joined the JPMorgan board while Dimon was CEO and chairman of JPMorgan in 2013, and that since then Bammann's only source of income has been her role on the board. *Id.*

The mere fact that Bammann and Dimon worked together at One Bank and JPMorgan does not give rise to an inference that Bammann is disabled from considering a litigation demand against Dimon. *See, e.g.*, *F5 Cap.*, 856 F.3d at 85 (noting that a "mere personal friendship or outside business relationship does not raise a reasonable doubt about a director's independence" and concluding allegations that directors served on several other boards together and had "substantial business entanglements" did not call into question director's independence (internal quotation marks omitted)); *Orman v. Cullman*, 794 A.2d 5, 27 (Del. Ch. 2002) ("[A]llegations concerning longstanding business relations fail as a matter of law to place in issue the independence of directors . . . .").

Nor is the bare allegation that Bammann joined the board while Dimon was CEO and Chairman sufficient to rebut the presumption of independence. Delaware courts have repeatedly found that even where a

director is appointed at the behest of a company's controlling shareholder –– a far more extreme scenario than that presented here -- the fact of a director's appointment alone does not rebut the presumption of independence, since that is simply how the normal process of nominating directors operates in such instances. *See McElrath v. Kalanick*, 224 A.3d 982, 995 (Del. 2020) ("Importantly, being nominated or elected by a director who controls the outcome is insufficient by itself to reasonably doubt a director's independence because that is the usual way a person becomes a corporate director." (internal quotation marks omitted); *Baiera*, 119 A.3d at 60-61 (same). The fact that Bammann's sole employment since 2013 as been her service on JPMorgan's board does not alter this conclusion, given that plaintiffs have not explained why this compensation would be imperiled were she to consider a litigation demand or alleged that the amount she is paid is particularly significant to her overall financial prosperity. *See Simons v. Brookfield Asset Mgmt. Inc.*, 2022 WL 223464, at *15 (Del. Ch. Jan. 21, 2022) ("[M]ere allegations of payment of director fees are insufficient to create a reasonable doubt as to the director's independence."); *Halpert Enter., Inc. v. Harrison*, 362 F. Supp. 2d 426, 433 (S.D.N.Y.2005) ("The allegations that the Board members receive various fees from [the company] are similarly unavailing, because there are no particularized allegations indicating that that compensation is excessive.").

Plaintiffs argue that the relationship between Bammann and Dimon goes beyond a normal professional relationship because Bammann "owes

a significant portion of her professional success to Dimon." Pls. Opp. at 19. But the amended complaint's allegations do not support this claim. Nowhere does the amended complaint actually allege, let alone offer particularized factual allegations, how Bammann's professional advancement was the result of Dimon's influence. Rather, plaintiffs' argument is based solely on the circumstantial inference that, because Bammann and Dimon had overlapping upward trajectories at One Bank and JPMorgan, Dimon must have been the cause. But these allegations at most establish that it is conceivable Dimon played a role in Bammann's advancement, and pleading conceivability alone is insufficient even under Federal Rule of Civil Procedure 8(a)'s more permissive pleading standard. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (complaint must allege sufficient factual matter to "nudged [plaintiffs'] claims across the line from conceivable to plausible").

The inference that Bammann owes some professional debt to Dimon is further undermined by the fact that their time serving together as managers occurred over a decade ago. While plaintiff responds that "past benefits conferred . . . may establish an obligation or debt," Pls. Opp. at 20, the age of any such obligation remains relevant. Absent more particularized allegations about the nature of the debt of gratitude Bammann supposedly owes to Dimon, the Court is unable to reasonably infer that such a debt was so substantial as to imperil Bammann's independence so many years later. In short, even when taken as a whole, plaintiffs' threadbare allegations are insufficient to

give rise to a reasonable inference that Bammann lacks independence from Dimon.

**Novakovic.** Plaintiffs argue Novakovic lacks independence from Crown, who was among the directors on the board at the time Epstein was a client. Novakovic is the CEO and Chairman of another company, General Dynamics, which the amended complaint describes as "affiliated with the Crown family," and as a "Crown[] family business." Am. Compl. ¶¶ 36, 195. The amended complaint also alleges Novakovic served on the General Dynamics board with Crown. *Id.* ¶ 33. Plaintiffs claim that, as a result of the Crown-family's control of General Dynamics, Novakovic is beholden to Crown and therefore could not disinterestedly consider a litigation demand against him. *See* Pls. Opp. at 19.

Plaintiffs have failed to allege that Crown's and Novakovic's ties to General Dynamics rise beyond the general business relationships that are otherwise insufficient to establish a lack of independence. *See supra.* While plaintiffs claim that, because General Dynamics is "Crown's family business," Crown "likely had the influence to fire Novakovic" from her position as General Dynamics CEO, Am. Compl. ¶ 194, plaintiffs offer no particularized allegations to support this contention that Crown had the unilateral power to fire Novakovic or that Crown exercised significant influence over the direction of the company. *See Flannery v. Genomic Health, Inc.*, 2021 WL 3615540, at *15 (Del. Ch. Aug. 16, 2021) (concluding allegation director had "significant investments" in employer of director was insufficient where complaint failed to allege whether those investments gave the

"unilateral power" to control the directors compensation). General Dynamics is not a privately held family business but a publicly traded Fortune 100 company, and it is simply not plausible, based on the conclusory allegations in the amended complaint, to conclude Crown had sufficient power over Novakovic's employment at General Dynamics so as to render Novakovic not disinterested.[5]

*    *    *    *    *

For the reasons set forth above, the Court grants the motions to dismiss. Because the plaintiffs have already amended their complaint and because, even based on the additional allegations referenced in their reply papers, the complaint would still have to be dismissed, the dismissal is with prejudice. Accordingly, the Court hereby dismisses the case with prejudice. The Clerk of the Court is directed to enter final judgment forthwith and close the case.

SO ORDERED.

New York, NY
January 12, 2024

JED S. RAKOFF, U.S.D.J.

---

[5]    Indeed, the absence of any particularized allegations of control of General Dynamics by the Crown is likely because they would be counterfactual. According to General Dynamic's 2023 proxy statement, as of March 2023 Crown directly owned under .5% of the Company's shares and was potentially the indirect beneficial owner of slightly over 5% of shares. *See* General Dynamics Proxy Statement, at 88-89 (Mar. 24, 2023), available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0000040533/8a5193e1-4ca4-4d33-b67d-dabb158e8ed9.pdf. No other Crown family member is listed as controlling over 5% of the company's stock.